**No. 21-60766 consolidated with No. 21-60800**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

WAGES AND WHITE LION INVESTMENTS, L.L.C., doing business as
TRITON DISTRIBUTION,

Petitioner,

v.

FOOD & DRUG ADMINISTRATION,

Respondent.

On Petition for Review of a Final Marketing Denial Order
by the U.S. Food and Drug Administration

## BRIEF FOR RESPONDENT

*Of Counsel:*

DANIEL J. BARRY
 *Acting General Counsel*
 *Dep't of Health and Human Services*

WENDY S. VICENTE
 *Acting Deputy Chief Counsel for Lit.*
 *Food and Drug Administration*

SETH I. HELLER
 *Associate Chief Counsel*
 *Office of the Chief Counsel*
 *Food and Drug Administration*

BRIAN M. BOYNTON
 *Acting Assistant Attorney General*
 *Civil Division*

ARUN G. RAO
 *Deputy Assistant Attorney General*

GUSTAV W. EYLER
 *Director*

HILARY K. PERKINS
 *Assistant Director*

NOAH T. KATZEN
 *Trial Attorney*
 *Consumer Protection Branch*
 *U.S. Department of Justice*
 *450 5th Street, NW*
 *Washington, DC 20001*
 *(202) 305-2428*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners challenge orders of the U.S. Food and Drug Administration (FDA) denying their applications for authorization to market certain "e-cigarette" products in flavors that are particularly attractive to youth, such as fruit and dessert.  After this Court granted a stay pending review, *see Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021), the Sixth Circuit denied another manufacturer's analogous stay motion, *see Breeze Smoke, LLC v. FDA*, 18 F.4th 499 (6th Cir. 2021).  That manufacturer then filed a stay application with Circuit Justice Kavanaugh, urging that a stay was warranted for the reasons set out by this Court.  Justice Kavanaugh referred the application to the full Court, which, after considering FDA's response, denied the application without recorded dissent.  *See Breeze Smoke, LLC v. FDA*, — S. Ct. —, No. 21A176, 2021 WL 5860294 (U.S. Dec. 10, 2021).

Given the importance of the issues presented, the government respectfully requests oral argument.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION .....................................................................4

STATEMENT OF THE ISSUE .............................................................................4

STATEMENT OF THE CASE................................................................................5

I.      Statutory Background ................................................................................5

II.     Regulatory Background.............................................................................7

III.    FDA's Denial Of Petitioners' Applications To Market
        Flavored E-Cigarette Products................................................................16

IV.     This Court's Order Granting A Stay Pending Review; The
        Sixth Circuit's Contrary Order in *Breeze Smoke*; And The
        Supreme Court's Denial Of Breeze Smoke's Stay Application............19

SUMMARY OF ARGUMENT .............................................................................22

STANDARD OF REVIEW ..................................................................................25

ARGUMENT..........................................................................................................25

I.      FDA Reasonably Determined That Flavored E-Cigarette
        Products Pose A Serious Risk To Youth That Is Not
        Adequately Mitigated By Traditional Access Restrictions...................26

        A.      Flavors play a significant role in youth initiation and
                use of e-cigarettes that extends across device types ..................26

B.      FDA reasonably determined that traditional access
        restrictions do not sufficiently reduce youth use of
        e-cigarettes ............................................................................................. 33

II.    FDA Did Not Announce A New Standard In Denying
       Petitioners' Applications .............................................................................. 38

III.   FDA Reasonably Considered The Risks And Benefits Of
       Other Tobacco Products In Assessing The Net Benefits of
       Petitioners' Products ..................................................................................... 52

IV.    Any Relief Would Properly Be Limited To A Remand ........................ 58

CONCLUSION ......................................................................................................... 60

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH FEDERAL
RULE OF APPELLATE PROCEDURE 32(A)

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*American Acad. of Pediatrics v. FDA*,
   399 F. Supp. 3d 479 (D. Md. 2019), *appeal dismissed sub nom.*
   *In re Cigar Ass'n of Am.*, 812 F. App'x 128 (4th Cir. 2020)............................13

*Big Time Vapes, Inc. v. FDA*,
   963 F.3d 436 (5th Cir. 2020), *cert. denied*,
   141 S. Ct. 2746 (2021) ...........................................................................................8

*Breeze Smoke, LLC v. FDA*,
   18 F.4th 499 (6th Cir. 2021) ...................................... 3, 20, 21, 24, 37, 43, 50, 51

*Breeze Smoke, LLC v. FDA*,
   — S. Ct. —, No. 21A176,
   2021 WL 5860294 (U.S. Dec. 10, 2021) ........................................................ 4, 21

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ............................................................................................51

*Circus Circus Casinos, Inc. v. NLRB*,
   961 F.3d 469 (D.C. Cir. 2020) ............................................................................51

*County of Los Angeles v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999) ..........................................................................58

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ........................................................................................52

*Employer Sols. Staffing Grp. II, LLC v. Office of Chief Admin. Hearing Officer*,
   833 F.3d 480 (5th Cir. 2016) ..............................................................................51

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
   867 F.3d 564 (5th Cir. 2017) ..............................................................................51

*General Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ............................................................................51

*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) ............................................................58

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ..........................................................................51

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................25

*Nicopure Labs, LLC v. FDA*,
   944 F.3d 267 (D.C. Cir. 2019) ..................................................... 7, 49

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016), *reinstated in relevant part*,
   881 F.3d 75 (D.C. Cir 2018) ............................................................51

*PPG Indus., Inc. v. United States*,
   52 F.3d 363 (D.C. Cir. 1995) ...........................................................58

*Public Citizen v. Federal Motor Carrier Safety Admin.*,
   374 F.3d 1209 (D.C. Cir. 2004) ................................................. 21, 38

*Serono Labs., Inc. v. Shalala*,
   158 F.3d 1313 (D.C. Cir. 1998) .......................................................53

*Shinseki v. Sanders*,
   556 U.S. 396 (2009) ..........................................................................37

*United States v. Chrysler Corp.*,
   158 F.3d 1350 (D.C. Cir. 1998) .......................................................51

*Wages & White Lion Invs., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ........................................ 3, 20, 32, 49

**Statutes:**

Family Smoking Prevention and Tobacco Control Act,
   Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009) ...........................5
      § 2(1), 123 Stat. at 1777 ................................................................5
      § 2(4), 123 Stat. at 1777 ................................................................6

5 U.S.C. § 706 ........................................................................................37

5 U.S.C. § 706(2) ............................................................................. 25, 58

21 U.S.C. § 321(rr)(1) ..............................................................................5

21 U.S.C. § 355(b)(1)(A)(i) ...................................................................54

21 U.S.C. § 355(d)(4)-(5) ......................................................................55

21 U.S.C. § 387a .......................................................................................5

21 U.S.C. § 387g ....................................................................................57

21 U.S.C. § 387j(a)(1) ...............................................................................5

21 U.S.C. § 387j(a)(1)-(2) .........................................................................5

21 U.S.C. § 387j(a)(2)(A)(i)(I) .................................................................7

21 U.S.C. § 387j(b)(1)(A) ................................................................ 24, 53

21 U.S.C. § 387j(c) .................................................................................57

21 U.S.C. § 387j(c)(2) ................................................. 1, 6, 25, 38, 53

21 U.S.C. § 387j(c)(4) ....................................................... 1, 6, 26, 38

21 U.S.C. § 387j(c)(5) .............................................................................47

21 U.S.C. § 387k .....................................................................................56

21 U.S.C. § 387*l*(a)(1)(B) .........................................................................4

21 U.S.C. § 387*l*(b) ..........................................................................25, 37

**Regulation:**

21 C.F.R. § 314.125(b)(4)-(5) ...............................................................55

81 Fed. Reg. 28,974 (May 10, 2016) ........................................... 8, 9, 49

85 Fed. Reg. 720 (Jan. 7, 2020) .............................................................32

86 Fed. Reg. 55,300 (Oct. 5, 2021) ......................................................47

**Other Authorities:**

Deepa R. Camenga et al.,
  *Appeal and Use of Customizable E-Cigarette Product Features in Adolescents*,
  4 Tobacco Reg. Sci. 51-60 (Mar. 2018) ...........................................30

Carrie M. Carpenter et al.,
  *New Cigarette Brands with Flavors That Appeal to Youth: Tobacco Marketing
  Strategies*, 24 Health Affairs 1601-10 (2005)...................................30

FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS)
  and Other Deemed Products on the Market Without Premarket Authorization
  (Revised): Guidance for Industry* (Apr. 2020),
  https://go.usa.gov/xeG3C.....................9, 9-10, 10, 11, 12, 22, 34, 35, 36, 38

FDA, *FDA Permits Marketing of E-Cigarette Products, Marking First
  Authorization of Its Kind by the Agency* (Oct. 12, 2021),
  https://go.usa.gov/xef5Q ..............................................................40

FDA, *Results From 2018 National Youth Tobacco Survey Show Dramatic
  Increase In E-Cigarette Use Among Youth Over Past Year* (Nov. 15, 2018),
  https://perma.cc/9C3U-XSXT?type=image.................................28

FDA, *Statement from Commissioner Scott Gottlieb, M.D., on Proposed New Steps
  to Protect Youth by Preventing Access to Flavored Tobacco Products and
  Banning Menthol in Cigarettes* (Nov. 15, 2018),
  https://perma.cc/AF4M-6M9H .....................................................34

FDA, *Technical Project Lead Review for Applications Submitted By R.J. Reynolds
  Vapor Company* (Oct. 12, 2021),
  https://go.usa.gov/xef5N..............................................................14

Nicholas Florko,
  *Former FDA Commissioner Calls for a Full Ban on Pod-Based E-Cigarettes*,
  STAT (Nov. 12, 2019),
  https://perma.cc/D4KH-FME6.................................................31-32

M.B. Harrell et al.,
  *Flavored E-Cigarette Use: Characterizing Youth, Young Adult, and Adult
  Users*, 5 Preventive Med. Rep. 33-40 (2017) ..................................................30

