No. 21-60766 consolidated with No. 21-60800

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

WAGES AND WHITE LION INVESTMENTS, LLC, DOING BUSINESS AS TRITON DISTRIBUTION, *ET AL.*,

*Petitioners,*

v.

U.S. FOOD AND DRUG ADMINISTRATION,

*Respondent.*

On Review of a Final Marketing Denial Order by the
United States Food & Drug Administration

## BRIEF OF *AMICUS CURIAE* R.J. REYNOLDS VAPOR COMPANY IN SUPPORT OF PETITIONERS

Noel J. Francisco
Christian G. Vergonis
Ryan J. Watson
Andrew J. Bentz
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel: 202-879-3939
njfrancisco@jonesday.com
cvergonis@jonesday.com
rwatson@jonesday.com
abentz@jonesday.com

*Counsel for Amicus Curiae R.J. Reynolds Vapor Company*

## CERTIFICATE OF INTERESTED PERSONS
Nos. 21-60766 and 21-60800

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. *Amicus Curiae* R.J. Reynolds Vapor Company is a direct, wholly owned subsidiary of RAI Innovations Company; RAI Innovations Company is a direct, wholly owned subsidiary of Reynolds American Inc.; and Reynolds American Inc. is an indirect, wholly owned subsidiary of British American Tobacco, p.l.c., a publicly traded company. No publicly traded corporation owns 5% or more of the outstanding shares of British American Tobacco, p.l.c.

2. The order on review potentially affects the financial interests of the tobacco industry as a whole, including manufacturers, distributors, retailers, as well as consumers. Such entities may include, among others, other applicants that filed applications pursuant to 21 U.S.C. § 387j with FDA.

The parties and their counsel are:

| Petitioners | Counsel |
|---|---|
| Wages and White Lion Investments, LLC d/b/a Triton Distribution | Anthony J. Hornbach
THOMPSON HINE LLP
312 Walnut Street, Suite 2000
Cincinnati, OH 45202 |

Certificate 1

Eric Heyer
Joseph Andrew Smith
James Christopher Fraser
THOMPSON HINE LLP
2049 Century Park E
Washington, DC 20036

Vapetasia LLC

Anthony J. Hornbach
THOMPSON HINE LLP
312 Walnut Street, Suite 2000
Cincinnati, OH 45202

Eric Heyer
Joseph Andrew Smith
James Christopher Fraser
THOMPSON HINE LLP
2049 Century Park E
Washington, DC 20036

| Respondent | Counsel |
| --- | --- |
| Food & Drug Administration | Benjamin Lewis<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Appellate Section<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530 |
| | Noah T. Katzen<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division<br>Federal Programs Branch<br>1100 L Street NW<br>Washington, DC 20005 |
| | Sean R. Keveney<br>Wendy S. Vicente<br>U.S. FOOD AND DRUG<br>ADMINISTRATION<br>Office of General Counsel |

Certificate 2

|  |  |
|---|---|
|  | 10903 New Hampshire Avenue<br>White Oak 31<br>Silver Spring, MD 20993 |
| *Amici Curiae* in Support of Petitioners | Counsel |
| American Vaping Association, Inc.<br>American Vapor Manufacturers Association, Inc.<br>Consumer Advocates for Smoke-Free Alternatives Association, Inc.<br>Smoke-Free Alternatives Trade Association, Inc.<br>United Vapers Alliance, Inc. | J. Gregory Troutman<br>TROUTMAN LAW OFFICE, PLLC<br>Suite 201<br>420 Springhurst Boulevard<br>Louisville, KY 40241 |
| David B. Abrams<br>Clive D. Bates<br>David T. Sweanor, J.D. | Mary G. Bielaska<br>ZANICORN LEGAL, P.L.L.C.<br>845 Third Avenue<br>6th Floor<br>New York, NY 10022<br><br>Michael D. Matthews, Jr.<br>MCDOWELL HETHERINGTON, L.L.P.<br>1001 Fannin Street<br>Suite 2700<br>Houston, TX 77002 |
| Vapor Technology Association | Anthony Abboud<br>LAW OFFICES OF TONY ABBOUD<br>950 Hawthorne Lane<br>Northbrook, IL 60062 |
| R.J. Reynolds Vapor Company | Christian G. Vergonis<br>Noel J. Francisco<br>Ryan J. Watson<br>Andrew J. Bentz<br>JONES DAY<br>51 Louisiana Ave., NW |

Certificate 3

|  | Washington, DC 20001 |
|  | Tel: 202-879-3939 |
|  | JONES DAY |
|  | 51 Louisiana Ave., NW |
|  | Washington, DC 20001 |

| *Amici Curiae* in Support of Respondent | Counsel |
|---|---|
| American Academy of Pediatrics American Cancer Society Cancer Action Network American Heart Association American Lung Association Campaign for Tobacco-Free Kids Parents Against Vaping e-cigarettes Truth Initiative Foundation d/b/a Truth Initiative | Leane K. Capps POLSINELLI, P.C. 4020 Maple Avenue Suite 2100 Dallas, TX 75219 Scott P. Lewis Austin Paganelli Anderson ANDERSON & KRIEGER, L.L.P. 50 Milk Street Boston, MA 02109 |
| American Medical Association Louisiana State Medical Society American Academy of Family Physicians | Scott P. Lewis Austin Paganelli Anderson ANDERSON & KRIEGER, L.L.P. 50 Milk Street Boston, MA 02109 |

Dated: March 13, 2026

Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco
*Counsel for Amicus Curiae R.J. Reynolds Vapor Company*

Certificate 4

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICUS CURIAE* ................................................................. 1

ARGUMENT ...................................................................................................... 2

I.   FDA VIOLATED THE TCA BY UNLAWFULLY IMPOSING A TOBACCO
PRODUCT STANDARD WITHOUT NOTICE AND COMMENT. ..................... 2

    A.   FDA's Comparative-Efficacy Standard Is a "Tobacco Product
Standard," so the TCA Required Notice and Comment. ..................... 3

    B.   FDA's Contrary Arguments Are Unavailing. ................................... 7

II.  FDA VIOLATED THE APA BY ADOPTING THE COMPARATIVE-EFFICACY
STANDARD WITHOUT NOTICE AND COMMENT. ................................... 9

    A.   The Comparative-Efficacy Standard Is a Substantive Rule That
Was Not Actually the Product of Adjudication. ......................... 10

    B.   Establishing a Comparative-Efficacy Standard Through
Adjudication Would Be an Abuse of Discretion. ......................... 14

    C.   Even If the Comparative-Efficacy Standard Is Guidance, It Is
Unlawful. ......................................................................... 17

III. MENTHOL E-CIGARETTES PRESENT DISTINCT PUBLIC-HEALTH ISSUES
FROM THE OTHER-FLAVORED PRODUCTS AT ISSUE HERE. ................... 18

    A.   Menthol Is Different from Other E-cigarette Flavors. ................... 19

    B.   FDA Arbitrarily Broke from Its Longstanding Treatment of
Menthol. ......................................................................... 22

CONCLUSION .............................................................................................. 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brown-Forman Corp. v. NLRB,*
   --- F.4th ---, 2026 WL 632679 (6th Cir. Mar. 6, 2026) ....................................12, 13, 14

*City of Arlington v. FCC,*
   668 F.3d 229 (5th Cir. 2012), *aff'd on other grounds,* 569 U.S. 290 (2013) ...9, 10, 12, 14

*DHS v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020) .........................................................................................23, 24

*FCC v. Fox TV Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................................. 23

*FDA v. Wages & White Lion Invs., L.L.C.,*
   604 U.S. 542 (2025) ........................................2, 3, 7, 8, 9, 11, 15, 16, 22, 24, 25

*Logic Tech. Dev. LLC v. FDA,*
   84 F.4th 537 (3d Cir. 2023)............................................................. 20, 21, 23, 26

*MacLean v. DHS,*
   543 F.3d 1145 (9th Cir. 2008) (per curiam) ...................................................... 14

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ............................................................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .............................................................................................. 23

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA,*
   752 F.3d 999 (D.C. Cir. 2014) ...................................................................... 17, 18

*NLRB v. Bell Aerospace Co.,*
   416 U.S. 267 (1974) ............................................................................................ 14

*Pfaff v. HUD,*
   88 F.3d 739 (9th Cir. 1996).......................................................................... 14, 15

*RJRV v. FDA,*
   65 F.4th 182 (5th Cir. 2023) .................................1, 2, 3, 4, 5, 7, 10, 11, 22, 23, 25, 27

*RJRV v. FDA,* No. 23-60128 (5th Cir. Mar. 29, 2023) ........................................ 1

*RJRV v. FDA,* No. 23-60545 (5th Cir. Oct. 13, 2023) ......................................... 1

*RJRV v. FDA,* No. 23-60037 (5th Cir. Feb. 2, 2024) ........................................... 1

*Shell Offshore Inc. v. Babbitt,*
   238 F.3d 622 (5th Cir. 2001) .................................................................9, 12, 13

*SWT Global Supply, Inc. v. FDA,*
   2024 WL 3595387 (5th Cir. July 31, 2024) (per curiam), *vacated and
   remanded,* 145 S. Ct. 1919 (2025) ......................................................... 13, 26

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ............................................................... 10, 26