Sherry T. Liu et al.,
  *Youth Access to Tobacco Products in the United States, 2016-2018*,
  5 Tobacco Reg. Sci. 491-501 (Nov. 2019),
  https://go.usa.gov/xeGZH.............................................................................35

Jennifer Maloney,
  *Juul Pitches Locked E-Cigarette in Bid to Stay on U.S. Market*,
  Wall Street J. (Feb. 24, 2020) .............................................................36

Order, *American Acad. of Pediatrics v. FDA*,
  No. 18-883 (D. Md. Aug. 12, 2019), Dkt. No. 132 .........................................13

Eunice Park-Lee et al.,
  *Notes from the Field: E-Cigarette Use Among Middle and High School
  Students – National Youth Tobacco Survey, United States, 2021*,
  70 Morbidity & Mortality Wkly. Rep. 1387 (2021),
  https://go.usa.gov/xeGq5 ..........................................................................7, 8

J.K. Pepper et al.,
  *Adolescents' Interest in Trying Flavoured E-Cigarettes*,
  25 Tobacco Control ii62-ii66 (Sept. 15, 2016) ................................................30

Carl V. Phillips,
  *CASAA ecig survey results*, anti-THR lies Blog (Jan. 4, 2016),
  https://perma.cc/9LYT-YUTB .............................................................. 18, 45

Brian L. Rostron et al.,
  *Prevalence and Reasons for Use of Flavored Cigars and ENS Among US Youth
  and Adults: Estimates from Wave 4 of the PATH Study, 2016-2017*,
  44 Am. J. Health Behav. 76-81 (Jan. 2020) ....................................................30

## INTRODUCTION

The Family Smoking Prevention and Tobacco Control Act (TCA) makes it unlawful for a manufacturer to market a "new tobacco product"—defined as a tobacco product that was not on the market as of February 15, 2007—without authorization from the U.S. Food and Drug Administration (FDA). The TCA requires FDA to deny an application to market a new tobacco product unless FDA finds that marketing the product would be "appropriate for the protection of the public health," taking into account the impact on both nonusers and existing users of tobacco products. 21 U.S.C. § 387j(c)(2), (4). Under this standard, an applicant must show a net benefit to public health based upon the risks and benefits to the population as a whole. In evaluating applications, FDA, among other things, weighs the risk that youth will start using a new tobacco product against the product's potential to help adults significantly reduce or cease their use of combustible cigarettes.

There is no dispute that electronic nicotine delivery systems (ENDS)—often referred to as "e-cigarettes"—are new tobacco products within the meaning of the TCA. FDA has granted applications to market certain tobacco-flavored e-cigarettes based on, among other things,

evidence that youth use of tobacco-flavored products is limited and that

such products may help adults switch from combustible cigarettes. But for

e-cigarettes with flavors other than tobacco and menthol, "the risk of youth

initiation and use is substantial" and well-documented. TRITON–FDA1–

000278; TRIVAPE–FDA1–000104. Thus, to support a finding that the

marketing of a flavored e-cigarette product is appropriate for the

protection of the public health, "an applicant would have to show that the

significant risk to youth could be overcome by likely benefits substantial

enough such that the net impact to public health would be positive."

TRITON–FDA1–000278; TRIVAPE–FDA1–000104.

     Petitioners seek to market flavored e-cigarette products that present a

significant risk to youth. FDA reasonably concluded that petitioners had

failed to adduce evidence establishing that the benefits of their products

outweigh the well-documented risks. FDA emphasized that the strong

appeal of flavored e-cigarettes to youth demanded a "likely benefit"

"substantial enough to overcome the significant risk of youth uptake and

use posed by the flavored ENDS product." TRITON–FDA1–000278;

TRIVAPE–FDA1–000104. FDA explained why the literature and the

survey data submitted by petitioners did not provide robust or reliable

evidence of a significant benefit to adult smokers.  TRITON–FDA1–000279-282; TRIVAPE–FDA1–000105-108.

We respectfully submit that this Court's preliminary analysis of petitioners' likelihood of success on the merits, issued in the context of an emergency stay motion, was mistaken.  *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021).  There is no merit to the arguments that FDA's denial of petitioners' applications announced a new evidentiary standard, failed to consider relevant evidence, or was otherwise arbitrary and capricious or inconsistent with the TCA.  FDA applied the standard established by Congress in the TCA and articulated in prior and subsequent agency rules and guidance, and it reasonably concluded that the evidence failed to show that the marketing of these flavored e-cigarettes would be appropriate for the protection of the public health.  TRITON–FDA1–000282-283; TRIVAPE–FDA1–000108-109.  After this Court granted petitioners' emergency stay motion, the Sixth Circuit denied another manufacturer's motion to stay a similar FDA order pending review, *Breeze Smoke, LLC v. FDA*, 18 F.4th 499 (6th Cir. 2021), and the Supreme Court denied the manufacturer's stay application without

recorded dissent, *see Breeze Smoke, LLC v. FDA*, — S. Ct. —, No. 21A176,

2021 WL 5860294 (U.S. Dec. 10, 2021).

## STATEMENT OF JURISDICTION

On September 14 and 16, 2021, FDA issued orders denying

petitioners' applications to market certain new tobacco products.

TRITON–FDA1–000115-117, 124-126; TRIVAPE–FDA1–000044-46.  Triton

filed timely petitions for review on October 1 and 15, 2021, and Vapetasia

filed a timely petition for review on October 15, 2021.  Petition for Review,

No. 21-60766; Petition for Review, No. 21-60800.  This Court has

jurisdiction under 21 U.S.C. § 387*l*(a)(1)(B).

## STATEMENT OF THE ISSUE

Petitioners applied for FDA authorization to market certain

e-cigarette products in flavors attractive to youth.  The question presented

is whether FDA properly denied petitioners' applications because the

evidence did not show that the serious risk that such products pose to

youth is outweighed by a benefit to adults seeking to stop or significantly

reduce smoking combustible cigarettes, and petitioners thus failed to

demonstrate that the marketing of the products would be appropriate for the protection of the public health.

## STATEMENT OF THE CASE

### I.     Statutory Background

The Family Smoking Prevention and Tobacco Control Act established a comprehensive scheme for the regulation of tobacco products.  Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009).  The Act was predicated on Congress's finding that use of tobacco products by youth "is a pediatric disease of considerable proportions."  TCA § 2(1), 123 Stat. at 1777.  The TCA applies to products such as cigarettes and smokeless tobacco, as well as to other products made or derived from tobacco that FDA by regulation deems to be subject to the Act.  21 U.S.C. § 387a; *see also id.* § 321(rr)(1).

The TCA provision at issue here makes it unlawful for a manufacturer to introduce in interstate commerce any "new tobacco product" unless the manufacturer obtains premarket authorization from FDA.  21 U.S.C. § 387j(a)(1)-(2).  The statute defines a "new tobacco product" as one that was not commercially marketed in the United States as of February 15, 2007, or that was modified after that date.  *Id.* § 387j(a)(1).

The TCA provides that FDA "shall deny" a manufacturer's application to market a new tobacco product "if, upon the basis of the information submitted to [FDA] as part of the application and any other information before [FDA] with respect to such tobacco product," the agency "finds that . . . there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2).  The TCA specifies that, in making that determination, FDA must evaluate "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," taking into account both the "likelihood that existing users of tobacco products will stop using such products" and the "likelihood that those who do not use tobacco products will start."  *Id.* § 387j(c)(4).  Because "[v]irtually all new users of tobacco products are under the minimum legal age to purchase such products," TCA § 2(4), 123 Stat. at 1777, FDA (among other things) weighs the risk that a new tobacco product will promote youth initiation and use against the product's potential for helping adults who smoke combustible cigarettes switch to a less dangerous alternative.

In order to obtain marketing authorization, an applicant must demonstrate a net benefit to public health taking such risks and benefits into account.[1]

## II.    Regulatory Background

**1.** E-cigarettes deliver nicotine, which is "among the most addictive substances used by humans," "by vaporizing a liquid that includes other chemicals and flavorings." *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 270 (D.C. Cir. 2019). "The device heats the liquid until it generates an aerosol — or 'vapor' — that can be inhaled." *Id.*

The term "e-cigarettes" encompasses a variety of devices. Some devices have "pods" or "cartridges" that hold nicotine-containing liquid known as "e-liquid." *See* Eunice Park-Lee et al., *Notes from the Field: E-Cigarette Use Among Middle and High School Students – National Youth Tobacco Survey, United States, 2021*, 70 Morbidity & Mortality Wkly. Rep. 1387, 1387 n.* (2021).[2] Some pods or cartridges (known as closed systems) come pre-filled with e-liquid and are replaced after the e-liquid is used up,

---

[1] The TCA provides a separate premarket authorization pathway for tobacco products that are substantially equivalent to products that were commercially marketed in the United States as of February 15, 2007. 21 U.S.C. § 387j(a)(2)(A)(i)(I). That pathway is not at issue here.

[2] https://go.usa.gov/xeGq5.

while others (known as open systems) can be refilled by the user. *Id.* Tank or "mod" (short for "modifiable") devices can also be refilled by users and are also usually customizable. *Id.* Disposable e-cigarettes come prefilled with the e-liquid, and the entire device is designed to be discarded after the e-liquid runs out. *Id.*

In 2016, FDA exercised its statutory authority to deem e-cigarettes and other products made or derived from tobacco to be subject to the TCA's requirements. 81 Fed. Reg. 28,974 (May 10, 2016). Most e-cigarettes were not on the market as of February 15, 2007, and thus meet the TCA's definition of a "new tobacco product" and became unlawful to market without FDA authorization after the rule's August 8, 2016, effective date. *See Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 440 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2746 (2021). As a policy matter, however, FDA decided against immediate enforcement of that statutory prohibition for products already on the market as of the rule's August 8, 2016, effective date. 81 Fed. Reg. at 28,977-78; *see id.* at 29,011 n.13.