*Wages & White Lion Invs., L.L.C. v. FDA,*
   90 F.4th 357 (5th Cir. 2024) (en banc), *vacated on other grounds,* 604 U.S.
   542 (2025) ........................................................................................... 2, 7

**STATUTES**

Food, Drug, and Cosmetic Act (FDCA)

   FDCA § 302, 21 U.S.C. § 332 ................................................................... 16

   FDCA § 303, 21 U.S.C. § 333 ................................................................... 16

   FDCA § 304, 21 U.S.C. § 334 ................................................................... 16

   FDCA § 701, 21 U.S.C. § 371 ................................................................... 18

   FDCA § 907, 21 U.S.C. § 387g ............................................................3, 4, 19

Administrative Procedure Act ("APA") ...............................................*passim*

   5 U.S.C. § 706 ........................................................................................ 18

Tobacco Control Act ("TCA") ............................................................................*passim*

**REGULATORY AND ADMINISTRATIVE MATERIALS**

21 C.F.R. § 10.115 ............................................................................ 17, 18

*Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act,* 81 Fed. Reg. 28,973 (May 10, 2016) ............................................... 17

FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems* (rev. Apr. 2020) .......................................................................................... 5

FDA, *Flavored Electronic Nicotine Delivery System (ENDS) Premarket Applications – Considerations Related to Youth Risk (Draft Guidance)* (March 2026) ...................................................................................6, 7, 10, 20

FDA, *Roundtable on PMTA Submissions for ENDS Products* (Feb. 10, 2026) ................... 6, 7

FDA, *Technical Project Lead for Wages & White Lion* (Sept. 9, 2021) ................................ 20

FDA, *Technical Project Lead (TPL) of Nicotine Pouch PMTAs* (Dec. 23, 2024) .................... 9

FDA, *Technical Project Lead (TPL) Review of PMTAs* (June 21, 2024) ..................... 6, 10, 27

FDA, *Technical Project Lead (TPL) Review of PMTAs* (July 17, 2025) ........................... 6, 10

*Tobacco Product Standard for Menthol in Cigarettes,* 87 Fed. Reg. 26,454 (May 4, 2022) ............................................................................................ 5

**OTHER AUTHORITIES**

CDC, *More than 2.5 Million Youth Reported E-cigarette Use in 2022* (Oct. 6, 2022) ...................................................................................... 21

CDC, *Notes from the Field* (Sept. 5, 2024) ................................................ 21

FDA Brief, *Breeze Smoke v. FDA,* No. 24-60304 (filed Sept. 1, 2026) ....................... 7, 25

FDA Brief, *NicQuid v. FDA,* No. 24-60272 (filed Dec. 22, 2025) .......................... 7, 25

FDA Brief, *VDX Distro v. FDA,* No. 24-60537 (filed Sept. 15, 2025) ..........7, 8, 25, 26

FDA, *FDA Denies Marketing for 65 "MNGO Disposable Stick" E-Cigarettes* (Apr. 15, 2024) ............................................................................. 5

H.R. Rep. No. 111-58, pt. 1 (2009) ................................................ 19, 20

Merriam-Webster Dictionary ............................................................ 4

## INTEREST OF *AMICUS CURIAE* [1]

Through FDA's ongoing review of premarket tobacco product applications for flavored e-cigarettes, the agency has flouted basic principles of administrative law.[2] FDA's unlawful actions hurt not only Petitioners here but many other businesses—including *amicus* R.J. Reynolds Vapor Company ("RJRV"). RJRV sells menthol-flavored Vuse e-cigarettes. By denying authorization to continue marketing those products, FDA threatens to endanger public health (by potentially driving former smokers back to risky combustible cigarettes) and upend the marketplace. Those denial orders, however, are likely unlawful, as multiple motions panels of this Court have found. *RJRV v. FDA* ("*RJRV*"), 65 F.4th 182 (5th Cir. 2023); Stay Order, *RJRV v. FDA*, No. 23-60128 (5th Cir. Mar. 29, 2023); Stay Order, *RJRV v. FDA*, No. 23-60037 (5th Cir. Feb. 2, 2024); *see also* Admin. Stay Order, *RJRV v. FDA*, No. 23-60545 (5th Cir. Oct. 13, 2023).

In issuing denial orders to Petitioners and RJRV, FDA violated the Tobacco Control Act and APA by imposing a comparative-efficacy requirement on flavored e-cigarettes—including menthol e-cigarettes—without notice and comment. *Amicus* submits this brief to expound on Petitioners' discussion of that error (Pet'rs' Suppl. Br.

---

[1] This brief is submitted with the consent of all parties. Undersigned counsel certifies that this brief was not authored in whole or part by counsel for any parties; no party or party's counsel contributed money for the brief; and no one other than *Amicus* and its counsel has contributed money for this brief.

[2] This brief refers to e-cigarette products as "e-cigarettes," and all non-tobacco-flavored e-cigarettes as "flavored e-cigarettes."

20–38), and explain why FDA's treatment of menthol e-cigarettes presents legal challenges different from those created by its treatment of non-menthol flavors here.

## ARGUMENT

### I.  FDA VIOLATED THE TCA BY UNLAWFULLY IMPOSING A TOBACCO PRODUCT STANDARD WITHOUT NOTICE AND COMMENT.

In reviewing e-cigarette applications, FDA may either adopt bright-line standards through rulemaking or proceed through case-by-case adjudication requiring a holistic evaluation of multiple factors. Confronted with applications covering millions of e-cigarettes, FDA understandably sought a bright-line rule to streamline its review. It had the authority to adopt one—but only through rulemaking that gave manufacturers and consumers an opportunity to comment. Instead, FDA proceeded in secret and imposed its comparative-efficacy standard without public notice and comment.

That was unlawful, as this Court has recognized twice. *Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 384 n.5 (5th Cir. 2024) (en banc), *vacated on other grounds*, 604 U.S. 542 (2025); *RJRV*, 65 F.4th at 194. Indeed, in this Court's words, this issue is "not a close call." *RJRV*, 65 F.4th at 194. This Court's previous en banc holding in this case remains binding as both circuit precedent and law of the case, as the Supreme Court expressly declined to disturb it. *See Wages*, 604 U.S. at 565 (acknowledging this Court's holding that the TCA "required notice-and-comment rulemaking" and stating, "we do not reach that question and express no view on its merits"). This Court thus should and must adhere to that holding.

2

## A. FDA's Comparative-Efficacy Standard Is a "Tobacco Product Standard," so the TCA Required Notice and Comment.

Although agencies may generally develop regulatory standards through either rulemaking or adjudication, "if a statute requires rulemaking, the affected agency must comply." *Wages*, 604 U.S. at 565. As this Court previously held, "[t]here is no dispute that the TCA requires the FDA to abide by notice-and-comment rulemaking procedures before establishing a 'tobacco product standard.'" *RJRV*, 65 F.4th at 192. The TCA provides that FDA "*shall*" use "rulemaking for the establishment … of *any* tobacco product standard." 21 U.S.C. § 387g(c)(1) (emphasis added); *see also id.* § 387g(d). Here, it is undisputed that FDA did not engage in notice-and-comment rulemaking before establishing the "comparative-efficacy standard." *Wages*, 604 U.S. at 565. The only question is whether that standard is a "tobacco product standard."

The answer is "yes," as this Court has held. *See RJRV*, 65 F.4th at 193 (FDA's "new standard of evidence" is a "tobacco product standard"). As the Supreme Court concluded, FDA has established "requirements that must be met in a premarket tobacco product application" for any flavored e-cigarette. *Wages*, 604 U.S. at 565. Specifically, FDA has imposed a "comparative-efficacy standard," which requires manufacturers "to compare the health effects" of their flavored e-cigarettes "to those of tobacco-flavored" e-cigarettes. *Id.* at 578–81. The manufacturer must show that its flavored e-cigarettes "*promote more switching*" for smokers or substantially reduce smoking more than "tobacco-flavored e-cigarettes." *Id.* at 578 (emphasis added). And if that

3

"precise comparison" is not shown, FDA will "categorically reject[]" the application. *Id.* at 578, 580. It is therefore no surprise that this Court has already held that the comparative-efficacy requirement—which by definition *applies only* to flavored e-cigarettes and requires those products to meet a heightened standard—is a tobacco product standard. *See RJRV*, 65 F.4th at 193.[3]

This Court's straightforward conclusion that the comparative-efficacy requirement is a tobacco product standard accords with the TCA's text. The ordinary meaning of "standard" is "a level of quality, achievement, performance that is considered acceptable or desirable." *Standard*, Merriam-Webster, https://tinyurl.com/3rpyeb39 (last visited Mar. 10, 2025) (definition 3b). And FDA's comparative-efficacy requirement mandates a level of performance that certain tobacco products must meet: a flavored e-cigarette must perform better at reducing cigarette use than a tobacco-flavored cigarette. So it is a standard.

Congressional and agency practice confirm that conclusion. Congress—in the section of the TCA entitled "Tobacco product standards"—refers to a flavor-based requirement as a "tobacco product standard." 21 U.S.C. § 387g(a)(1)(A); *see also id.* § 387g(a)(2) (calling the rule about flavors in cigarettes a "tobacco product standard[]"); *id.* § 387g(a)(3) (same). FDA likewise has repeatedly characterized flavor-based

---

[3] Although this case does not involve menthol e-cigarettes, FDA also applies the comparative-efficacy standard to them. *RJRV*, 65 F.4th at 194.

requirements as "tobacco product standards," including when it proposed (via rulemaking) a "product standard" that would ban menthol as a characterizing flavor in cigarettes, 87 Fed. Reg. 26,454, 26,455–56 (proposed May 4, 2022), and when it explained that "*restricting* or eliminating the use of flavors in" e-cigarettes would be a "tobacco product standard," FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems* 34 (rev. Apr. 2020) (emphasis added) ("2020 Guidance"), https://tinyurl.com/zf4f9n77.