Through enforcement policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adults quit

or significantly reduce smoking combustible cigarettes.  FDA has "repeatedly emphasized that the availability of non-combustible options should not come at the expense of addicting a generation of children to nicotine through these same delivery vehicles."  FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised): Guidance for Industry* 38 (Apr. 2020) (2020 Guidance).[3]  Moreover, FDA has "consistently informed industry that its compliance policies will be responsive to changed circumstances," *id.* at 35, and that "manufacturers cannot have settled expectations to market unlawful products, especially in the face of evolving public health concerns," *id.* at 36.

**2.**  Initially, FDA announced that, for e-cigarettes already on the market as of the 2016 rule's effective date, the agency generally would not take enforcement action based on a product's lack of premarket authorization for a two-to-three-year period while manufacturers prepared, and FDA reviewed, marketing applications.  81 Fed. Reg. at 28,978.  In 2017 guidance, FDA extended that period until 2022.  *See* 2020

---

[3] https://go.usa.gov/xeG3C.

Guidance 5. Prior to that announcement, nationally representative data suggested that youth use of e-cigarettes had declined beginning in 2016. *Id.*

By late 2017, however, FDA began to see an alarming increase in the use of e-cigarettes by middle and high school students. 2020 Guidance 6. FDA therefore stepped up enforcement actions against products marketed to youth and against retailers that sold e-cigarettes to minors, *id.* at 6-7, and the agency sent letters directing manufacturers with significant market share to submit plans to help restrict minors' access to e-cigarettes, *id.* at 7. In response, manufacturers proposed safeguards such as age-verification technology for online sales, enhanced monitoring of retailer compliance with age-verification and sales restrictions, contractual penalties for retailers that failed to comply with such requirements, and limits on the quantity of e-cigarettes that a customer could purchase within a particular period of time. *Id.*

Nonetheless, in 2019, youth e-cigarette use hit the highest levels ever recorded. 2020 Guidance 7. FDA thus revised its enforcement policy. Although FDA continued to enforce sales restrictions, it concluded that "age verification alone is not sufficient to address this issue, given the most recent data that youth use of [e-cigarette] products continues to increase."

10

*Id.* at 44. "The reality," FDA explained, "is that youth have continued access to [e-cigarette] products in the face of legal prohibitions and even after voluntary actions by some manufacturers." *Id.* In part because many youth obtain their e-cigarettes from friends or other sources in their social networks, *id.* at 45, FDA determined that sales restrictions alone would "not be sufficient to address youth use of these products," *id.* at 44.

Instead of focusing solely on how an e-cigarette product is sold, FDA's 2020 policy prioritized enforcement against the types of products that were, at that time, especially popular among youth: flavored, cartridge-based e-cigarettes (other than tobacco-flavored or menthol-flavored products). 2020 Guidance 10. FDA emphasized the "extraordinary popularity" of flavored e-cigarettes among youth, *id.* at 13, noting that 93% of e-cigarette users aged 12-17 reported that their first e-cigarette was a flavored product, and that 71% of youth users indicated they used e-cigarettes "because they come in flavors I like," *id.* at 14. FDA also explained that the leading e-cigarette brand at that time (JUUL) was a cartridge-based product that commanded 70% of the market, and that features of cartridge-based products made them especially easy to use and conceal, and thus particularly attractive to youth. *Id.* at 15-16. And while

FDA focused its concern at that point on particular types of cartridge-based products, it made clear that it would "make enforcement decisions on a case-by-case basis" and that it "retains discretion to pursue enforcement action at any time against any deemed new tobacco product marketed without premarket authorization." *Id.* at 11.

Although the 2020 enforcement policy led to a removal of many flavored products from the market and contributed to a decline in youth use, use of e-cigarettes by children and adolescents has remained at levels comparable to those that originally led FDA to declare a youth vaping epidemic. *See* TRITON–FDA1–000273; TRIVAPE–FDA1–000099. The market exit of flavored, cartridge-based e-cigarettes led to a substantial rise in youth use of disposable e-cigarettes which had largely been excluded from the 2020 enforcement policy because, at the time that policy was developed, those products were not commonly used by youth. TRITON–FDA1–000273; TRIVAPE–FDA1–000099. As FDA recognized, this trend illustrates that the removal of one flavored product option can prompt youth to migrate to other e-cigarette types that offer the desired flavor options, "underscoring the fundamental role of flavor in driving appeal." TRITON–FDA1–000276; TRIVAPE–FDA1–000102.

**3.** Shortly before September 9, 2020, FDA received a large volume of applications to market e-cigarette products. The influx resulted in part from a court-ordered deadline in an action brought by public-health organizations. *See American Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479 (D. Md. 2019), *appeal dismissed sub nom. In re Cigar Ass'n of Am.*, 812 F. App'x 128 (4th Cir. 2020). That court observed that, "however laudable the FDA's intended regulatory response is, the record before me shows a purposeful avoidance by the industry of complying with the premarket requirements despite entreaties from the FDA." *Id.* at 485. The court thus directed FDA to require manufacturers to submit applications for premarket authorization within ten months of its order—a date later extended to September 9, 2020, as a result of the pandemic—and provided that products for which timely applications had been submitted could remain on the market without being subject to FDA enforcement action for up to a year. *Id.* at 487.[4]

---

[4] The court later clarified that FDA was permitted to take enforcement action during the application review period. Order, *American Acad. of Pediatrics v. FDA*, No. 18-883 (D. Md. Aug. 12, 2019), Dkt. No. 132.

FDA has acted on many of those applications.  To date, the applications that FDA has granted have been for tobacco-flavored e-cigarette products.  *See* FDA, *Technical Project Lead Review for Applications Submitted By R.J. Reynolds Vapor Company* (Oct. 12, 2021).[5]  In authorizing the marketing of those products, FDA determined that youth interest in tobacco-flavored products is low.  *Id.* at 17 (citing a 2020 nationwide survey finding that the prevalence of tobacco-flavored e-cigarette use was 2.9% among 10th and 12th graders).  FDA also found evidence that established cigarette users had the "highest purchase intent" for tobacco-flavored products.  *Id.*  FDA thus concluded that the applicant had demonstrated that current adult smokers are particularly interested in the new tobacco-flavored products to assist in intended switching from combustible cigarettes and that those products have the potential to benefit that group as compared to continued exclusive use of combustible cigarettes.  *Id.* at 4. After conducting a scientific review, FDA found that permitting the marketing of those tobacco-flavored products would be appropriate for the protection of the public health.  *Id.*

---

[5] https://go.usa.gov/xef5N.

In contrast to tobacco-flavored e-cigarettes, FDA has explained that
e-cigarettes in other flavors, such as fruit or dessert, present a significant
risk to youth that is well documented by nationally representative studies.
*See, e.g.*, TRITON–FDA1–000274-275; TRIVAPE–FDA1–000100-101.  Thus,
for FDA to find that the marketing of such products is appropriate for the
protection of the public health, applications to market flavored products
must show that this significant risk to youth is outweighed by likely
benefits to existing users of tobacco products "substantial enough such that
the net impact to public health would be positive."  TRITON–FDA1–
000278; TRIVAPE–FDA1–000104.  "[A]s the known risks [of a product]
increase, so too does the burden of demonstrating a substantial enough
benefit" to support the finding of a net positive effect.  TRITON–FDA1–
000278; TRIVAPE–FDA1–000104.  Some manufacturers submitted evidence
of a type that could potentially support such a finding for their flavored
products, and those applications remain under agency review.  *See, e.g.*,
Motion for Voluntary Dismissal, *Turning Point Brands, Inc. v. FDA*, No.
21-3855 (6th Cir. Oct. 8, 2021), Dkt. No. 19 (noting FDA's agreement to
reconsider applications when it overlooked such evidence).  FDA has
denied applications to market e-cigarette products where manufacturers

have failed to submit evidence that satisfies the statutorily required

showing.

### III.    FDA's Denial Of Petitioners' Applications To Market Flavored E-Cigarette Products

Petitioners manufacture and sell flavored e-cigarette products, which

are particularly attractive to youth.  TRITON–FDA1–000275-276;

TRIVAPE–FDA1–000101-102.  On September 9, 2020, petitioners submitted

their applications to market e-cigarettes in various flavors, including

blueberry parfait, strawberry, peachy strawberry, pistachio, and crème

brulée.  TRITON–FDA1–000003-56; TRIVAPE–FDA1–000003-17.

In reviewing petitioners' applications, FDA first determined that

flavored e-cigarette products of this type present a significant and well-

documented risk to youth, TRITON–FDA1–000275; TRIVAPE–FDA1–

000101, and reiterated the determination made in the 2020 guidance that

the agency is "not aware of access restrictions that, to date, have been

successful in sufficiently decreasing the ability of youth to obtain and use

ENDS," TRITON–FDA1–000279 n.xix; TRIVAPE–FDA1–000105 n.xix.  FDA

then considered whether petitioners provided robust and reliable evidence

showing that their products would provide a benefit to adult smokers by

facilitating switching or significantly reducing their use of combustible cigarettes. TRITON–FDA1–000279; TRIVAPE–FDA1–000105. In particular, the agency looked for evidence demonstrating that petitioners' products would provide an added benefit to adult smokers relative to tobacco-flavored products, which do not present the same degree of risk to youth. TRITON–FDA1–000279; TRIVAPE–FDA1–000105.

In their applications, petitioners acknowledged that "[r]esearch addressing the specific role of flavors in vaping effectiveness is in its infancy." *See, e.g.*, Vapetasia Blueberry Parfait Salt E-Liquid PMTA 61. Accordingly, in the section of their applications dedicated to "Cessation," *id.* at 66, they did not address the role of flavors in promoting switching. Instead, they pointed to cross-sectional survey results—including a Triton Distribution survey of 121 current and past customers—that showed their flavored products "continue to be used by existing adult users." *Id.* at 67. They also cited online cross-sectional surveys ostensibly demonstrating that adults prefer flavors, *id.* at 27-28, but these included a survey of members of the Consumer Advocates for Smoke-Free Alternatives Association (CASAA) that reported that many adults who quit smoking combustible cigarettes start by using tobacco-flavored e-cigarettes, rather

than flavored products like the ones at issue here.[6]  Petitioners also relied
on a literature review that concluded "there is not enough evidence from
well-designed studies to determine whether e-cigarette flavors aid in
smoking cessation."  ENDS & E-Liquid – State of the Science 139.