Other FDA actions further confirm this reading. In March 2023, when this Court issued its decision in *RJRV*, FDA had not granted "a single application to market non-tobacco-flavored e-cigarettes"—meaning it had "denied over 355,000 such applications, which amount to 99% of all timely-filed [applications]." *RJRV*, 65 F.4th at 192.[4] This Court observed that FDA's new standard of evidence for non-tobacco-flavored e-cigarettes thus amounted to "a *de facto* ban on non-tobacco-flavored e-cigarettes"—which was yet more evidence that the new requirement was a "tobacco product standard" as defined by the TCA. *Id.* To be clear, the *de facto* ban (at the time) is not the standard. The standard is the comparative-efficacy requirement. The fact that FDA denied virtually every application for a flavored e-cigarette just proves that *there is* a standard.

---

[4] FDA has continued to deny applications, citing the comparative-efficacy requirement. *See, e.g.*, FDA, *FDA Denies Marketing for 65 "MNGO Disposable Stick" E-Cigarettes* (Apr. 15, 2024), https://tinyurl.com/565ny8fw ("FDA Press Release").

Since then, FDA issued orders granting authorization to market menthol e-cigarettes to two companies, NJOY and JUUL. In doing so, FDA explicitly confirmed that the manufacturer of a flavored e-cigarette—including menthol—"has a higher burden" than the manufacturer of a tobacco-flavored product via the comparative-efficacy standard. FDA, *Technical Project Lead (TPL) Review of PMTAs* ("NJOY Ace Review") at 5–6 (June 21, 2024), https://tinyurl.com/3vca9t99 ("evidence of an added benefit from the flavored [e-cigarette] relative to that of tobacco-flavored [e-cigarettes]"); FDA, *Technical Project Lead (TPL) Review of PMTAs* ("JUUL Menthol Review") at 6 (July 17, 2025), https://tinyurl.com/k8ka43my (same).

If that were not enough, FDA stated at a recent FDA Roundtable: "[I]n reviewing PMTAs for flavored ENDS, FDA looks for robust and reliable product-specific evidence of a new product's benefits for adult smokers" and "[s]pecifically, … evidence that the flavored ENDS are likely to promote complete switching or significantly reduced cigarette smoking in adults beyond that of tobacco-flavored ENDS." FDA, *Roundtable on PMTA Submissions for ENDS Products*, at 5:18:55–5:19:15 (Feb. 10, 2026) ("Roundtable"), https://tinyurl.com/r3d943kn. And just days ago FDA released new draft guidance acknowledging that it applies the comparative-efficacy standard to flavored e-cigarettes. FDA, *Flavored Electronic Nicotine Delivery System (ENDS) Premarket Applications – Considerations Related to Youth Risk (Draft Guidance)* 4 (March 2026) ("Draft Guidance"), https://tinyurl.com/452cp63s ("That approach remains

6

unchanged."). FDA even *admitted* at the Roundtable that it is avoiding notice-and-comment procedures in order to evade judicial review, explaining its belief that issuing a regulation would generate "lawsuits" and "drag[] the process out." Roundtable at 45:41–45:53. So instead, FDA "give[s] guidance to [its] own staff" (*id.* at 45:57–46:04), and leaves the public out of the process.

Thus, because "FDA unquestionably failed to follow" the TCA's "notice-and-comment obligations" before imposing the comparative-efficacy standard on flavored e-cigarettes, the denials should be vacated. *RJRV*, 65 F.4th at 193; *Wages*, 90 F.4th at 384 n.5, *vacated on other grounds*, 604 U.S. at 565 (declining to reach this issue).

## B.    FDA's Contrary Arguments Are Unavailing.

In other cases pending before this Court, FDA argues that it did not violate the TCA by adopting the comparative-efficacy standard without notice and comment. *See* FDA Brief, *Breeze Smoke v. FDA*, No. 24-60304 (filed Sept. 1, 2026); FDA Brief, *NicQuid v. FDA*, No. 24-60272 (filed Dec. 22, 2025); FDA Brief, *VDX Distro v. FDA*, No. 24-60537 (filed Sept. 15, 2025) ("FDA *VDX* Br."). FDA's arguments fail.

*First*, invoking the Supreme Court's observation that agencies generally may develop regulatory standards by adjudication, FDA argues that the TCA permits FDA to adopt a tobacco product standard through adjudication. *E.g.*, FDA *VDX* Br. 47–48. But FDA ignores not only the first clause of that quotation—"[u]nless Congress has specified otherwise"—but also the next sentence of the Supreme Court's opinion, which said: "Of course, if a statute requires rulemaking, the affected agency must

7

comply." *Wages*, 604 U.S. at 565. That is precisely what the TCA requires, as this Court has already held. *See supra* Section I.A.

*Second*, FDA argues that its requirement is not actually an across-the-board standard, and that the agency has just been "consistent in its approach" to individual applications. *E.g.*, FDA *VDX* Br. 48. But both this Court and the Supreme Court have recognized that FDA requires comparative-efficacy evidence for every flavored e-cigarette application. *See Wages*, 604 U.S. at 578, 582 (referring to FDA's "comparative-efficacy standard" and "comparative-efficacy requirement"); *RJRV*, 65 F.4th at 192 (noting that FDA adopted a "heightened evidentiary standard"). That is a tobacco product standard.

*Third*, FDA suggests that even if the comparative-efficacy requirement *is* a standard, FDA did not come up with that standard on its own, and Congress somehow "expressly" imposed it in the TCA. *E.g.*, FDA *VDX* Br. 39.

That argument is foreclosed by the Supreme Court's decision and the statutory text. As the Supreme Court recognized, neither the TCA nor FDA originally imposed the comparative-efficacy requirement. The TCA's text merely requires applicants to compare their products to "*other tobacco products*"; it does not specify that applicants must make "cross-flavor comparisons" to tobacco-flavored e-cigarette products. *Wages*, 604 U.S. at 578 (quoting 21 U.S.C. § 387j(b)(1)(A)). Furthermore, for many years, FDA never required that "manufacturers must draw that precise comparison." *Id.* at 580. "[I]n fact, [FDA's] 2019 guidance gave manufacturers some discretion in choosing

8

appropriate comparators as long as the FDA could understand an applicant's rationale and justification for comparators chosen." *Id.* Only later did FDA adopt the comparative-efficacy standard. *Id.* Indeed, FDA does not apply (nor claim to apply) the comparative-efficacy requirement to flavored products in *other* categories—most notably, oral nicotine pouches—which refutes the claim that the standard is mandated by the statute. FDA, *Technical Project Lead (TPL) of Nicotine Pouch PMTAs* (Dec. 23, 2024), https://tinyurl.com/2j7a7z6p. Thus, as the Supreme Court recognized, FDA—not Congress—created the comparative-efficacy standard. *See Wages*, 604 U.S. at 580.

## II.   FDA VIOLATED THE APA BY ADOPTING THE COMPARATIVE-EFFICACY STANDARD WITHOUT NOTICE AND COMMENT.

Whether or not it is a tobacco product standard, FDA's adoption of the comparative-efficacy standard without notice and comment also violated the APA.

An agency's power to develop substantive standards through adjudication is subject to two important limits. First, the agency must have actually engaged in adjudication. "Otherwise, an agency would be able to escape the APA's notice-and-comment requirements simply by labeling a rulemaking an adjudication." *City of Arlington v. FCC*, 668 F.3d 229, 241 (5th Cir. 2012), *aff'd on other grounds*, 569 U.S. 290 (2013); *see also Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). Second, the decision to proceed by adjudication rather than rulemaking must not be an abuse of discretion. *City of Arlington*, 668 F.3d at 241–42. Here, FDA exceeded both of these limits.

9

**A.      The Comparative-Efficacy Standard Is a Substantive Rule That Was Not Actually the Product of Adjudication.**

1.      Unless FDA properly proceeded via adjudication, the comparative-efficacy standard is a substantive rule (not an interpretive one) for which the APA (apart from the TCA) requires notice and comment. Indeed, this Court already concluded in *RJRV* that FDA's "heightened evidentiary standard" "'bears all the hallmarks' of a substantive rule." 65 F.4th at 193.

Whether a rule is "substantive" "turns on whether an agency intends to bind *itself* to a particular legal position." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). An action is binding if it "appears on its face to be binding," "is applied by the agency in a way that indicates it is binding," or "retract[s] an agency's discretion to adopt a different view of the law." *Id.* at 441–42. A substantive rule also typically "affects the rights of broad classes of unspecified individuals." *City of Arlington*, 668 F.3d at 242.