FDA concluded that petitioners' evidence and other evidence it
reviewed did not support a finding that petitioners' flavored products
would provide a sufficient benefit to adult users relative to their risk to
youth.  FDA determined that cross-sectional survey data in general "does
not enable reliable evaluation of behavior change over time," TRITON–
FDA1–000280; TRIVAPE–FDA1–000106, and it specifically found that the
cross-sectional survey of Vapetasia's customers "is not sufficient to show a
benefit to adult smokers . . . because it does not evaluate the specific
products in the application(s) or evaluate product switching or cigarette
reduction resulting from use of these products over time."  TRIPVAPE–
FDA1–000044-45.

FDA also reviewed a significant body of literature concerning studies
and surveys of e-cigarettes.  Based on this review, FDA concluded that "the

---

[6] *See* Carl V. Phillips, *CASAA ecig survey results*, anti-THR lies Blog
(Jan. 4, 2016), https://perma.cc/9LYT-YUTB.

evidence regarding the role of flavors in promoting switching among adult smokers is far from conclusive," and "the literature does not establish that flavors differentially promote switching amongst [e-cigarette] users in general." TRITON–FDA1–000279-280; TRIVAPE–FDA1–000105-106.  Thus, on September 16, 2021, FDA denied petitioners' applications because the evidence failed to show that the marketing of their flavored products would be appropriate for the protection of the public health.  TRITON–FDA1–000282-283; TRIVAPE–FDA1–000108-109.

### IV.  This Court's Order Granting A Stay Pending Review; The Sixth Circuit's Contrary Order in *Breeze Smoke*; And The Supreme Court's Denial Of Breeze Smoke's Stay Application

Petitioners filed petitions for review in this Court on October 1, 2021 (Triton), and October 15, 2021 (both Triton and Vapetasia).  On October 5, 2021, Triton moved for a stay pending appeal in the first case.  On October 26, 2021, this Court granted the stay motion and consolidated the cases.

In granting a stay, the motions panel reasoned that Triton was likely to succeed in demonstrating that FDA failed to consider relevant factors in denying its application, including: (1) the effect of Triton's marketing plans on reducing risk to youth; (2) Triton's reliance on FDA's previously stated expectation that long-term studies generally would not be required to

support applications; (3) whether Triton's reusable e-cigarette products would be less appealing to youth than disposable e-cigarettes; and (4) evidence of the potential benefits of flavored e-cigarettes. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1136-40 (5th Cir. 2021). The Court also concluded that Triton had established irreparable injury, that the balance of harms favored a stay, and that the public interest was "at worst neutral." *Id.* at 1442-43.

On November 12, 2021, the Sixth Circuit reached a different result in a similar case, concluding that the petitioner (Breeze Smoke) "ha[d] not made a strong showing" that FDA failed to consider relevant factors. *Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 503 (6th Cir. 2021). In particular, the court determined that FDA had not departed from its prior statements regarding the evidence required to support a marketing application: The 2019 FDA guidance explained that the agency "*might* accept evidence other than long-term studies, if that evidence had sufficient scientific underpinnings to meet the TCA's statutory mandate of demonstrating that flavored [e-cigarettes] are appropriate for the protection of public health." *Id.* at 506-07. And FDA reasonably "found [petitioner's] evidence lacking against this standard," *id.* at 507, because neither the literature nor

20

petitioners' survey data provided evidence of potential benefits sufficient to overcome FDA's finding of "clear and consistent patterns of real-world use showing youth initiation of flavored ENDS products," *id.* at 506 (internal quotation marks omitted). Although the court stated that "FDA likely should have more thoroughly considered [petitioner's] marketing plan" for limiting youth access to its products, it concluded that this potential error did not "permeate[] the entire [adjudication] process." *Id.* at 507-08 (third alteration in original) (quoting *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004)). The dissenting judge would have granted a stay for the reasons provided by this Court. *Id.* at 508-09 (Kethledge, J., dissenting).

Breeze Smoke then filed a stay application with Circuit Justice Kavanaugh, urging that a stay was warranted for the reasons set out by this Court. Justice Kavanaugh referred the application to the full Court, which, after considering FDA's response, denied the application without recorded dissent. *See Breeze Smoke, LLC v. FDA*, — S. Ct. —, No. 21A176, 2021 WL 5860294 (U.S. Dec. 10, 2021).

21

## SUMMARY OF ARGUMENT

**I.**  There is an epidemic of youth use of e-cigarettes, and flavored products are at the center of that problem.  FDA reasonably determined that the significant risks posed by flavored e-cigarettes are not limited to cartridge-based devices but rather extend across device types.

While measures to restrict youth access to e-cigarettes are important, FDA's experience has shown such restrictions alone to be insufficient in reducing youth initiation and use.  2020 Guidance 44.  Many youth obtain e-cigarettes through friends, *id.* at 45, and youth e-cigarette use has reached record levels despite industry efforts to restrict access and rigorous FDA enforcement of such measures, *id.* at 7-8.  Against the backdrop of that experience demonstrating the shortcomings of traditional access restrictions, FDA reasonably determined that specific consideration of petitioners' proposed restrictions (which petitioners do not claim are novel) would not affect its determination because these measures would not tip the balance between adult benefit and youth risk.

**II.**  Because the risks of flavored e-cigarettes are well established, the showing needed to demonstrate that the marketing of these products is appropriate for the protection of the public health is demanding.  *See*

22

TRITON–FDA1–000279; TRIVAPE–FDA1–000105.  FDA examined

petitioners' applications for evidence that their flavored e-cigarette

products would provide a countervailing benefit to adult smokers greater

than the benefit provided by other, lower-risk products, and it found the

evidence wanting.  TRITON–FDA1–000281-282; TRIVAPE–FDA1–000107-

108.  FDA explained that the literature it reviewed did not suffice to make

the required showing because, "in contrast to the evidence related to youth

initiation—which shows clear and consistent patterns of real-world use

that support strong conclusions—the evidence regarding the role of flavors

in promoting switching among adult smokers is far from conclusive."

TRITON–FDA1–000279; TRIVAPE–FDA1–000105.  FDA also determined

that petitioners' survey data was flawed.  TRITON–FDA1–000280-281;

TRIVAPE–FDA1–000106-107.

Contrary to petitioners' contention, FDA did not announce a new

evidentiary standard in reviewing petitioners' marketing applications.  As

the Sixth Circuit observed in denying a stay in a similar case, a 2019 FDA

guidance explained that the agency "*might* accept evidence other than long-

term studies, if that evidence had sufficient scientific underpinnings to

meet the TCA's statutory mandate of demonstrating that flavored

[e-cigarettes] are appropriate for the protection of public health." *Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 506-07 (6th Cir. 2021). Here, as in *Breeze Smoke*, FDA reasonably "found [petitioner's] evidence lacking against this standard," *id.* at 507, because neither the literature nor petitioners' survey data provided evidence of potential benefits sufficient to overcome the "clear and consistent patterns of real-world use showing youth initiation of flavored ENDS products," *id.* at 506 (internal quotation marks omitted).

**III.** There is similarly no merit to petitioners' contention that FDA exceeded its authority in applying the public-health standard set forth in § 387j(c). Petitioners argue that § 387j(c) does not allow FDA to consider whether the product for which a manufacturer is seeking authorization provides greater benefits to existing users of combustible cigarettes than do other products that present less risk to youth. But § 387j(c) expressly contemplates a comparative analysis by directing FDA to consider an application that contains information showing "whether [the new] tobacco product presents less risk than other tobacco products." 21 U.S.C. § 387j(b)(1)(A). FDA reasonably determined that if a less risky product provides similar or greater benefits, the benefits of marketing the riskier product generally will not be sufficient to make it "appropriate for the

24

protection of the public health."  *Id.* § 387j(c)(2).  Contrary to petitioners'

contention, FDA's conclusion in this respect does not implicate the TCA's

provisions governing the promulgation of "tobacco product standards" or

the authorization of modified risk tobacco products.  Nothing in those

separate provisions relieves FDA of the responsibility to consider the

comparative risks of tobacco products when reviewing a manufacturer's

application to market a new tobacco product pursuant to § 387j(c).

## STANDARD OF REVIEW

FDA's denial of an application to market a new tobacco product is

reviewed under the familiar, deferential standards established by the

Administrative Procedure Act (APA) and may be held unlawful and set

aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2); *see* 21 U.S.C. § 387*l*(b)

(incorporating this standard).  Review under that standard "is narrow and

a court is not to substitute its judgment for that of the agency."  *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

FDA denied petitioners' applications to market e-cigarette products

in flavors attractive to children and adolescents because the evidence failed

to show that the serious and well-documented risk that these products pose to youth is outweighed by their potential to help adults switch from combustible cigarettes so as to make their marketing appropriate for the protection of the public health.  Petitioners' challenges to that determination are meritless.

I.    **FDA Reasonably Determined That Flavored E-Cigarette Products Pose A Serious Risk To Youth That Is Not Adequately Mitigated By Traditional Access Restrictions**

A.    **Flavors play a significant role in youth initiation and use of e-cigarettes that extends across device types**

**1.**  Because the TCA requires FDA to consider a new tobacco product's effect on the population as a whole, taking into account both the "likelihood that existing users of tobacco products will stop using such products" and the "likelihood that those who do not use tobacco products will start," 21 U.S.C. § 387j(c)(4), FDA reasonably began its analysis by considering the risks of flavored e-cigarettes to nonusers, particularly youth.  FDA explained that the "use of tobacco products, no matter what type, is almost always started and established during adolescence when the developing brain is most vulnerable to nicotine addiction" and that "almost 90 percent of adult daily smokers started smoking by the age of

18." TRITON–FDA1–000273; TRIVAPE–FDA1–000099; *see also* TRITON–FDA1–000276 (explaining that "[y]outh and young adult brains are more vulnerable to nicotine's effects than the adult brain due to ongoing neural development"); TRIVAPE–FDA1–000102 (same).