The comparative-efficacy standard plainly qualifies. To begin, FDA has repeatedly stated that applications must meet that standard. *See RJRV v. FDA*, No. 23-60037, Stay App'x A83–84 (5th Cir. Feb. 1, 2023) (FDA denial for menthol Vibe: "there is a lack of evidence to demonstrate that the [menthol e-cigarettes], relative to tobacco-flavored [e-cigarettes], would provide an added benefit for adult smokers"); *see* FDA Press Release (FDA denied authorization for 65 flavored e-cigarettes for the same reason); NJOY Ace Review 5–6; JUUL Menthol Review 6; Draft Guidance 4. FDA may have rescinded the "Fatal Flaw memo," where this heightened standard was first

10

created. *Wages*, 604 U.S. at 558, 577–78. But that is of no moment, because FDA *continues to apply the heightened standard across the board,* as discussed above.

Moreover, the back-and-forth about whether FDA followed or rescinded the Fatal Flaw memo is a red herring. That tug-of-war was about whether FDA had required particular types of evidence ("randomized controlled trials" or "longitudinal cohort studies," as indicated in the Fatal Flaw memo, or any form of "reliabl[e] and robust[]" evidence). *Wages*, 604 U.S. at at 577. That is beside the point here. Whatever the type of acceptable evidence, FDA requires that a flavored e-cigarette outperform tobacco-flavored e-cigarettes when it comes to reducing smoking. And that requirement—separate from the type of evidence used to establish it—is a binding substantive rule. *See supra* Section I.A.

FDA's comparative-efficacy standard bears the other indicators of a substantive rule. The comparative-efficacy standard has "affected the rights of literally hundreds of thousands of applicants." *RJRV*, 65 F.4th at 194. Further, reviewers have no "discretion to consider individual [applications]." *Id.* at 193. Instead, if a manufacturer fails to provide comparative-efficacy evidence, the reviewer *must* reject the application, even if other aspects of the application make up for that lack of evidence. *Id.* at 194.

2.    Because FDA's comparative-efficacy standard is a substantive rule, the APA requires notice-and-comment rulemaking unless FDA developed the standard through adjudication. But FDA did not do that here.

11

An agency may forgo notice and comment when establishing a substantive policy only if the policy actually "was the product of adjudication rather than rulemaking." *City of Arlington*, 668 F.3d at 240. But a court cannot just rely on the agency's say-so, because that would enable the agency "to escape the APA's notice-and-comment requirements simply by labeling a rulemaking an adjudication." *Id.* at 241; *see also* Pet'rs' Suppl. Br. at 20, 23-24 (citing cases).

Rather, as this Court has explained, agency action amounts to rulemaking, rather than an adjudication, where the agency "establishe[s] a new policy and then applie[s] that new policy to several [applicants]," such that the "new policy [i]s the basis for the adjudication, rather than the facts of the adjudication causing [the agency]" to adopt the policy. *Shell Offshore*, 238 F.3d at 628. In *Shell Offshore*, for example, this Court relied on the agency's internal memoranda and correspondence with the plaintiff to reject the agency's denial of an application on the ground that the policy applied in the adjudication of the application was "in effect, a new 'substantive' rule" that should have gone through notice-and-comment rulemaking. *Id.*

Similarly, the Sixth Circuit recently held unlawful the NLRB's attempt to rely on a substantive rule that it claimed to have developed via adjudication. *Brown-Forman Corp. v. NLRB*, --- F.4th ---, 2026 WL 632679 (6th Cir. Mar. 6, 2026). There, the NLRB issued a bargaining order under the Board's new *Cemex* standard, which the Board had announced in an adjudication. *Id.* at *6. The Sixth Circuit held that the *Cemex* standard was "improperly promulgated" "under the guise of adjudication" because it was a

12

"general, non-case-specific rule[]" that "was not derived from the case-specific facts of the contemporaneous adjudication." *Id.* at *6, *11, *15.

Like the policies applied in *Shell Offshore* and *Brown-Forman*, the comparative-efficacy requirement was not developed in adjudication. As described above, FDA first established the standard and then applied it to deny hundreds of thousands of applications "using the same boilerplate language." *SWT Global Supply, Inc. v. FDA*, 2024 WL 3595387, at *2 (5th Cir. July 31, 2024) (per curiam), *vacated and remanded*, 145 S. Ct. 1919 (2025). FDA did all of this pursuant to the policy first articulated in the internal Fatal Flaw memorandum (and subsequently restated in its August 17, 2021 memorandum, *see* Pet'rs' Suppl. Br. at 22), which FDA explicitly grounded in "existing scientific evidence and our experiences … over the last several years," A177 (superseding memorandum), *not* "the facts of [an] adjudication," *Shell Offshore*, 238 F.3d at 628; *Brown-Forman Corp.*, 2026 WL 632679, at *6, *11. *See also* Pet'rs' Suppl. Br. at 22-23 (discussing similar characteristics of August 17, 2021 memorandum). In fact, FDA announced its "objective" "to take final action on as many applications as possible" by the looming deadline and to "address these applications by applying a standard for evidence" (A155)—thus impermissibly "establish[ing] a new policy [first] and then appl[ying] that new policy to several [applications]. *Shell Offshore*, 238 F.3d at 628; *see also* A168 ("We intend to conduct a streamlined scientific review of PMTAs for flavored ENDS to determine whether the applications contain evidence of this type."). Indeed,

13

the comparative-efficacy requirement's "broad utility accentuates why adjudication was not the proper process for its creation." *Brown-Forman Corp.*, 2026 WL 632679, at \*15.

In sum, the comparative-efficacy standard is a substantive rule that was not created through rulemaking or adjudication. It is therefore unlawful under the APA.

### B.    Establishing a Comparative-Efficacy Standard Through Adjudication Would Be an Abuse of Discretion.

Even if FDA developed its comparative-efficacy standard through adjudication, FDA still violated the APA. An agency's "discretion" to proceed through adjudication "is not unlimited." *City of Arlington*, 668 F.3d at 241. "[T]here may be situations where [an agency's] reliance on adjudication would amount to an abuse of discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). "An agency adjudication may require a notice and comment period if it constitutes de facto rulemaking that 'affects the rights of broad classes of unspecified individuals.'" *MacLean v. DHS*, 543 F.3d 1145, 1151 (9th Cir. 2008) (per curiam); *see also City of Arlington*, 668 F.3d at 241–42 (endorsing *MacLean*). Moreover, it is an abuse of discretion to proceed through adjudication "where the new standard … departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application." *Pfaff v. HUD*, 88 F.3d 739, 748 (9th Cir. 1996); *see also City of Arlington*, 688 F.3d at 242–43.

14

*Pfaff* is instructive. There, HUD brought an enforcement action against a landlord who imposed a numerical-occupancy restriction. HUD determined that restriction amounted to "familial status" discrimination, relying on a previous decision by the HUD Secretary (*"Mountain Side"*)—which required the landlord to show the occupancy restriction was the least restrictive means of achieving a compelling business necessity. The Ninth Circuit held that HUD abused its discretion in creating the "compelling business necessity" requirement through adjudication, explaining that "the *Mountain Side* standard is broad, general, and prospective in application." 88 F.3d at 748. "[A]s the Pfaffs' case shows," failure to comply would result in severe penalties. *Id.* And "most egregiously, HUD has made inconsistent and misleading representations to those regulated." *Id.* Those factors showed that HUD should have engaged in rulemaking— not adjudication—to establish the "compelling business necessity" standard. *Id.*

The same is true here. FDA's comparative-efficacy standard is "broad, general, and prospective in application." The standard applies to all applications for all 6+ million flavored e-cigarettes. *Wages*, 604 U.S. at 562, 578. It is a general standard, not tailored to any one application. And, after FDA settled on the standard, it applied it going forward. It is not retroactive in the traditional sense; this is not like a court or agency determining whether someone violated a regulation. It is instead a forward-looking rule—which FDA applied to pending applications without giving applicants fair notice of the standard. Moreover, failure to comply with the standard means the marketing application will be denied. And marketing an e-cigarette without

15

authorization can result in severe—even criminal—penalties. *See* 21 U.S.C. §§ 332(a), 333(a) & (f)(9)(A), 334(a) & (g).

FDA's nebulous and inconsistent approach confirms that adopting the comparative-efficacy standard through adjudication (even if that is what happened), rather than notice-and-comment rulemaking, was an abuse of discretion. Before FDA demanded applications be submitted in 2020, FDA never explicitly told applicants that flavored e-cigarettes (in particular *menthol*-flavored e-cigarettes) must be compared to tobacco-flavored e-cigarettes. As the Supreme Court noted, "FDA has not pointed us to any portion of its predecisional guidance that said in so many words that manufacturers [of non-menthol flavored e-cigarettes] must draw that precise comparison." *Wages*, 604 U.S. at 580. "And, in fact, the 2019 guidance gave manufacturers some discretion in choosing appropriate comparators as long as the 'FDA [could] understand [an] applicant's rationale and justification for comparators chosen.'" *Id.* The agency suggested comparing non-menthol/non-tobacco-flavored e-cigarettes to products "with *similar* nicotine content, *flavors*, and other ingredients." *Id.* at 579 (emphasis added). But then, FDA denied applications for non-menthol/non-tobacco-flavored e-cigarettes that failed to show the flavored e-cigarette outperformed tobacco-flavored ones.