FDA further explained that significant long-term health consequences are associated with youth-initiated e-cigarette use. The nicotine in e-cigarettes can have permanent effects on the developing adolescent brain and can "induce short and long-term deficits in attention, learning, and memory." TRITON–FDA1–000276; TRIVAPE–FDA1–000102. Studies also have shown associations between e-cigarette use and "asthma, chronic bronchitis, emphysema, or chronic obstructive pulmonary disease." TRITON–FDA1–000277; TRIVAPE–FDA1–000103. Moreover, those who use e-cigarettes during childhood or adolescence are significantly more likely to begin using combustible cigarettes, raising concerns that, over time, the "trend of declining cigarette smoking could slow or even reverse." TRITON–FDA1–000277; TRIVAPE–FDA1–000103. Given the scientific consensus on the risks of flavored e-cigarettes and the "lifelong implications" of e-cigarette use by youth, FDA determined that "preventing tobacco use initiation in young people is a central priority for

27

protecting population health."  TRITON–FDA1–000274; TRIVAPE–FDA1–000100.

Despite these risks, youth use of e-cigarettes has exploded.  From 2017 to 2018, the number of high-school-age youth reporting use of e-cigarettes rose by more than 75% and use among middle-school-age youth increased nearly 50%.  FDA, *Results From 2018 National Youth Tobacco Survey Show Dramatic Increase In E-Cigarette Use Among Youth Over Past Year* (Nov. 15, 2018);[7] *see* TRITON–FDA1–000277 (noting the "exponential growth in youth [e-cigarette] use observed from 2017 to 2019"); TRIVAPE–FDA1–000103 (same).  While this use declined somewhat following FDA's 2020 enforcement efforts, youth e-cigarette use remains at epidemic levels.  *See* TRITON–FDA1–000273 & n.ix; TRIVAPE–FDA1–000099 & n.ix.  In 2020, approximately 19.6% of U.S. high school students and 4.7% of middle school students—roughly 3.6 million children and adolescents—were current users of e-cigarettes, making e-cigarettes "the most widely used tobacco product among youth by far."  TRITON–FDA1–000274; TRIVAPE–FDA1–000100.

---

[7] https://perma.cc/9C3U-XSXT?type=image.

FDA found that flavors play a significant role in driving youth
e-cigarette use.  There is strong evidence that flavors encourage youth to
begin experimenting with e-cigarettes and also promote more frequent and
sustained use.  TRITON–FDA1–000274-275; TRIVAPE–FDA1–000100-101.
In a 2016-2017 study, "93.2% of youth and 83.7% of young adult
[e-cigarette] users reported that their first [e-cigarette] was flavored," and
71% said they used e-cigarettes "because they come in flavors I like."
TRITON–FDA1–000274-275; TRIVAPE–FDA1–000100-101.  Similarly, in
2020, 84.7% of high school e-cigarette users and 73.9% of middle school
users reported using a flavored product.  TRITON–FDA1–000274;
TRIVAPE–FDA1–000100.  The majority of middle and high school users
(over 70%) reported using fruit flavored e-cigarettes, while others used
flavors including "candy, dessert, or other sweets."  TRITON–FDA1–
000274; TRIVAPE–FDA1–000100.[8]

---

[8] One of petitioners' *amici* contends that, although youth indisputably
prefer flavors, "[t]he choice of flavors reflects preferences among young
people already using ENDS, but it does not necessarily explain why they
. . . decide to use ENDS in the first place."  Br. of Dr. David B. Abrams et al.
10.  This contention ignores the evidence demonstrating that the vast
majority of youth begin their e-cigarette use with flavored products.  *See*
TRITON–FDA1–000274 (reporting that 93.2% of youth e-cigarette users

**2.** Petitioners do not dispute the extent of underage use of

e-cigarettes generally or the extent to which flavored products drive their

popularity. Instead, petitioners contend that FDA disregarded evidence

that their e-cigarettes "are bottled e-liquids for use in open-system devices,

not the closed-system cartridges popular with youth." Br. 32. But the

evidence FDA considered included studies showing that "[t]he role of

flavors in increasing the appeal of tobacco products to youth—across

tobacco product categories—is well-established" and that the appeal of

flavors persists across both open- and closed-system devices. TRITON–

FDA1–000275; TRIVAPE–FDA1–000101.[9] The 2020 National Youth

---

reported that their first e-cigarette was flavored compared to 52.9% of adult
users (citing Brian L. Rostron et al., *Prevalence and Reasons for Use of Flavored
Cigars and ENS Among US Youth and Adults: Estimates from Wave 4 of the
PATH Study, 2016-2017*, 44 Am. J. Health Behav. 76-81 (Jan. 2020)));
TRIVAPE–FDA1–000100 (same). Moreover, "nationally representative
studies find that when asked to indicate their reasons for using ENDS,
youth users consistently select flavors as a top reason." TRITON–FDA1–
000275 (citing studies); TRIVAPE–FDA1–000101 (same).

[9] Deepa R. Camenga et al., *Appeal and Use of Customizable E-Cigarette
Product Features in Adolescents*, 4 Tobacco Reg. Sci. 51-60 (Mar. 2018); M.B.
Harrell et al., *Flavored E-Cigarette Use: Characterizing Youth, Young Adult, and
Adult Users*, 5 Preventive Med. Rep. 33-40 (2017); J.K. Pepper et al.,
*Adolescents' Interest in Trying Flavoured E-Cigarettes*, 25 Tobacco Control ii62-
ii66 (Sept. 15, 2016); Carrie M. Carpenter et al., *New Cigarette Brands with
Flavors That Appeal to Youth: Tobacco Marketing Strategies*, 24 Health Affairs
1601-10 (2005).

Tobacco Survey—a large, cross-sectional survey of middle and high school students—shows that, "within the [e-cigarette] category, there is variability in the popularity of device types among youth," but "across these different device types, the role of flavor is consistent."  TRITON–FDA1–000275; TRIVAPE–FDA1–000101.

Studies of market trends "underscor[e] the fundamental role of flavor in driving appeal."  TRITON–FDA1–000276; TRIVAPE–FDA1–000102. When FDA prioritized enforcement against the flavored, cartridge-based e-cigarettes, youth migrated to other flavored products (disposables) that previously had not been as popular among youth as the cartridge-based products.  TRITON–FDA1–000276; TRIVAPE–FDA1–000102.  "This trend illustrates that the removal of one flavored product option prompted youth to migrate to another ENDS type that offered the desired flavor options, underscoring the fundamental role of flavor in driving appeal."  TRITON–FDA1–000276; TRIVAPE–FDA1–000102.

In nevertheless insisting that their products do not present a meaningful risk to youth, petitioners cite a statement made by a former FDA Commissioner more than two years ago noting the relative unpopularity of open-tank systems among youth.  Br. 37 (citing Nicholas

Florko, *Former FDA Commissioner Calls for a Full Ban on Pod-Based E-Cigarettes*, STAT (Nov. 12, 2019)[10]).  They likewise cite (Br. 37-38) a nearly two-year-old Federal Register announcement of FDA enforcement priorities stating that then-recent data "indicate[d] that youth overwhelmingly prefer cartridge-based ENDS products."  85 Fed. Reg. 720, 722 (Jan. 7, 2020).  These observations have been overtaken by events, as explained above.  Rather than "contradict[]" the agency's earlier focus on cartridge-based products, Br. 37, FDA's analysis of petitioners' applications properly incorporated new evidence regarding device-type popularity and reasonably relied on evidence demonstrating the significant youth appeal of flavors across e-cigarette product categories.[11]

---

[10] https://perma.cc/D4KH-FME6.

[11] This Court's description of the 2020 guidance confused disposable products with cartridge-based products and thus overlooked the significance of the market trends.  *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021) (incorrectly suggesting that the 2020 guidance found that youth preferred "disposable" ENDS products).

**B.    FDA reasonably determined that traditional access restrictions do not sufficiently reduce youth use of e-cigarettes**

Petitioners also assert that youth use of their flavored products will be mitigated by limiting product sales to "age-gated vape and specialty tobacco shops and through age-gated online sales" and by avoiding marketing that makes the products "attractive to youth."  Br. 32. Petitioners contend that FDA acted arbitrarily and capriciously by denying their applications without evaluating these specific measures to prevent youth use of petitioners' products. *See id.*

FDA's conclusion that consideration of the specific marketing measures proposed in petitioners' applications would not alter the agency's determination was made against the backdrop of the agency's 2020 guidance, which details efforts by FDA and manufacturers to reduce youth access to e-cigarettes and documents the inadequacy of such measures.  The guidance is referenced in FDA's review of petitioners' applications.  TRITON–FDA1–000289; TRIVAPE–FDA1–000111.

FDA explained in the 2020 guidance that, from April 2018 to August 2019, the agency sent more than 6,000 warning letters and more than 1,000 civil money penalty complaints to online and brick-and-mortar retailers for

illegal sales of e-cigarettes to minors.  2020 Guidance 8.  During the same

period, FDA also issued dozens of warning letters to manufacturers,

distributors, and retailers for selling e-cigarette products with labeling or

advertising that resembled kid-friendly food products, such as juice boxes,

candy, or cookies, and for engaging social media influencers that appeal to

youth.  *Id.*  FDA also asked manufacturers to propose measures they could

implement to help restrict youth access to e-cigarettes.  *See id.* at 7.  The

proposed measures included the use of age-verification technology for

online sales, enhanced monitoring of retailer compliance with age-

verification requirements, and contractual penalties for retailers that failed

to comply with sales restrictions.  *Id.*

Youth e-cigarette use continued to increase notwithstanding these

efforts, 2020 Guidance 8, 22—a finding that postdates the statement on

which petitioners rely in suggesting that FDA's denial of petitioners'

applications contradicted its prior position regarding the effectiveness of

marketing restrictions.  Br. 32 (citing FDA, *Statement from Commissioner

Scott Gottlieb, M.D., on Proposed New Steps to Protect Youth by Preventing

Access to Flavored Tobacco Products and Banning Menthol in Cigarettes* (Nov.