It is true that the Supreme Court went on to conclude that, as to non-menthol/non-tobacco-flavored e-cigarettes, the standard "was a natural consequence of its predecisional guidance." *Id.* at 580. But the question here is whether FDA abused

16

its discretion in creating that standard *without notice and comment*. Clearly, given FDA's past (at best) ambiguous statements on what was required before applications were due, FDA should have gone through notice and comment to provide companies with pending applications a chance to weigh in and potentially amend their applications. At a minimum, it was an abuse of discretion for FDA to establish the comparative-efficacy requirement through adjudication when it had years to do so through rulemaking. FDA knew of its need to review flavored e-cigarette applications beginning with the 2016 Deeming Rule, 81 Fed. Reg. 28,973, 28,977–78 (May 10, 2016), and only got around to denying applications under the comparative-efficacy requirement five years later.

### C. Even If the Comparative-Efficacy Standard Is Guidance, It Is Unlawful.

Even if the comparative-efficacy standard were merely guidance rather than a substantive rule, FDA regulations required FDA to seek public comment. FDA's "good guidance practices" are judicially enforceable "policies and procedures for developing, issuing, and using guidance documents." 21 C.F.R. § 10.115(a); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). "Guidance documents are documents … that describe the agency's interpretation of or policy on a regulatory issue." 21 C.F.R. § 10.115(b)(1). "Level 1 guidance documents," which include guidance that details "changes in interpretation or policy that are of more than a minor nature," or "highly controversial issues," *id.* § 10.115(c)(1)(ii) & (iv), must satisfy stringent

procedural requirements, including public comment, *see id.* § 10.115(g)(1); *see also* 21 U.S.C. § 371(h)(1)(C)(i).

If the comparative-efficacy standard is not a substantive rule, then the consistent practice applying it amounts (at minimum) to Level 1 guidance requiring public comment. FDA's implementation (and memorialization) of the standard marked a "change[] in [FDA's] interpretation or policy that [was] of more than a minor nature," 21 C.F.R. § 10.115(c)(1)(ii), by departing from its past treatment of menthol e-cigarettes, *infra* Section III. At a minimum, the guidance concerned a "highly controversial issue," 21 C.F.R. § 10.115(c)(1)(iv)—as evidenced by the litigation involving FDA's ever-shifting views on flavored e-cigarette products.

FDA's regulations require FDA to provide the public an opportunity to comment on its guidance; FDA's failure to do so renders its implementation of the comparative-efficacy standard to flavored e-cigarettes contrary to law. 5 U.S.C. § 706(2)(A); *Clean Air Project*, 752 F.3d at 1009.

## III. MENTHOL E-CIGARETTES PRESENT DISTINCT PUBLIC-HEALTH ISSUES FROM THE OTHER-FLAVORED PRODUCTS AT ISSUE HERE.

Regardless how the Court resolves the denial orders about the non-menthol flavor e-cigarettes at issue here, menthol is unique. So even if this Court were to uphold FDA's orders in this case, it should make clear that menthol presents special considerations not at issue here.

## A. Menthol Is Different from Other E-cigarette Flavors.

Congress, FDA, and public-health experts have repeatedly recognized the unique public-health considerations—and even distinctive potential public-health *benefits*—of menthol e-cigarettes. These factors require distinguishing challenges to denial orders involving menthol e-cigarettes from the challenge here.

**1.** In the TCA, Congress prohibited characterizing flavors in combustible cigarettes, but specifically carved out tobacco and menthol flavors from that ban. 21 U.S.C. § 387g(a)(1)(A). The carve-out reflects Congress's view that there are "unique issues surrounding menthol cigarettes." H.R. Rep. No. 111-58, pt. 1, at 38 (2009). Congress instead targeted "'characterizing flavors' that appeal to youth"—a decision it viewed as "[c]onsistent with the overall intent of the bill to protect the public health, including by reducing the number of children and adolescents who smoke cigarettes." *Id.* at 37. It "concluded that the ban [on all flavors except menthol and tobacco] will not lead to negative public health effects, because of how the affected products generally are used and because of their low overall use by adult smokers." *Id.* at 38. Banning menthol, on the other hand, "would pose different questions of public health." *Id.* (citing, among other things, the illicit market).

**2.** Similar considerations apply to menthol e-cigarettes. Indeed, FDA has repeatedly recognized differences in the public-health impacts of menthol e-cigarettes and other-flavored e-cigarettes.

19

In FDA's own words, "[m]enthol is unique compared to other available [e-cigarette] product flavors as it is the only characterizing flavor available in cigarettes." 2020 Guidance 23. For this reason, menthol e-cigarettes should remain available as potentially reduced-risk alternatives for menthol smokers, as FDA recognized when it exempted menthol-flavored products from its 2020 decision to prioritize enforcement against flavored cartridge-based e-cigarettes, *see id.* 23–24 and again during its initial consideration of e-cigarette applications, *see, e.g.,* A85 n.ii (FDA, *Technical Project Lead for Wages & White Lion* (Sept. 9, 2021)) ("the assessment for menthol [e-cigarettes], as compared to other non-tobacco-flavored [e-cigarettes], raises unique considerations").

FDA's pre-2022 treatment of menthol reflected scientific consensus within the agency. FDA scientists unanimously recommended authorizing menthol e-cigarettes as appropriate for the protection of the public health. *Logic Tech. Dev. LLC v. FDA,* 84 F.4th 537, 560 (3d Cir. 2023) (Porter, J. dissenting) (discussing "the unanimous [Office of Science] divisions' careful scientific analyses"). Indeed, "every discipline within the [FDA Office of Science] concluded that [the] menthol products should be approved." *Id.* at 558. FDA's Social Science department noted that "menthol flavored new products ... have lower youth appeal," and "may offer menthol cigarette smokers an appealing option to transition away from combusted cigarette smoking, an option particularly important given some menthol smokers' lower rates of combusted cigarette cessation." *Id.* at 559; *see* Draft Guidance 13–14 (similar). Epidemiology also distinguished menthol from other flavored e-cigarettes. *Logic,* 84 F.4th at 559 (Porter, J., dissenting). The other

20

disciplines—Engineering, Chemistry, Microbiology, Behavioral and Clinical Pharmacology, and Medical—all concurred that menthol e-cigarettes should be authorized. *Id.*

Based on that input, the Office of Science concluded that menthol e-cigarettes should be authorized. It found that the "'potential benefit' of adult menthol smokers switching from combustible cigarettes to menthol [e-cigarettes] 'amounted to a likelihood of greater cessation or significant reduction in smoking that would outweigh the known risks to youth from the marketing of the products, sufficient to meet the legal standard for authorization.'" *Id.*

Although FDA changed its tune at the direction of a new appointee in 2022, as discussed further below, *infra* Section III.B, recent data confirm FDA's original position on menthol e-cigarettes. The 2024 National Youth Tobacco Survey[5] shows that menthol's popularity among youth has steadily and significantly declined in recent years: in 2022, 26.6% of surveyed youth who regularly used e-cigarettes reported using menthol-flavored e-cigarettes; in 2024, that number dropped to 15.1% (as compared to 62.8% reporting using fruit flavors and 33.3% reporting using flavors mimicking candy, desserts, or other sweets). CDC, *Notes from the Field* (Sept. 5, 2024), https://tinyurl.com/dkj2spja; CDC, *More than 2.5 Million Youth Reported E-cigarette Use in 2022* (Oct. 6, 2022), https://tinyurl.com/msf98n8r.

---

[5] Findings from 2025 are not yet available.

### B.    FDA Arbitrarily Broke from Its Longstanding Treatment of Menthol.

FDA arbitrarily broke with its well-documented treatment of menthol to apply the comparative-efficacy standard to menthol e-cigarettes. It did so even though FDA made clear to manufacturers before applications were due that the agency treated menthol differently than other flavors in e-cigarettes. *Wages*, 604 U.S. at 580. The unique reliance interests at stake distinguish FDA's treatment of menthol e-cigarettes from its treatment of other flavors.

FDA changed its tune regarding menthol e-cigarettes at the direction of a new appointee in 2022. Originally, FDA applied the same standard to menthol- and *tobacco*-flavored e-cigarettes. *See RJRV*, 65 F.4th at 190–91. And FDA initially developed the comparative-efficacy standard only for dessert-, candy-, and fruit-flavored e-cigarettes—*not* for menthol-flavored e-cigarettes. *See Wages*, 604 U.S. at 580. Indeed, in 2022, the FDA Center for Tobacco Products (CTP)'s Office of Science "recommended" to higher-ups that menthol e-cigarettes generally be authorized because their "benefits to smokers likely outweigh[] the 'known risks to youth.'" *RJRV*, 65 F.4th at 192. That was because menthol is the only characterizing flavor allowed in combustible cigarettes other than tobacco. Many smokers of menthol cigarettes looking for potentially less-risky alternatives would naturally look to menthol e-cigarettes. "By March 2022, every discipline within the [Office] concluded that [the] menthol products

22

should be approved." *Logic*, 84 F.4th at 558 (Porter, J. dissenting); *see also RJRV*, 65 F.4th at 192.

But then, "a new CTP director appeared … and told [the Office] that … 'the products could be [authorized] only if the evidence showed that the benefits of the menthol-flavored [e-cigarettes] were greater than tobacco-flavored [e-cigarettes].'" *RJRV*, 65 F.4th at 192. "Without citing any scientific studies or published articles," the Director "*overrode* the unanimous [Office of Science] divisions' careful scientific analyses." *Logic*, 84 F.4th at 559–60 (Porter, J., dissenting). "Chastened by the new directive, [the Office] acquiesced." *Id.* at 559. The CTP Director and the Office of Science each memorialized that change in position with respect to menthol in internal memos. That policy then became the basis for a raft of denials for menthol e-cigarettes. *See RJRV*, 64 F.4th at 193.