15, 2018), https://perma.cc/AF4M-6M9H).  Subsequent experience has

shown that "[t]he reality is that youth have continued access to [e-cigarette] products in the face of legal prohibitions and even after voluntary actions by some manufacturers." 2020 Guidance 44; *see id.* at 21. This is due in substantial part to the fact that youth overwhelmingly obtain e-cigarettes from social sources, such as friends and family members, and do not purchase the products themselves. *See* Sherry T. Liu et al., *Youth Access to Tobacco Products in the United States, 2016-2018*, 5 Tobacco Reg. Sci. 491-501 (Nov. 2019).[12]

Contrary to petitioners' assertions, FDA did not ignore the potential impact of access restrictions in assessing petitioners' applications. FDA recognized that it "is theoretically possible that significant mitigation efforts could adequately reduce youth access and appeal such that the risk for youth initiation would be reduced." TRITON–FDA1–000279 n.xix; TRIVAPE–FDA 1–000105 n.xix. But given the magnitude of the problems regarding youth use of flavored e-cigarettes, FDA explained in denying petitioners' applications that no known "advertising and promotion restrictions" have been identified that would "decrease appeal to youth to

---

[12] https://go.usa.gov/xeGZH.

a degree significant enough to address and counter-balance" such
"substantial concerns." TRITON–FDA1–000279 n.xix; TRIVAPE–FDA1–
000105 n.xix. Under these circumstances, and in light of FDA's
independent determination that petitioners had not submitted sufficient
evidence of benefits to adults, FDA reasonably determined that
consideration of petitioners' proposed marketing measures would not tip
the balance between adult benefits and youth risks and therefore would
not alter FDA's conclusion as to whether the marketing of petitioners'
products would be appropriate for the protection of the public health. *See*
TRITON–FDA1–000279 n.xix; TRIVAPE–FDA1–000105 n.xix.

Petitioners do not assert that they represented to FDA that their
proposed measures were novel or materially different from the measures
that FDA had previously indicated in 2020 were inadequate to prevent
youth use. *See* 2020 Guidance 6-8, 44-45. In contrast to petitioners, other
manufacturers have proposed using novel technologies that they claim
have the potential to lock devices against underage users. *See* Jennifer
Maloney, *Juul Pitches Locked E-Cigarette in Bid to Stay on U.S. Market*, Wall
Street J. (Feb. 24, 2020). Petitioners do not assert that their applications
proposed any such restrictions.

For the same reason, even assuming that FDA should have further discussed petitioners' access restrictions, any such error is harmless.  The TCA makes FDA's marketing orders subject to review "in accordance with chapter 7 of Title 5," 21 U.S.C. § 387*l*(b), thus incorporating the APA's rule of harmless error, *see* 5 U.S.C. § 706 (instructing that "due account shall be taken of the rule of prejudicial error" in conducting arbitrary-and-capricious review).   Given that petitioners do not claim to have proposed access measures different from those that FDA previously found inadequate to "counter-balance" the very serious youth vaping problem, TRITON–FDA1–000279 n.xix; TRIVAPE–FDA1–000105 n.xix, and given that petitioners' evidence failed to demonstrate a sufficient benefit to adult smokers, there is no basis to conclude that any harm flowed from the asserted failure-to-consider error.  *See Shinseki v. Sanders*, 556 U.S. 396, 409-11 (2009) (explaining the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); *see also Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 508 (6th Cir. 2021) (concluding that any "oversight" regarding the particulars of petitioner's marketing plan "has not 'permeated the entire [adjudication] process'" (alteration in

37

original) (quoting *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374

F.3d 1209, 1217 (D.C. Cir. 2004))).

## II. FDA Did Not Announce A New Standard In Denying Petitioners' Applications

**1.** There is no merit to the contention that FDA adopted a new

evidentiary standard in denying petitioners' applications.  The required

showing is established by statute:  The TCA directs FDA to deny an

application to market a new tobacco product unless the manufacturer

demonstrates that marketing the product would be "appropriate for the

protection of the public health," taking into account the "likelihood that

existing users of tobacco products will stop using such products" and the

"likelihood that those who do not use tobacco products will start."  21

U.S.C. § 387j(c)(2), (4).

Consistent with that standard, FDA has "repeatedly emphasized that

the availability of non-combustible options" that could potentially benefit

existing users of tobacco products "should not come at the expense of

addicting a generation of children to nicotine through these same delivery

vehicles."  2020 Guidance 38.  "[A]s the known risks increase, so too does

the burden of demonstrating a substantial enough benefit."  *See* TRITON–

FDA 1–000278; TRIVAPE–FDA1–000104.  "[T]he expectations for scientific evidence related to potential adult benefit" will thus "vary based on demonstrated risk to youth," and manufacturers of products that present a particularly significant risk to youth will have to make a stronger showing of benefits to existing users in order to satisfy the statutory standard. TRITON–FDA1–000279; TRIVAPE–FDA1–000105.

FDA applied the statutory standard in evaluating petitioners' applications and determined that the evidence provided did not show that petitioners' flavored e-cigarette products likely provide a sufficient benefit to existing users of tobacco products to outweigh the significant and well-documented risk to youth.  As discussed above, there is a consensus in the scientific literature that flavored e-cigarette products like petitioners' especially appeal to children and are the principal driver of the epidemic of youth use.  *Supra* pp. 29-32.  "Given the known and substantial risk of flavored ENDS with respect to youth appeal, uptake, and use," FDA concluded that petitioners could satisfy their burden of showing that the marketing of their flavored products would be appropriate for the protection of the public health only by providing "reliable and robust evidence of a potential benefit to adult smokers that could justify that risk"

39

to youth.  TRITON–FDA1–000271 (footnote omitted); TRIVAPE–FDA1–

000097 (footnote omitted).  In light of the lower risk to youth posed by

tobacco-flavored e-cigarettes, some of which now have marketing

authorization, *see* FDA, *FDA Permits Marketing of E-Cigarette Products,*

*Marking First Authorization of Its Kind by the Agency* (Oct. 12, 2021),[13] FDA

also looked for evidence that petitioners' flavored products would provide

a benefit to adult smokers relative to the benefit provided by these lower-

risk products.

FDA reasonably determined that petitioners' evidence did not

demonstrate a sufficient benefit to existing users of tobacco products to

make the marketing of petitioners' products appropriate under the TCA.

While FDA explained that "evidence generated using either a[]

[randomized controlled trial] design or longitudinal cohort study design is

mostly likely to demonstrate such a benefit," the agency emphasized that

"other types of evidence could be adequate if sufficiently reliable and

robust, and will be evaluated on a case by case basis," TRITON–FDA1–

000280; TRIVAPE–FDA1–000106, and it considered the strength of

---

[13] https://go.usa.gov/xef5Q.

petitioners' evidence.  Contrary to petitioners' suggestion (Br. 18-21, 27-28), FDA denied petitioners' applications *not* because they failed to include a randomized controlled trial or longitudinal cohort study but because they failed to include *any* evidence robust enough to carry petitioners' burden under the statute.  *See* TRITON–FDA1–000282; TRIVAPE–FDA1–000108.

Petitioners cite (Br. 17-20) a superseded memorandum in which FDA considered whether, for flavored e-cigarettes, any application that did not contain a randomized controlled trial or a longitudinal cohort study should "likely receive a marketing denial order" because other types of evidence would be insufficient to carry the applicant's burden.  TRITON–FDA2–005144-5145; TRIVAPE–FDA2–005144-5145.  Petitioners' fair-notice and reliance arguments are premised on the idea that the memorandum announced a new "fatal flaw" approach under which FDA would reject any application without further review if it failed to include either a randomized controlled trial or a longitudinal cohort study demonstrating the products' benefits over time.  *See* Br. 17-20, 29-35.  But FDA rescinded that approach before acting on petitioners' applications.  TRITON–FDA2–005157 n.ix (making clear FDA would "also consider evidence from another study design, provided that it could reliably and robustly assess

behavior change (product switching or cigarette reduction) over time");

TRIVAPE–FDA2–005157 n.ix (same).

While petitioners suggest that FDA reviewed the applications to

determine only whether they included a randomized controlled trial or

longitudinal cohort study, *see* Br. 19 (citing TRITON–FDA1–000247-260;

TRIVAPE–FDA1–000089-94), the very documents that petitioners cite

confirm that FDA looked for "[o]ther evidence" that petitioner submitted

about its products establishing a benefit to adults and found none that

sufficed to support the statutorily-required showing.  TRITON–FDA1–

000249; TRIVAPE–FDA1–000091, 94; *see also* TRITON–FDA1–000271, 279,

280, 283; TRIVAPE–FDA1–000097, 105, 106, 109.

**2.**  Petitioners' evidence addressing the potential benefits of its

products for adult smokers consisted of a literature review suggesting that

e-cigarette use is less harmful than conventional cigarette use and cross-

sectional surveys of adult users of petitioners' products claiming to show a

preference for flavored products.  FDA concluded that, "in contrast to the

evidence related to youth initiation—which shows clear and consistent

patterns of real-world use that support strong conclusions—the evidence

regarding the role of flavors in promoting switching among adult smokers

is far from conclusive." TRITON–FDA1–000279; TRIVAPE–FDA1–000105.

Indeed, petitioners' own literature review concluded that "there is not

enough evidence from well-designed studies to determine whether

e-cigarette flavors aid in smoking cessation." ENDS & E-Liquid – State of

the Science 139. Consistent with that assessment, FDA observed that "the

findings are quite mixed and as a result the literature does not establish

that flavors differentially promote switching amongst [e-cigarette] users in

general." TRITON–FDA1–000279-280; TRIVAPE–FDA1–000105-106; *see*

*Breeze Smoke*, 18 F.4th at 506 (observing that the literature "offers mixed

findings" in this respect).