Because FDA's new standard for menthol e-cigarettes was a policy change, the APA required FDA to "supply a reasoned analysis" and "consider reliance interests." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). But FDA has never offered a reasoned explanation, instead relying on its new Director's policy preferences. FDA has not even acknowledged "that it *is* changing position" on menthol. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Worse, *Amicus* RJRV—like many manufacturers—invested heavily in preparing applications following FDA's initial guidance on menthol. *See RJRV*, 65 F.4th at 189 and 188 n.3 ("RJRV's application for

23

Vuse Vibe … spanned over 150,000 pages" and "FDA did not reasonably consider RJRV's legitimate reliance interests before changing its position"). But FDA never even acknowledged those interests when the agency changed positions behind closed doors—let alone determined whether they were "significant," or explained how they "weigh[ed] … against competing policy concerns." *Regents*, 591 U.S. at 33. Accordingly, FDA's denial orders for menthol e-cigarettes represent an unlawful policy switch.

Nothing in the Supreme Court's opinion in this case undermines that conclusion. The Supreme Court carefully traced FDA's evolving guidance with respect to "dessert-, candy-, and fruit-flavored e-cigarette products"—and concluded that *with respect to those flavors*, FDA had not unlawfully changed its position. *Wages*, 604 U.S. at 571. But critically, the Supreme Court recognized that FDA has historically taken a different regulatory approach to *menthol-flavored* e-cigarettes than it has to dessert-, candy-, and fruit-flavored e-cigarettes. *Id.* at 580. Indeed, at oral argument, FDA admitted that its treatment of menthol-flavored e-cigarettes "may be a different point" from its treatment of dessert-, candy-, and fruit-flavored ones. *See* Transcript of Oral Argument at 37, *Wages*, 604 U.S. 542 (2024) (No. 23-1038) ("I think it's fine to say menthol may be a different point."). Taking FDA at its word, the Court scrupulously distinguished menthol from fruit, candy, and dessert flavors throughout its opinion. *See, e.g., Wages*, 604 U.S. at 580 ("FDA telegraphed its view that dessert-, candy-, and fruit-flavored e-cigarette products are more likely than tobacco- and menthol-flavored products to appeal to the young."); *id.* at 581 (noting "FDA's specific worry that dessert-, candy-,

24

and fruit-flavored products would appeal to youth more than tobacco- and menthol-flavored products").

And for good reason: FDA's historic treatment of menthol warrants a different result under the change-in-position doctrine. The agency's surprise change in position on menthol-flavored e-cigarettes was *not* a "natural consequence" of FDA's "predecisional guidance." 604 U.S. at 580. On the contrary, a brand-new director showed up one day and ordered FDA staff to *reverse* their previous position—even though it had been in place for years, was unanimously supported by FDA scientists, and was backed by facts and data. As the Supreme Court's opinion makes clear, nothing like that ever happened with respect to dessert, candy, and fruit flavors. Accordingly, that opinion does not undermine this Court's prior conclusion that FDA committed an unlawful, unexplained "sudden turnabout" with respect to *menthol e-cigarettes. RJRV*, 65 F.4th at 192.

FDA's recent attempts to handwave its treatment of menthol are unpersuasive. *First,* FDA argues that its internal memos did not announce a new rule, but merely "memorialize[d] an 'analytical framework' that FDA developed in the process of adjudicating … applications submitted by Logic Technology." FDA *NicQuid* Br. 65; FDA *VDX* Br. 51; *Breeze Smoke* Br. 73 (similar). In fact, it is clear that FDA did not develop the comparative-efficacy standard through an individualized adjudication, but rather adopted that standard separate and apart from any specific adjudication and then applied it across the board. *See supra* Section II.A (explaining why this is unlawful). The

25

CTP Director's edict that menthol e-cigarettes are subject to the heightened standard was not directed at one application. He was establishing a universal rule based on generalized policy considerations: comparative-efficacy evidence *"is required"* for *every* menthol e-cigarette application. Exh. A, Brian King, *Memorandum to File* 4 (Oct. 25, 2022) ("King Memo") (emphasis added). And the Office of Science memo confirmed that it would apply the rule to all *"pending applications."* Exh. B, Benjamin Apelberg, *Memorandum to File* 3 (Oct. 25, 2022) ("Apelberg Memo") (emphasis added). The Office of Science *"then* applied this approach to the Logic application," based on its "new awareness and understanding of the [Director's] position." *Id.*; *Logic*, 84 F.4th at 560 (Porter, J., dissenting). Unsurprisingly, as this Court observed, FDA then rejected "thousands" of applications "using the same boilerplate language." *SWT Global Supply, Inc.*, 2024 WL 3595387, at *2, *vacated and remanded*, 145 S. Ct. 1919. But even if FDA is right, then FDA has admitted to a *TCA violation*—as explained above, the TCA does not permit FDA to adopt tobacco product standards through adjudication. *See supra* Section I.A.

*Second*, FDA claims that the menthol memos are not binding on FDA or future applicants. *See, e.g.*, FDA *VDX* Br. 52. That claim appears to boil down to a belief that unless the agency specifically uses the word "binding," a standard is not binding. But the Fifth Circuit "does not look just to whether a rule 'limits discretion or uses binding language.'" *Mock v. Garland*, 75 F.4th 563, 579 (5th Cir. 2023); *see also Texas*, 933 F.3d at 441. And in any event, these internal memos are expressly binding on FDA. The CTP

26

Director's memo stated that comparative-efficacy evidence *"is required"* for any menthol-flavored e-cigarette application, King Memo 4 & n.3, and that flavored "'products could be [authorized] *only if* the evidence showed that the benefits of the menthol-flavored [e-cigarettes] were greater than tobacco-flavored [e-cigarettes].'" *RJRV*, 65 F.4th at 192 (emphasis added). Additionally, the Office of Science memo confirmed that its "staff" would apply the new approach to all *"pending applications* for menthol-flavored [e-cigarettes]." Apelberg Memo 3 (emphasis added). And FDA has specifically said that manufacturers of flavored e-cigarettes "ha[ve] a higher burden." NJOY Ace Review 5–6. If that is not binding on FDA, it is hard to see what could be.

## CONCLUSION

This Court should vacate FDA's marketing denial orders.

Dated: March 13, 2026

Respectfully submitted,

/s/ *Noel J. Francisco*
Noel J. Francisco
Christian G. Vergonis
Ryan J. Watson
Andrew J. Bentz
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel: 202-879-3939
Fax: 202-626-1700
njfrancisco@jonesday.com
cvergonis@jonesday.com
rwatson@jonesday.com
abentz@jonesday.com

*Counsel for Amicus Curiae R.J. Reynolds Vapor Company*

28

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

- this document contains 6,405 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

- this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Garamond font.

Dated: March 13, 2026

/s/ Noel J. Francisco
Noel J. Francisco

Counsel for Amicus Curiae R.J. Reynolds
Vapor Company

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: March 13, 2026

/s/ Noel J. Francisco
Noel J. Francisco

Counsel for Amicus Curiae R.J. Reynolds
Vapor Company

# Exhibits

*The menthol memos may also be accessed at Opposed Motion, *R.J. Reynolds Vapor Co. v. FDA*, No. 23-60037 (5th Cir. Jan. 25, 2023), at A176–80 (King Memo), 182–84 (Apelberg Memo), ECF 9.

# Exhibit A
## "King Memo"

**Memorandum to File**

Date: October 25, 2022

From: Brian A. King, PhD, MPH
Director, Center for Tobacco Products

Brian King
Digitally signed by Brian King
Date: 2022.10.25 18:23:33
-04'00'

Michele Mital
Deputy Director, Center for Tobacco Products

Michele Mital -S
Digitally signed by Michele Mital -S
Date: 2022.10.25 18:29:05
-04'00'

Subject: Process for Evaluating Menthol-Flavored ENDS PMTAs

## Introduction

This memo summarizes FDA's Center for Tobacco Products' (CTP's) history and process in developing an approach for evaluating pre-market tobacco product applications (PMTAs) for menthol-flavored electronic nicotine delivery systems (ENDS). Like many other questions of first impression that CTP has been required to decide, establishing a process and analytical framework for these applications has involved novel and complex questions that overlap matters of science, law, and policy. CTP has engaged in substantial discussion and debate over these questions, which has involved some disagreements. This memo discusses the relevant authority and processes that CTP followed in resolving these foundational questions and the steps taken by CTP's Office of the Center Director (OCD) to improve internal communications.

## Background

Under the Federal Food, Drug, and Cosmetic Act (FD&C Act), authority is granted to the Secretary of Health and Human Services to regulate tobacco products, including issuing orders on PMTAs. Sections 901(a) and 910(c). This authority has been delegated to the Commissioner of Food and Drugs and redelegated, with respect to orders on PMTAs, to the Director of CTP and the Director of CTP's Office of Science (OS), among others.[1] The Director of OS reports to the Director of CTP.