Petitioners contend that FDA applied a double standard in finding

the literature insufficient to demonstrate their products' benefits while

relying on the literature as evidence of their risks. Br. 36-39. But FDA

based its approach on the differences in the strength of the supporting

evidence and its ability to support the statutorily required showing. As the

Sixth Circuit explained, "FDA relied on literature concerning flavored

[e-cigarettes] products' appeal to youths because those risks are

understood as a matter of scientific consensus." *Breeze Smoke*, 18 F.4th at

508. FDA further found that the role of flavor in appealing to youth is

consistent across device types and thus extends to petitioners' products. *See* TRITON–FDA1–000275-276; TRIVAPE–FDA1–000101-102.

By contrast, the literature regarding the potential health benefits of e-cigarettes is "quite mixed," TRITON–FDA1–000279-280; TRIVAPE–FDA1–000105-106, and is "far from conclusive" with respect to the role of flavors in promoting switching among adults. TRITON–FDA1–000279; TRIVAPE–FDA1–000105. FDA reasonably concluded that the "heterogeneity" of this literature is likely due at least in part "to differences in the products studied," meaning that even if some e-cigarettes provide meaningful benefits, others may not. TRITON–FDA1–000279-280; TRIVAPE–FDA1–000105-106. For that reason, FDA reasonably determined that product-specific evidence was needed to support these applications. *See* TRITON–FDA1–000280; TRIVAPE–FDA1–000106.

Like the literature, petitioners' cross-sectional survey data failed to provide robust or reliable evidence of its products' asserted benefits. For example, the Coalition Survey showed an adult preference for flavors but did not suggest that flavors played an important role in causing smokers to

quit or in preventing relapse.[14]  Similarly, the 2015 online survey of CASAA

members reported that 72% of CASAA members taking the survey "credit

interesting flavors with helping them quit" but did not purport to measure

how many survey participants would have used other products or found

other ways to quit if those flavors were unavailable.[15]

FDA concluded that petitioners' cross-sectional survey data did not

suffice to make the required showing.  As FDA explained, "[u]ptake and

transition to [e-cigarette] use is a behavioral pattern that requires

assessment at more than one time point."  TRITON–FDA1–000280;

TRIVAPE–FDA1–000106.  A single data collection, like petitioners' surveys,

"does not enable reliable evaluation of behavior change over time" and

therefore does not provide a sufficiently robust measure of the products'

potential benefits to outweigh their well-documented risks.  TRITON–

FDA1–000280; TRIVAPE–FDA1–000106; *see* TRIPVAPE–FDA1–000044-45.

For these reasons, FDA reasonably concluded that petitioners had not

carried their burden of showing that the marketing of their products would

---

[14] *See* Electronic Nicotine Product Use Survey Results: Combined
Consortium Findings 32 (Aug. 2020) (reporting a preference for flavors but
saying nothing connecting availability of flavors to cessation).

[15] *See CASAA ecig survey results*, *supra*.

be appropriate for the protection of the public health.  TRITON–FDA1–

000281-282; TRIVAPE–FDA 1–000107-108.

Petitioners' objection that FDA used "generalized language" in

rejecting its evidence of benefits is therefore misplaced.  *See* Br. 39-40.

While petitioners posit that FDA failed to consider "relevant issues Triton

and Vapetasia *may* have raised . . . but others might not have," *id.*

(emphasis added), they fail to identify such an issue.  There is likewise no

merit to petitioners' suggestion (Br. 39) that it was unreasonable for FDA to

rely on "its experience and expertise" in determining which specific factors

were most probative in adjudicating petitioners' applications.

**3.**  Contrary to petitioners' contention (Br. 20-21), FDA's approach in

denying petitioners' applications is consistent with the agency's 2021 final

rule and earlier statements of policy, which explain that FDA will apply the

TCA's public-health standard in adjudicating applications for premarket

authorization.  Elaborating on that standard, these sources explain that

long-term clinical studies will sometimes, but not always, be necessary to

meet the statutory standard and that the evidence needed to support an

application will vary according to a product's risks.

FDA's most recent statement on this subject is found in the final rule on Premarket Tobacco Product Applications and Recordkeeping Requirements. 86 Fed. Reg. 55,300 (Oct. 5, 2021). The rule explains that, consistent with the TCA, whether the marketing of a product is appropriate for the public health "shall, when appropriate, be determined on the basis of well-controlled investigations," but FDA may base its determination on "valid scientific evidence (other than evidence derived from [well-controlled investigations]) which is sufficient to evaluate the tobacco product." *Id.* at 55,387 (alteration in original) (quoting 21 U.S.C. § 387j(c)(5)). The rule states that "FDA does not expect that long-term clinical studies will need to be conducted *for each* PMTA; instead, it expects that it should be able to rely on other valid scientific evidence to evaluate *some* PMTAs" and will "*consider* whether there are other sources of scientific evidence that sufficiently demonstrate the potential health risks of the product." *Id.* (emphases added). FDA emphasized, however, that "information from nonclinical studies alone is generally not sufficient to support a determination that permitting the marketing of the product would be [appropriate for the protection of the public health]." *Id.*

47

FDA's 2019 guidance similarly cautioned that "[n]onclinical studies alone are generally not sufficient to support" the required showing. TRITON–FDA2–004422; TRIVAPE–FDA2–004422. While "FDA believes that in some cases, it may be possible to support a marketing order for an ENDS product without conducting new nonclinical or clinical studies," TRITON–FDA2–004456; TRIVAPE–FDA2–004456, the guidance underscores the need to review such evidence to determine whether it supports the required showing. "For example, if there is an established body of evidence regarding the health impact (individual or population) of [a subject] product or a similar product that can be adequately bridged to [the subject] product, such as data from the published literature or government-sponsored databases, these data may be sufficient to support" an application. TRITON–FDA2–004456; TRIVAPE–FDA2–004456. FDA stated that it "intends to review that information to determine whether it is valid scientific evidence sufficient to demonstrate that the marketing of a product would be [appropriate for the protection of the public health]." TRITON–FDA2–004422; TRIVAPE–FDA2–004422.

FDA's statement that, "in general, FDA does not expect that applicants will need to conduct long-term studies to support an

application," TRITON–FDA2–004423; TRIVAPE–FDA2–004423, was made in context of this broader discussion and cannot reasonably be construed to mean that manufacturers of products that present a particularly significant risk to youth will never need to provide robust evidence demonstrating a countervailing benefit to adult users.[16]  In its preliminary order granting Triton's motion for stay, this Court did not consider the relevant context, *see Wages & White Lion. Invs., L.L.C.*, 16 F.4th 1130, 1138-39 (5th Cir. 2021), which necessarily informs the reasonableness of petitioners' understanding of the required evidentiary showing.  That context also confirms FDA's consistent position that the evidence provided in support of a marketing application must be sufficient to demonstrate that a product's benefits to existing users of tobacco products outweigh its risks to nonusers.

---

[16] Petitioners also cite (Br. 27) the Court's statement in *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282 (D.C. Cir. 2019), that "FDA has expressed willingness to accept scientific literature reviews instead of commissioned studies in support of e-cigarette applications *in appropriate circumstances*." But that statement, too, aligns with the agency's consistent view that "'*some applicants* may not need to engage in resource-intensive clinical investigations and provide long-term data to prepare and submit' an application," Brief for Appellees at 26, *Nicopure Labs, LLC v. FDA*, No. 17-5196 (D.C. Cir. June 5, 2018) (emphasis added) (quoting 81 Fed. Reg. at 29,078), and that "scientific-literature reviews may be acceptable *in some circumstances*," *id.* (emphasis added).  The motion panel's reliance on *Nicopure* is similarly misplaced.  *See Wages & White Lion*, 16 F.4th at 1138.

49

As the foregoing shows, it is not the case that FDA previously made an across-the-board statement that applicants would not need to provide especially robust forms of evidence, just as it is not true that FDA denied petitioners' applications based solely on the lack of a randomized controlled trial or longitudinal cohort study.  Indeed, in reviewing petitioners' applications, FDA expressly allowed for the possibility that other evidence, including "studies with a shorter duration," could be adequate to support some applications.  TRITON-FDA1-000281 n.xxiii; TRIVAPE-FDA1-000107 n.xxiii.  Thus, as the Sixth Circuit noted, FDA's denial is consistent with prior and subsequent statements that FDA "*might* accept evidence other than long-term studies, if that evidence had sufficient scientific underpinnings to meet the TCA's statutory mandate of demonstrating that flavored ENDS devices are appropriate for the protection of public health."  *Breeze Smoke*, 18 F.4th at 506-07.  That is why the Sixth Circuit "decline[d] to embrace" the argument—that petitioners also make here—that "the FDA's willingness to consider some forms of evidence, explicitly phrased as such, required the FDA to accept that evidence as meeting a statutory requirement even where the FDA found the evidence unsatisfactory."  *Id.* at 507.

50

**4.** Contrary to petitioners' contention, FDA did not need to consider

petitioners' reliance interests in adjudicating their applications because

FDA "did not introduce a new standard of review in adjudication such that

it likely deprived [petitioner] of fair warning." *Breeze Smoke*, 18 F.4th at

507. The cases petitioners cite are inapposite. Some do not deal with

reliance interests at all. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974);

*Employer Sols. Staffing Grp. II, LLC v. Office of Chief Admin. Hearing Officer*,

833 F.3d 480, 488 (5th Cir. 2016); *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329

(D.C. Cir. 1995). Others involved circumstances in which agencies acted

contrary to a clear and longstanding view of the law's substantive

requirements. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157-

59 (2012); *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 580

(5th Cir. 2017); *PHH Corp. v. CFPB*, 839 F.3d 1, 44-49 (D.C. Cir. 2016),

*reinstated in relevant part*, 881 F.3d 75, 83 (D.C. Cir 2018); *Circus Circus

Casinos, Inc. v. NLRB*, 961 F.3d 469, 478, 481, 487 (D.C. Cir. 2020); *United

States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998).