Delegation does not entail the cessation of supervisory oversight. The normal and historical practice at FDA is that supervisory oversight occurs even when authority has been delegated to subordinate officials. See, e.g., 21 CFR 10.75(a) ("A decision of an FDA employee, other than the Commissioner, on a matter, is subject to review by the employee's supervisor under the following circumstances: (1) At the request of the employee; (2) On the initiative of the supervisor; (3) At the request of an interested person outside the [A]gency; (4) As required by delegations of authority."). At each level of decision-making, a staff member reports to their supervisor, who in turn reports to their supervisor, on up the chain. As part of this reporting relationship, supervisors routinely discuss matters that are under review with their subordinates, and they, in turn, keep their supervisors informed about those matters. For many decisions, discussions can reach well above the level of delegated authority. The more significant

---

[1] See FDA Staff Manual Guides (SMG), Vol. II – Delegations of Authority, SMG 1410.10 (Aug. 26, 2016), available at https://www.fda.gov/media/81983/download; SMG 1410.1103 (Apr. 27, 2017), available at https://www.fda.gov/media/83160/download; see also FD&C Act, Section 1003(d)(2) (the Secretary executes the Act "through the Commissioner").

1

or noteworthy the matter, by reason of science, policy, law, or level of public interest, the more likely such discussions will occur up the supervisory chain.

This type of collaboration has been routinely employed in CTP's decisions on matters of first impression, which have arisen frequently given the newness of CTP's authorities. The Family Smoking Prevention and Tobacco Control Act (TCA), enacted on June 22, 2009, granted FDA new authority to regulate the manufacture, marketing, and distribution of tobacco products. ENDS products were included as part of FDA's tobacco authority beginning in 2016.[2] As relevant here, Section 910 of the FD&C Act requires that, for a new tobacco product to receive a PMTA marketing authorization, FDA must conclude, among other things, that permitting the product to be marketed would be appropriate for the protection of the public health (APPH). Section 910(c)(2)(A). The statute specifies that, in assessing APPH, FDA must consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such products. Section 910(c)(4). Determining how best to implement these requirements into concrete processes, principles, and considerations involved interrelated questions of science, law, and policy, as well as questions of administrative process, that required extensive thought and discussion.

Accordingly, when such complex questions arise, it is not the role of OS to decide those questions independently from other parts of CTP and FDA. Instead, OS regularly presents its initial findings and conclusions to other senior leaders, including the Center Director, Deputy Director, Senior Science Advisor, and other members of OCD's Senior Leadership Team (SL), as well as other Office Directors within CTP. Consistent with processes used for other Centers across FDA, CTP also consults closely with the Office of the Chief Counsel and others within the Office of the Commissioner on these foundational questions. These types of deliberations stretch back to the very first days of product review under the TCA, including consideration of applications submitted through a variety of pathways, such as new products that manufacturers claim are substantially equivalent to products on the market, products to be marketed as modified risk, and applications for premarket authorization of new versions of cigarettes or smokeless tobacco. The questions involved in developing the framework under each pathway often involve significant discussion and debate, which at times have included disagreements.

In fact, FDA regulations recognize that, in the normal course of making regulatory decisions within the hierarchical structure typical of federal agencies, there will sometimes be "significant controversies" and "differences of opinion" in the recommended outcome on a particular matter. 21 CFR 10.70(b)(2)(i). The regulations provide an opportunity for an employee to record their "individual views," regardless of whether that recommendation is ultimately followed in the Agency's final decision. See 21 CFR 10.70(b)(2)(ii).

---

[2] "Deeming Tobacco Products to Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products," 81 FR 28973 (May 10, 2016).

## Discussion

Over the past two years, FDA has engaged in in-depth deliberation on the agency's approach to deciding menthol-flavored ENDS PMTAs, following the same general processes and procedures that have been followed for other regulatory decisions, as described above. As noted in the memorandum to file from current OS leadership, Benjamin Apelberg, Ph.D. and Todd L. Cecil, Ph.D., on the subject of "Development of the Approach to Evaluating Menthol-Flavored ENDS PMTAs" (OS memo), OS chose to focus its work on the Logic menthol-flavored ENDS PMTA, and the agency's deliberations led to the approach laid out in the Technical Project Lead Review (TPL) for the Logic menthol-flavored ENDS PMTA.

During deliberations, it became clear that there was not agreement within CTP on the approach for evaluating menthol-flavored ENDS. OCD took steps to consider and address staff views and to ensure that the process for decisions on PMTAs was driven by the science. In July 2022, shortly after becoming CTP's Center Director, Brian King, a doctoral level scientist, conferred with OS and members of OCD about menthol-flavored ENDS and the Logic menthol-flavored ENDS PMTA.

As explained more fully in the OS memo, OS shared its views as held at that time with Dr. King and engaged in an open discussion on topics that included the general body of literature regarding menthol cigarette smokers and menthol-flavored ENDS use, Logic's clinical studies, risks to youth, and potential postmarketing requirements. After that meeting, the OCD Senior Science Advisor conveyed that Dr. King's position was the same as the previously held OCD position, articulating in particular that, in light of the risk to youth and the lack of robust evidence of actual differential use of menthol-flavored ENDS to quit or significantly reduce cigarettes per day, the approach to menthol-flavored ENDS should be the same as with other flavored ENDS with respect to the evidence of adult benefit. Subsequently, and upon its own initiative, OS reassessed OCD's approach and came to the conclusion that it was scientifically reasonable.

In reaching this conclusion, CTP leadership, supported by FDA leadership, has tried to maintain a balanced, appropriate, and science-driven focus. Among the views that CTP leadership considered are whether its evaluation of ENDS products places too much emphasis on the risks to youth from ENDS use, is not adequately bearing in mind the dangers from conventional smoking, and is pursuing the elimination of youth ENDS use without adequate regard to the impact on potential benefits to adult smokers.[3] CTP's review process has taken into account the magnitude and rigor of the data related to youth ENDS use, how CTP should consider these data in the context of available data related to complete cessation or significant reduction in cigarette smoking among adults, and the critical need to weigh evidence among both youth and adults in deciding whether to grant or deny marketing authorization under the statute. CTP leadership takes the view that a finding that marketing of a product is "appropriate for the protection of the public health" could be reached in spite of some amount of risk to youth, but only where the likely benefit to existing adult users would outweigh that risk. CTP leadership also recognizes that, consistent with the explicit goals of the TCA and extensive science on

---

[3] Another viewpoint that CTP considered was a concern that CTP's approach to evaluating ENDS applications will result in the removal of all ENDS from the U.S. market except for tobacco-flavored ENDS. This concern is based on an assumption that no applicant would ever submit evidence sufficient to support authorization of a non-tobacco flavored ENDS product, for example by conducting studies designed to assess the benefit of the applicant's non-tobacco-flavored ENDS over that of a tobacco-flavored ENDS and obtaining results that show such benefit.

3

the unique risks of tobacco use for youth, preventing youth initiation and subsequent tobacco product use must be a key consideration in the implementation of the law.

In the context of menthol-flavored ENDS, although there are published data showing that menthol combustible cigarette smokers indicate a preference for menthol-flavored ENDS products when asked about product appeal/preference, nationally representative data have not demonstrated that menthol combustible cigarette smokers are more likely to actually use menthol-flavored ENDS over tobacco-flavored ENDS to completely quit combustible cigarettes or significantly reduce their cigarette use. Studies that evaluate actual product use and behaviors in a real-world setting are more difficult to conduct, but current OS and OCD leadership agree that such data are much more robust evidence of potential benefit to adult smokers and that conducting such studies is feasible. In contrast, scientific evidence on the role of flavors in youth use of ENDS is significantly more rigorous and robust than the preference data concerning menthol combustible cigarette smokers: the evidence on flavors and youth ENDS use involves nationally representative and appropriately weighted populations and reports on actual use and behavior over time, and it reflects consistent patterns across the literature. In light of this evidence of risk to youth, FDA has reasonably concluded that robust evidence of benefit is required to overcome the risk to youth and show that authorizing the marketing of a menthol-flavored ENDS would be appropriate for the protection of the public health.

In light of these in-depth deliberations, OCD also asked CTP's Ombuds to provide an opportunity for OS staff who had direct involvement in menthol-flavored ENDS reviews to be heard regarding the Center's approach on menthol-flavored ENDS products. The CTP Ombuds Team invited the staff to share feedback, identify concerns, or offer insight related to the scientific review process, background, and direction relevant to menthol-flavored ENDS reviews in a voluntary, confidential, and non-pressured environment. Participants were informed the CTP Ombuds Team would provide a briefing to OS SL and OCD SL without identifying the staff who provided comments. The primary theme from these discussions, which the Ombuds Team shared with OCD SL and OS SL, was a desire for more transparency and communication by Center and OS leadership with OS staff.

Dr. King subsequently met with OS staff involved with menthol-flavored ENDS decisions in late September 2022 to provide additional clarity around the basis for the Center's approach on menthol-flavored ENDS products, including an explanation of the scientific analysis underlying the framework adopted. Dr. King also assured the staff that they will continue to be able to raise and resolve scientific disputes through established Center-wide policies. Although concerns were shared informally with the Ombuds Team, to date, neither the Ombuds Team nor the OCD SL has received a formal complaint or any requests for scientific dispute resolution related to this matter.

Throughout the decision-making process for ENDS applications, including for menthol-flavored ENDS products, CTP has followed the same general processes and procedures that have been followed for other regulatory decisions. The applications at issue involved complex questions of science, law, policy, and process that were matters of first impression. It was therefore appropriate for the discussions of these questions within CTP to include different supervisory levels within OS and CTP leadership, including OCD, before any application decisions were finalized. While the analysis and framework were deliberated, it was also appropriate that interim memos did not prematurely state final conclusions.