Here, FDA's denial of petitioners' applications was not contrary to a

clear and longstanding interpretation of the TCA but rather was consistent

with its nonbinding 2019 guidance and other statements regarding the

TCA's evidentiary requirements.  Because FDA did not change course with respect to its interpretation of the TCA's public-health standard, there was no prior interpretation on which manufacturers might have relied, and the agency therefore was not obligated to consider any such reliance.  *Cf. DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

### III.    FDA Reasonably Considered The Risks And Benefits Of Other Tobacco Products In Assessing The Net Benefits of Petitioners' Products

There is likewise no merit to petitioners' contention that FDA lacks authority to require manufacturers to show that their flavored e-cigarette products, which present a significant risk to youth, provide comparatively greater health benefits than other products that do not present the same degree of risk.  FDA reasonably concluded that the inquiry into whether a product will have a net benefit on the public health takes into account whether other products on the market that present less risk to youth are similarly likely to promote smoking cessation and reduction.

The statutory provision governing new tobacco products expressly contemplates a comparative analysis of risk by requiring applications to include "full reports of all information . . . concerning investigations which have been made to show . . . whether [the new] tobacco product presents

52

less risk than other tobacco products." 21 U.S.C. § 387j(b)(1)(A). If a less

risky product provides similar or greater benefits, the public-health

benefits of marketing the riskier product generally will not be sufficient to

make it "appropriate for the protection of the public health." *Id.*

§ 387j(c)(2).

As discussed above, FDA found significant evidence that the risks to

youth presented by flavored e-cigarette products like petitioners' are

significantly greater than the risks presented by tobacco-flavored products,

which "do not pose the same degree of risk of youth uptake." TRITON–

FDA1–000271; TRIVAPE–FDA1–000097. Because of this risk, FDA

concluded that the marketing of flavored e-cigarettes would be appropriate

for the protection of the public health only if such products also provided

an increased benefit over tobacco-flavored e-cigarette products. TRITON–

FDA1–000279; TRIVAPE–FDA1–000105. That conclusion, based on FDA's

scientific expertise, is entitled to deference. *See Serono Labs., Inc. v. Shalala*,

158 F.3d 1313, 1320 (D.C. Cir. 1998).

Indeed, petitioners' own applications for premarket authorization

recognized the importance of comparing a product's risks and benefits to

the risks and benefits of other products on the market, and they sought to

53

satisfy the statutory public-health standard by showing that their flavored

e-cigarettes *do* have an added benefit over other products.  Petitioners

urged, among other things, that "flavors are crucial to getting adult

smokers to make the switch and stay away from combustible cigarettes,"

Vapetasia Blueberry Parfait Salt E-Liquid PMTA 27; that certain survey

respondents "started out using tobacco or menthol flavors but now always

or almost always use other flavors," *id.* at 28; and that this change in

preference "has powerful implications" for "the role of flavors in helping

smokers' transition from smoking to vaping" and "helping vapers

maintain smoking abstinence and preventing relapse to smoking," *id.*

Consistent with the statute, petitioners sought to demonstrate that their

products would provide benefits to existing users of tobacco products

relative to other products.  In submitting their applications, petitioners

essentially recognized the applicable standard but fell short in producing

the evidence to satisfy that standard.

Contrary to petitioners' contention (Br. 42-43), FDA did not conflate

the TCA's public-health requirement with the "safe" and "effective"

standard applied in the drug context.  21 U.S.C. § 355(b)(1)(A)(i).  Unlike

the premarket review standard for drugs, which requires the submission of

information to show whether a drug is safe and effective, the TCA requires

premarket tobacco applications to include information regarding the health

risks of the tobacco product and whether the product presents less risk

than other tobacco products.  FDA did not require, and petitioners did not

produce, the type and quantum of evidence required to satisfy the

standard for approval of new drugs.[17]  Instead of evaluating safety and

effectiveness for treating an indication, FDA in the tobacco-product-

authorization context considers whether the product is appropriate for the

protection of the public health, which here involves consideration of

whether products that pose an acute risk to children and adolescents also

provide a countervailing benefit to existing users of tobacco products that

is greater than the benefit provided by less risky products.

---

[17] For example, agency regulations explain that FDA may refuse to approve a new drug application if, among other things, there is "insufficient information about the drug to determine whether the product is safe for use under the conditions prescribed, recommended, or suggested in [the] proposed labeling," or there is "a lack of substantial evidence consisting of adequate and well-controlled investigations . . . that the drug product will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in its proposed labeling."  21 C.F.R. § 314.125(b)(4)-(5); *see also* 21 U.S.C. § 355(d)(4)-(5). Petitioners did not submit, and FDA would not have required, such evidence of safety or effectiveness (which would be impossible given the inherent risk of tobacco products) in the context of a PMTA.

Petitioners also confuse (Br. 13) the statutory provision governing new tobacco products with the provision that governs products that are "modified risk tobacco products." Even if a tobacco product is not new, the manufacturer cannot market the product as posing a reduced risk compared to commercially marketed tobacco products without first substantiating that claim to FDA. *See* 21 U.S.C. § 387k. The modified risk requirement focuses on claims and other actions directed to consumers to communicate a reduced risk. *See id.* This provision is distinct from the provision at issue here, which relates to the sufficiency of the evidence that allowing a new tobacco product to enter the market would be appropriate for the protection of the public health. As part of that inquiry, § 387j(b)(1)(A) specifically directs manufacturers to provide evidence of "whether [a new] tobacco product presents less risk than other tobacco products" in order to support the inquiry required by that section, but that is different from the statutory requirement for substantiating a modified-risk claim.

For similar reasons, petitioners are incorrect to assert that FDA could not consider a product's comparative risks and benefits in reviewing a marketing application without first adopting a new "tobacco product

56

standard" through notice-and-comment rulemaking.  Br. 45.  While Congress gave FDA broad authority to promulgate new tobacco product standards through rulemaking, 21 U.S.C. § 387g, it also expressly directed FDA to adjudicate applications for marketing authorization under § 387j and to deny any applications that do not meet the statutory public-health standard.  *Id.* § 387j(c).  Those are distinct sources of authority, and the provisions governing marketing applications expressly put the onus on manufacturers, not FDA, to establish the appropriateness of new products prior to marketing—a burden that petitioners are trying to flip here by invoking an inapposite provision.

Petitioners suggest that FDA's adjudications threaten "a *de facto* ban on flavored ENDS products" because the agency could potentially "manipulate the comparative efficacy" analysis.  Br. 46.  But petitioners concede that FDA has not imposed an "outright prohibition on characterizing flavors."  *Id.*  Many marketing applications for flavored e-cigarettes remain pending, and FDA continues to evaluate in each instance whether there is evidence demonstrating that a flavored product provides a net benefit to the public health notwithstanding the pronounced risk to youth—consistent with § 387j(c).

## IV.    Any Relief Would Properly Be Limited To A Remand

Assuming arguendo that the petitions are granted, the Court should set aside the orders and remand to FDA for further proceedings—the relief prescribed by the APA, 5 U.S.C. § 706(2).  "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct[] legal standards." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)).  Relief in an APA case is thus ordinarily "limited only to vacating the unlawful action," and courts should not enjoin an agency to implement a specific remedy that "preclud[es] future agency decisionmaking." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 46 n.1 (D.C. Cir. 2013) (per curiam).

Petitioners agree that, "[i]f the Court concludes . . . that FDA lacks statutory authority to impose a comparative efficacy requirement for flavored ENDS products, the Court should set aside and vacate the MDOs and remand the issue back to FDA for further consideration of [petitioners' applications] in light of the Court's determination."  Br. 48.  But petitioners

incongruously contend that if the Court instead rejects petitioners' contention that FDA exceeded its statutory and concludes only that FDA failed to consider possible reliance interests, the Court should "go one step further" and grant petitioners' additional relief—specifically, an injunction preventing FDA from acting on the applications for eighteen months. As a general matter, there is no basis for awarding *greater* relief in the event the Court finds the agency committed a *lesser* error. And there is no basis for entering an injunction in the specific circumstances of this case.

Petitioners' claim that FDA might act unreasonably on remand, thereby necessitating an injunction, is speculative and unfounded. Br. 49 (asserting without any basis that petitioners "run the risk that FDA would not afford them a reasonable opportunity to satisfy the newly announced comparative efficacy requirement through appropriate studies before again issuing a marketing denial order"). FDA would be obligated on remand to act consistent with the Court's order. And any failure to do so would properly be the subject of further litigation, not the anticipatory injunctive relief petitioners seek.

## CONCLUSION

For the foregoing reasons, the petitions for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*
  *Civil Division*

*Of Counsel:*

DANIEL J. BARRY
  *Acting General Counsel*
  *Dep't of Health and Human Services*

ARUN G. RAO
  *Deputy Assistant Attorney General*

WENDY S. VICENTE
  *Acting Deputy Chief Counsel for Lit.*
  *Food and Drug Administration*

GUSTAV W. EYLER
  *Director*

SETH I. HELLER
  *Associate Chief Counsel*
  *Office of the Chief Counsel*
  *Food and Drug Administration*

HILARY K. PERKINS
  *Assistant Director*

  */s/ Noah T. Katzen*
NOAH T. KATZEN
  *Trial Attorney*
  *Consumer Protection Branch*
  *U.S. Department of Justice*
  *450 5th Street, NW*
  *Washington, DC 20001*

  *(202) 305-2428*

December 2021

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Noah T. Katzen*
NOAH T. KATZEN

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of

Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been

prepared in 14-point Book Antiqua, a proportionally spaced font.

I further certify that this brief complies with the type-volume

limitation of Rule 32(a)(7)(B) because it contains 11,507 words, excluding

the parts of the brief exempted under Rule 32(f), according to the count of

Microsoft Word.

_/s/ Noah T. Katzen_
NOAH T. KATZEN