4

Differing scientific opinions are not unexpected within FDA, and FDA's regulations recognize that there will be differences of opinion in the course of regulatory decision-making. Discussions of such differences can lead to a more comprehensive consideration of all of the issues before the Agency reaches its ultimate conclusion, as has occurred here for menthol-flavored ENDS.

# Exhibit B
## "Apelberg Memo"

**Memorandum to File**

| | |
|---|---|
| Date: | October 25, 2022 |
| From: | Benjamin Apelberg, Ph.D.<br>Deputy Director<br>Office of Science, Center for Tobacco Products |

Digitally signed by Benjamin Apelberg -S
Date: 2022.10.25 15:51:01 -04'00'

Todd L. Cecil, Ph.D.
Acting Director
Office of Science, Center for Tobacco Products

Todd L. Cecil -S    Digitally signed by Todd L. Cecil -S
Date: 2022.10.25 15:54:00 -04'00'

Subject:    Development of the Approach to Evaluating Menthol-Flavored ENDS PMTAs

## Introduction

The Director of the Office of Science (OS), Center for Tobacco Products (CTP), is among the CTP officials authorized to issue orders on pre-market tobacco product applications (PMTAs), and OS has been charged by the CTP Director with reviewing such applications. This memo describes how OS's thinking on the analytical approach to applications for menthol-flavored electronic nicotine delivery systems (ENDS) developed over time, taking into consideration, in particular, the peer-reviewed scientific literature related to menthol-flavored ENDS, regulatory policy, and discussions with CTP's Office of the Center Director (OCD).

## Background

Just prior to September 9, 2020, CTP received more than 6.5 million PMTAs for ENDS products. In the year that followed, CTP conducted premarket review of the applications, analyzed existing scientific evidence, and issued deficiency letters for certain applications. In August 2021, OS began issuing marketing denial orders on certain PMTAs for ENDS with flavors other than tobacco or menthol, deferring decisions on menthol products to allow more time to consider whether there were any aspects unique to menthol-flavored ENDS that would affect the assessment of whether authorizing the marketing of such products would be appropriate for the protection of the public health (APPH). Specifically, OS needed more time to assess whether and to what extent any evidence in the peer-reviewed scientific literature might, in concert with evidence provided in specific product applications, support a finding of benefit from menthol-flavored ENDS for adult menthol-flavored cigarette smokers sufficient to outweigh the risk to youth from the marketing of such a product.

In considering this issue, OS conducted a thorough review of the scientific literature regarding menthol-flavored cigarette smokers and menthol-flavored ENDS use to determine whether it established that menthol-flavored ENDS provide a sufficient benefit for adult smokers relative to that of tobacco-flavored ENDS. OS concluded that the existing literature supports that menthol-flavored cigarette smokers show a preference for menthol-flavored ENDS relative to tobacco-flavored ENDS. But OS did not find that the current literature supports that use of menthol-flavored ENDS by adult smokers is associated with greater likelihood of complete switching or significant cigarette reduction relative to

tobacco-flavored ENDS. OS considered these findings from the literature together with product-specific evidence to assess the public health impact of particular menthol-flavored ENDS products.

**Logic menthol-flavored ENDS PMTA**

From late 2021 to August 2022, OS work related to menthol-flavored ENDS focused on the Logic menthol-flavored ENDS PMTA because, among other reasons, it was one of the applications for menthol-flavored ENDS furthest along in review. In the latter half of 2021, OS briefed OCD on its evaluation of the Logic menthol PMTA and OS's preliminary recommendation to authorize the marketing of the products. This briefing focused in particular on whether the differential preference for menthol-flavored ENDS among menthol-flavored cigarette smokers documented in the peer-reviewed literature could provide evidence to support a sufficient potential benefit for adult smokers.[a]

From a policy perspective, OS believed at the time that as long as menthol-flavored cigarettes remain on the market, menthol-flavored ENDS could be a direct substitute for them, providing a less harmful alternative for menthol-flavored cigarette smokers, who are less likely to successfully quit smoking than smokers of non-menthol-flavored cigarettes.[b] OS acknowledged that menthol-flavored ENDS appeal to youth but suggested the appeal may not be at the same level as some other flavors (e.g., fruit-flavored ENDS). Accordingly, at the time, OS considered the documented preference for menthol-flavored ENDS among adult menthol-flavored cigarette smokers to suggest a potential benefit: that menthol-flavored cigarette smokers would be more likely to try menthol-flavored ENDS (relative to tobacco-flavored ENDS), creating an opportunity for some to use menthol ENDS and ultimately transition away from combustible cigarettes. OS considered that this suggested potential benefit, in the form of increased opportunity for use and transition, coupled with product-specific evidence of some benefit to smokers (even if not greater than that of tobacco-flavored ENDS products), amounted to a likelihood of greater cessation or significant reduction in smoking that would outweigh the known risks to youth from the marketing of the products, sufficient to meet the legal standard for authorization. OCD raised questions about OS's recommendation, including questions about the role and sufficiency of the general scientific literature on adult menthol smokers' differential preference for menthol ENDS in demonstrating likely behavioral change, and underscored its concerns about the substantial appeal of menthol to youth. Given the importance of the Logic menthol-flavored ENDS PMTA decision in establishing a precedent for CTP's approach to assessing APPH for menthol-flavored ENDS, discussions of whether the available evidence supported a potential benefit to adult smokers continued over the course of several months into 2022.

A decision was still pending for the Logic PMTA in July 2022, when CTP transitioned to a new Center Director.[c] In mid-July 2022, OS conferred with the new Center Director and members of OCD about menthol-flavored ENDS and the Logic menthol-flavored ENDS PMTA. OS shared its views with the new

---

[a] On the question of potential benefit and Logic's PMTA, OS did not consider the differential preference for menthol ENDS in the literature in isolation, but instead in combination with Logic's product-specific evidence of significant reduction in cigarettes smoked per day. However, Logic's evidence did not include a statistical comparison between menthol-flavored ENDS and tobacco-flavored ENDS and all cohorts in Logic's studies reduced cigarettes smoked per day to a similar degree. The evidence therefore did not demonstrate a sufficient benefit from menthol-flavored ENDS use relative to tobacco-flavored ENDS use.
[b] See, for example, Mills et al., 2021. "The Relationship Between Menthol Cigarette Use, Smoking Cessation, and Relapse: Findings From Waves 1 to 4 of the Population Assessment of Tobacco and Health Study." Nicotine Tob Res. 23(6):966-975.
[c] Prior to the start date of the new Center Director, then-OS Director Matthew Holman recused himself from all OS duties as he sought employment outside of FDA. In his absence, the authors of this memo were asked to fill his role until he either returned or left the organization. In late July 2022, Dr. Holman left for employment in the private sector at Philip Morris International.

Center Director and engaged in an open discussion on topics including the general body of literature, Logic's clinical studies, risks to youth, and potential postmarketing requirements. After that meeting, the OCD Senior Science Advisor shared OCD's views with OS, articulating that, in light of the substantial risk to youth and the lack of robust evidence of actual differential use to quit or significantly reduce cigarettes per day, the approach to menthol-flavored ENDS should be the same as for other flavored ENDS, i.e., the products could be found to be APPH only if the evidence showed that the benefits of the menthol-flavored ENDS were greater than tobacco-flavored ENDS, which pose lower risk to youth.

OS, on its own initiative, then reassessed and decided it was reasonable and consistent to treat menthol-flavored ENDS PMTAs in the same way as other non-tobacco-flavored ENDS PMTAs regarding the evidence needed to show a potential benefit to adult smokers. Regarding youth risk, OS had already determined that menthol-flavored ENDS pose a substantial risk of youth use greater than tobacco-flavored ENDS and similar to flavors such as candy, desserts, sweets, and mint.[d] Accordingly, and based on new awareness and understanding of the OCD position by OS leadership at that time, OS determined it was scientifically appropriate and consistent to adopt the approach applied to other non-tobacco-flavored ENDS, which present a similar risk to youth. In particular, OS concluded that the literature did not demonstrate that menthol-flavored ENDS were differentially effective, relative to tobacco-flavored ENDS, in terms of promoting significant cigarette reduction or complete switching among adult smokers, and that it was scientifically appropriate to expect applicants to provide robust, product-specific evidence showing that their menthol-flavored products facilitate complete switching or significant reduction in smoking (behavior change) among adults greater than that facilitated by tobacco-flavored ENDS, which pose less risk to youth. See, e.g., Logic Menthol Technical Project Lead Review, Section 1.1. OS staff then applied this approach to the Logic application, as they will to other pending applications for menthol-flavored ENDS.

---

[d] For example, in the 2022 National Youth Tobacco Survey, 85.5% of high school and 81.5% of middle school ENDS users reported using non-tobacco-flavored ENDS, and the most commonly used flavor type was fruit (69.1%), followed by candy, desserts, and other sweets (38.3%), mint (29.4%), and menthol (26.6%). Cooper M, Park-Lee E, Ren C, Cornelius M, Jamal A, Cullen KA. Notes from the Field: E-cigarette Use Among Middle and High School Students - United States, 2022. MMWR Morb Mortal Wkly Rep. 2022;71(40):1283-1285.