IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 21-60766
consolidated with
No. 21-60800

_____

WAGES AND WHITE LION INVESTMENTS, L.L.C., doing business as
TRITON DISTRIBUTION,

*Petitioner*,

v.

FOOD & DRUG ADMINISTRATION,

*Respondent*.

_____

On Petition for Review of a Final Marketing Denial Order
by the United States Food and Drug Administration

_____

**CORRECTED PETITIONERS' SUPPLEMENTAL BRIEF**
_____

Eric N. Heyer
Joseph A. Smith
James C. Fraser
Anna M. Stressenger
THOMPSON HINE LLP
1919 M Street, N.W., Suite 700
Washington, D.C.  20036
Phone: 202.331.8800
Fax:  202.331.8330

*Counsel for Petitioners Wages and White
Lion Investments, L.L.C. d/b/a Triton
Distribution and Vapetasia, LLC*

i

## CERTIFICATE OF INTERESTED PERSONS

Nos. 21-60766 and 21-60800

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of this

court may evaluate possible disqualification or recusal.

1.    Petitioners:

> Wages and White Lion Investments, LLC d/b/a Triton Distribution
> Vapetasia LLC

2.    Counsel for Petitioners:

> Anthony J. Hornbach
> Thompson Hine LLP
> 312 Walnut Street, Suite 2000
> Cincinnati, OH 45202
>
> Eric N. Heyer
> Joseph A. Smith
> James C. Fraser
> Anna M. Stressenger
> Thompson Hine LLP
> 1919 M Street NW, Suite 700
> Washington, DC 20036

3.    Respondent:

> United States Food and Drug Administration

4.    Counsel for Respondent:

> Benjamin Lewis
> U.S. Department of Justice
> Civil Division, Appellate Staff

ii

950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Noah T. Katzen
U.S. Department of Justice
Civil Division
450 Fifth Street, NW
Washington, DC 20530

Sean R. Keveney
Wendy S. Vicente
U.S. Food and Drug Administration Food and Drug Division
Office of General Counsel
10903 New Hampshire Ave.
Silver Spring, MD 20993

5.    *Amici Curiae* for Petitioners and Counsel for *Amici Curiae:*

American Vaping Association, Inc.
American Vapor Manufacturers Association, Inc.
Consumer Advocates for Smoke-Free Alternatives Association, Inc
Smoke-Free Alternatives Trade Association, Inc.
United Vapers Alliance, Inc.
38 National and State ENDS Product Advocacy Associations

J. Gregory Troutman
Troutman Law Office, PLLC
4205 Springhurst Blvd., Suite 201
Louisville, KY 40241

Dr. David B. Abrams
Clive D. Bates
David T. Sweanor, J.D.

Mary G. Bielaska
Zanicorn Legal P.L.L.C.
845 Third Ave., 6th Floor
New York, New York 10022

Michael D. Matthews, Jr.

iii

McDowell Hetherington LLP
1001 Fannin St., Suite 2700
Houston, TX 77022

Vapor Technology Association

Anthony L. Abboud, Esq.
950 Hawthorne Lane
Northbrook, IL 60062

R.J. Reynolds Vapor Company

Noel J. Francisco
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

6.   *Amici Curiae* for Respondent and Counsel for *Amici Curiae*:

American Academy of Pediatrics
American Academy of Family Physicians
American Cancer Society Cancer Action Network
American Heart Association
American Lung Association
American Medical Association
Campaign for Tobacco-Free Kids
Louisiana State Medical Society
Parents Against Vaping e-cigarettes
Truth Initiative Foundation d/b/a Truth Initiative

Leane K. Capps
Polsinelli, P.C.
2950 N. Harwood Street
Suite 2100
Dallas, TX 75201

Scott P. Lewis
Austin Paganelli Anderson
Anderson & Kreiger, LLP

50 Milk Street
Boston, MA 02109


/s/ Eric N. Heyer
Eric N. Heyer

# TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………………..…………1

STATEMENT OF THE CASE..................................................................3

I. The Tobacco Control Act's "Appropriate for the Protection of the Public Health" Standard for Marketing Authorization...................................3

II. FDA's Instructions to Manufacturers ...........................................6

III. FDA's 2020 Enforcement Guidance ............................................7

IV. Petitioners' PMTAs .................................................................8

V. FDA's Internal Memoranda.........................................................8

  A. FDA's July 9, 2021 Memorandum...........................................8

  B. FDA's August 17, 2021 Memorandum....................................10

VI. FDA's Review Forms ..............................................................11

VII. The Marketing Denial Orders and TPL Reviews............................13

VIII. Procedural History ...............................................................16

SUMMARY OF ARGUMENT ...............................................................18

ARGUMENT ....................................................................................20

  A. FDA's Longitudinal Comparative Efficacy Requirement is a Rule ...20

  B. The Longitudinal Comparative Efficacy Requirement is Not a Mere Statement of Policy .........................................................32

  C. Regardless of Whether the Longitudinal Comparative Efficacy Requirement is a "Legislative" or "Interpretive" Rule, Notice and Comment was Mandatory ......................................................33

  D. FDA's Failure to Engage in Notice and Comment Procedures Renders Petitioners' Denial Orders Arbitrary, Capricious, and Not in Accordance with Law................................................................37

CONCLUSION ...................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Acad. of Pediatrics v. FDA,*
    399 F. Supp. 3d 479 (D. Md. 2019)...............................................................5, 6

*Azar v. Allina Health Servs.,*
    587 U.S. 566 (2019)...............................................................................23

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1998)...............................................................................21

*Brown Express, Inc. v. United States,*
    607 F.2d 695 (5th Cir. 1979) ...................................................................24

*City of Arlington v. FCC,*
    688 F.3d 229 (5th Cir. 2012) ...................................................................31

*City of Billings v. Transp. Sec. Admin.,*
    153 F.4th 46 (D.C. Cir. 2025)...................................................................34

*Columbia Broad. Sys. v United States,*
    316 U.S. 407 (1942)...............................................................................24

*FDA v. Wages & White Lion Invs., LLC,*
    604 U.S. 542 (2025)...............................................................1, 17, 18, 36

*Gallo v. U.S. Dist. Ct. for Dist. of Ariz.,*
    349 F.3d 1169 (9th Cir. 2003), *cert. denied,* 541 U.S. 1073 (2004) ...................23

*GE v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002)..................................................................32

*ITServe All, Inc. v. Dep't of Homeland Security,*
    71 F.4th 1028 (D.C. Cir. 2023)..................................................................21

*Mauthe v. Millennium Health LLC,*
    58 F.4th 93 (3d Cir. 2023) .......................................................................24

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ...............................................................33, 34

*Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng'rs,*
417 F.3d 1272 (D.C. Cir. 2005)...........................................................24

*NLRB v. Bell Aerospace Co.,*
416 U.S. 267 (1974)...........................................................................31

*Pfaff v. U.S. Dep't of Hous. & Urb. Dev.,*
88 F.3d 739 (9th Cir. 1996) ..............................................................31

*Professionals & Patients for Customized Care v. Shalala,*
56 F.3d 592 (5th Cir. 1995) ..............................................................24

*R.J. Reynolds Vapor Co. v. FDA,*
65 F.4th 182 (5th Cir. 2023) .........................................................32, 33

*Safari Club Int'l v. Zinke,*
878 F.3d 316 (D.C. Cir. 2017)...................................................20, 24, 37

*Scenic Am., Inc. v. U.S. Dep't of Transp.,*
836 F.3d 42 (D.C. Cir. 2016)............................................................33

*Silkwood v. Kerr-McGee Corp.,*
464 U.S. 238, 258 (1984)...................................................................1

*Texas v. EEOC,*
933 F.3d 433 (5th Cir. 2019) ........................................................32, 33

*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015) ............................................................32

*United States v. Fl. E. Coast Ry. Co.,*
410 U.S. 224 (1973).......................................................................27, 28

*Vapor Technology Ass'n v. FDA,*
977 F.3d 496 (6th Cir. 2020) .............................................................5

*Wages & White Lion Invs., LLC. v. FDA,*
16 F.4th 1130 (5th Cir. 2021) ...........................................................16

*Wages & White Lion Invs., LLC v. FDA,*
41 F.4th 427 (5th Cir. 2022) ............................................................16

*Wages & White Lion Invs., LLC v. FDA,*

90 F.4th 357 (5th Cir. 2024) ..................................................16, 17

*Xcaliber Int'l Ltd. v. Att'y Gen. of La.*,
   612 F.3d 368 (5th Cir. 2010) ...............................................23

*Yesler Terrace Cmty. Council v. Cisneros*,
   37 F.3d 442 (9th Cir. 1994) .............................................29, 37

**Statutes**

Family Smoking Prevention and Tobacco Control Act,
   Pub. L. No 111-31, 123 Stat. 1776 (2009)................................3

5 U.S.C. § 551 ............................................2, 18, 19, 21, 22

5 U.S.C. § 553 ............................................2, 19, 21, 32, 33, 34

5 U.S.C. § 706 ...............................................................17

21 U.S.C. § 321 ................................................................3

21 U.S.C. § 371 .........................................................3, 19, 35

21 U.S.C. § 387a ..............................................................4

21 U.S.C. § 387g ..........................................................16, 17

21 U.S.C. § 387j ........................................................4, 20, 35

**Regulations**

1 C.F.R. § 18.12 ..............................................................22

21 C.F.R. 10.115 .......................................................3, 19, 34, 36

81 Fed. Reg. 28973 (May 10, 2016) .........................................4

**Other Authorities**

Ahmed Jamal, et al., *Tobacco Product Use Among Middle and High
   School Students—National Youth Tobacco Survey, United States,
   2024*, 73 Morbidity and Mortality Weekly Report 917 (Oct. 17,
   2024) .........................................................................29

Eunice Park-Lee et al., Notes from the Field: *E-Cigarette Use Among Middle and Hight School Students – National Youth Tobacco Survey, United States, 2021,* 70 Morbidity and Mortality Weekly Report 1387 (2021), https://bit.ly/2ZSLenl (2021) ...........................................29

FDA, Deemed Tobacco Product Applications – A Public Meeting (Oct. 28-29, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/deemed-tobacco-product-applications-public-meeting-10282019#agenda ...........................................................................................6

FDA, *Guidance for Industry, Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule* (Aug. 10, 2017), https://bit.ly/3BNLhyf ...................................................................5

FDA, *Premarket Tobacco Product Applications and Recordkeeping Requirements, Proposed Rule,* 84 Fed. Reg. 50566 (Sept. 25, 2019) ..................6

FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (ENDS): Guidance for Industry* (June 2019) ..................................................................................................................6

FDA, Press Release, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://tinyurl.com/bddrcmy3. ..................................................30

FDA, Press Release, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://bit.ly/2YsYmzd ...................................................................13

FDA, Press Release, *FDA Makes Significant Progress in Science-Based Public Health Application for Review, Taking Action on Over 90% of More than 6.5 Million 'Deemed' New Tobacco Products Submitted* (Sept. 9, 2021), https://bit.ly/33Av9oz..............................14

FDA, Press Release, *Youth E-Cigarette Use Drops to Lowest Level in a Decade,* https://www.fda.gov/news-events/press-announcements/youth-e-cigarette-use-drops-lowest-level-decade (Sept. 5, 2024)................................................................................................29

FDA Sample Technical Project Lead Review of ENDS-Product PMTA (Sept. 17, 2021), https://bit.ly/304PSyH ...............................................15

FDA, *Technical Project Lead (TPL) Review of PMTAs (NJOY Ace Menthol)* (June 21, 2024), https://tinyurl.com/4fwkck8u...................................30

FDA, *Technical Project Lead (TPL) Review of PMTAs (JUUL Menthol)* (July 17, 2025), https://tinyurl.com/5a2n5htf. ...................................31

FDA, Tobacco Product Application Review – A Public Meeting (Oct. 22, 2018), https://bit.ly/3FhPxJi ...................................................6

FDA, Transcript, *Deemed Product Review: A Conversation with the Office of Science* (June 11, 2021), https://www.fda.gov/media/150275/download ....................................9

Office of Information and Regulatory Affairs, Office of Management and Budget, Notice regarding *Statement of Policy – Considerations for Flavored Electronic Nicotine Delivery Systems (ENDS) Premarket Applications; Draft Guidance for Industry*, https://perma.cc/3APD-F999 .................................................37

## INTRODUCTION

In vacating the *en banc* Court's opinion granting the petitions for review filed by Petitioners Wages & White Lion Investments, LLC d/b/a Triton Distribution ("Triton") and Vapetasia LLC ("Vapetasia"), the Supreme Court specifically declined to reach the question of whether FDA failed to follow required notice-and-comment procedures when it adopted its "longitudinal comparative efficacy" requirement for premarket applications for non-tobacco-flavored[1] electronic nicotine delivery systems ("ENDS"). *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 565 (2025). That issue thus remains live and subject to this Court's further review. *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 258 (1984) ("On remand Kerr-McGee is free to reassert any claims it made before the Court of Appeals which were not addressed by that court or by this opinion . . . .") (merits later superseded by statute).

As explained herein, FDA violated the Administrative Procedure Act ("APA") and/or the agency's own "good guidance practices" regulations when it adopted and applied its longitudinal comparative efficacy requirement without notice or opportunity for public comment. The requirement was first set forth in an internal FDA memorandum dated August 17, 2021, not in the adjudication of any

---

[1] For simplicity, this Supplemental Brief refers to non-tobacco-flavored ENDS products as "flavored" ENDS.

particular premarket application. FDA also premised its adoption of the longitudinal comparative efficacy requirement on its determination that all flavored ENDS products present a high, uniform, and immutable risk of youth initiation. But FDA reached this conclusion in the abstract, divorced from the actual evidence of risk of youth use presented in any particular application for a flavored ENDS product pending before the agency.

In denying Petitioners' applications, FDA refused to even consider the evidence set forth in the applications, including from the CDC's own National Youth Tobacco Survey, that Petitioners' bottled e-liquids presented a low or non-existent risk to youth. Further, FDA has continued to uniformly apply the comparative efficacy requirement to all applications for flavored ENDS products since adopting it in August 2021, despite the fact that youth use of all ENDS products has declined dramatically in the intervening years. The longitudinal comparative efficacy requirement is thus a rule because it is an "agency statement of general or particular applicability and future effect." 5 U.S.C. § 551(4).

If the rule is "legislative" in nature, the APA requires advance notice and opportunity for public comment. 5 U.S.C. § 553. And if the rule is "interpretive" in nature, FDA's own "good guidance practices" regulations require the agency to communicate to the public "expectations that are not readily apparent from the statute" in a guidance document subject to the same notice-and-comment

2

requirements. 21 C.F.R. § 10.115(e); *see also* 21 C.F.R. § 10.115(c)(1), (g); 21 U.S.C. § 371(h)(1)(C)(i). Because FDA failed to engage in the legally required notice and comment process before adopting and applying its longitudinal comparative efficacy requirement, its actions were arbitrary, capricious, and not in accordance with law. The Court should grant the petitions for review and set aside Petitioners' denial orders.

## STATEMENT OF THE CASE

I.      **The Tobacco Control Act's "Appropriate for the Protection of the Public Health" Standard for Marketing Authorization**

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA") to amend the Food, Drug, and Cosmetic Act ("FDCA") and grant FDA authority over tobacco products. Pub. L. No 111-31, 123 Stat. 1776 (2009). At all relevant times, the TCA defined a "tobacco product," in relevant part, as "any product made or derived from tobacco that is intended for human consumption, including any component, part, or accessory of a tobacco product." 21 U.S.C. § 321(rr) (2009).[2]

---

[2] In 2022, Congress expanded the statutory definition of "tobacco product" in 21 U.S.C. § 321(rr) to include products "containing nicotine from any source." *See* Consolidated Appropriations Act, 2022, Pub. Law 117-103, Division P, Title I, Subtitle B. Because Petitioners' e-liquids at issue only contained tobacco-derived nicotine, this amendment is irrelevant to these petitions.

3

Under the TCA, FDA must issue a marketing order before any tobacco product that was not commercially marketed as of February 15, 2007, can be commercially marketed in the United States. 21 U.S.C. § 387j. To obtain marketing authorization, manufacturers of ENDS products must submit a premarket tobacco product application ("PMTA") to FDA. *See* 81 Fed. Reg. 28973, 28990-97 (May 10, 2016).

To obtain marketing authorization, section 910 of the FDCA, 21 U.S.C. § 387j, requires that an applicant show that the marketing of its tobacco product is "appropriate for the protection of the public health," or "APPH." 21 U.S.C. § 387j(c)(2)(A). Whether a product is appropriate for the protection of the public health is determined "with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," taking into account both "(A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products." 21 U.S.C. § 387j(c)(4).

The TCA's requirements originally only applied to cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco. 21 U.S.C. § 387a(b). However, in 2016, FDA finalized a rule that deemed ENDS products containing or

intended to be used with tobacco-derived nicotine to be "tobacco products." 81 Fed. Reg. 28973 (May 10, 2016) (codified at 21 C.F.R. § 1143.1).

Because millions of ENDS products were already commercially marketed as of the Deeming Rule's effective date of August 8, 2016, FDA adopted a discretionary enforcement policy for those products. *See* 81 Fed. Reg. at 29009-15. Under this policy, PMTA submissions were originally required by August 8, 2018, and ENDS products on the market as of August 8, 2016, would not be subject to FDA enforcement action for failure to submit a PMTA before this submission deadline. *Id*. at 28977-78, 29011.

In August 2017, FDA delayed the PMTA submission deadline for four years to August 8, 2022. *See* FDA, Guidance for Industry, *Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule* (Aug. 10, 2017), at 8, https://bit.ly/3BNLhyf. Anti-vaping groups then brought litigation in district court in Maryland challenging the delay. *See Vapor Technology Ass'n v. FDA*, 977 F.3d 496, 497-502 (6th Cir. 2020) (summarizing district court litigation). Ultimately, in July 2019, based on FDA's representation that such a deadline was feasible, the district court ordered FDA to set a PMTA submission deadline of May 2020, which was ultimately extended to September 9, 2020, due to COVID-19. *Id*. at 499-500; *Am. Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479, 481 (D. Md. 2019). FDA's

5

belief that this deadline was feasible was based on the expectation it would receive approximately 6,800 PMTAs.[3]

## II.    FDA's Instructions to Manufacturers

Before the September 9, 2020 deadline for submitting PMTAs, FDA communicated its instructions and recommendations for applicants to show that their products satisfied the "appropriate for the protection of the public health" standard through several means, including two public meetings in October 2018 and October 2019,[4] a proposed and final ENDS PMTA Guidance,[5] and a proposed rule on the required contents of PMTAs.[6] However, FDA never published a guidance document that specifically mentioned any requirement that manufacturers of ENDS products

---

[3] *See* Declaration of FDA Center for Tobacco Products Director Mitchell Zeller at 15, *Am. Acad. of Pediatrics v. FDA*, No. 8:18-cv-00883 PWG (D. Md. June 12, 2019), Doc. No. 120-1.

[4] FDA, Tobacco Product Application Review – A Public Meeting (Oct. 22, 2018), https://bit.ly/3FhPxJi; FDA, Deemed Tobacco Product Applications – A Public Meeting (Oct. 28-29, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/deemed-tobacco-product-applications-public-meeting-10282019#agenda.

[5] FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (ENDS): Guidance for Industry* (June 2019), A284.

[6] FDA, *Premarket Tobacco Product Applications and Recordkeeping Requirements, Proposed Rule*, 84 Fed. Reg. 50566 (Sept. 25, 2019).

in non-tobacco flavors provide evidence that their products were more effective than comparator tobacco-flavored ENDS products in reducing cigarette smoking.

## III.　FDA's 2020 Enforcement Guidance

On January 2, 2020, FDA issued a new guidance document ("2020 Enforcement Guidance") in which the agency modified its enforcement priorities under its deferred enforcement policy described above.[7] A183. In light of then-increasing youth usage of certain ENDS products, FDA stated that it would prioritize for enforcement: (i) flavored, cartridge-based ENDS products other than tobacco- or menthol-flavored ENDS products; (ii) all other ENDS products for which the manufacturer failed to take adequate measures to prevent minors' access; and (iii) any ENDS products targeted to minors or whose marketing is likely to promote use by minors. A193-94. The 2020 Enforcement Guidance did not address the information applicants should include in their PMTAs. Rather, FDA stated that "[m]anufacturers may obtain information about the application process from the statutory criteria, as well as published guidances, webinars, and marketing orders and their accompanying documentation provided by FDA." A210-11.

---

[7] The Enforcement Guidance was revised and updated in April 2020 due to the extension of the PMTA submission deadline from May 2020 to September 9, 2020.

## IV.    Petitioners' PMTAs

Petitioner Triton manufactures nicotine-containing bottled e-liquids both for its own brands and as a contract manufacturer for third parties, including Petitioner Vapetasia. Petitioners' Record Excerpts ("RE") at 15-16. Triton submitted its and Vapetasia's PMTAs on the deadline of September 9, 2020. A3, A109. Vapetasia's PMTA was similar to Triton's. A107-23.

Consumer surveys included in Triton and Vapetasia's marketing plans found that over two-thirds of users of the subject bottled e-liquids were over the age of 35. A395; A447. Both Triton and Vapetasia also stressed that, because their subject products were bottled e-liquids for use with refillable, "open-system" ENDS devices, as opposed to the cartridge-based ENDS devices that FDA had stressed in its 2020 Enforcement Guidance had surged in popularity with youth, their products did not present the same elevated risks of youth uptake. A381, A434-35.

## V.    FDA's Internal Memoranda

### A.    FDA's July 9, 2021 Memorandum

Ten months after Petitioners submitted their PMTAs, and without the knowledge of anyone outside FDA, on July 9, 2021, FDA issued an internal memorandum stating that, at the Acting Commissioner's urging, FDA would apply a new "standard for evidence" for some, but not all, PMTAs for flavored ENDS

8

products, with the intent of ruling on as many applications as possible in a two-month period. A155.

Per the memorandum, the Office of Science was "tasked with developing a new plan to effectively manage the remaining non-tobacco flavored ENDS PMTAs" not already in substantive scientific review to enable FDA to take "final action on as many applications as possible by September 10, 2021." A155. Under this new "standard for evidence," rather than review an entire PMTA and its contents in context, given the "large number of applications that remain[ed] to be reviewed by September 9, 2021,"[8] FDA would "conduct a Fatal Flaw review . . . a simple review in which the reviewer examines the submission to identify whether or not it contains the necessary type of studies." A156. The memorandum stated that the "fatal flaw" would be the absence of randomized controlled trials or longitudinal cohort studies demonstrating that an applicant's flavored ENDS provides a greater benefit to adult smokers in terms of promoting smoking cessation relative to a comparator tobacco-flavored ENDS product. A155-56. Any application lacking this evidence would "likely receive a marketing denial order." A156. According to FDA, this memorandum was later superseded. But, as discussed below, FDA carried over to

---

[8] FDA had expected 6,800 product applications but received *6.5 million*, exceeding its anticipated volume "by orders of magnitude." FDA, Transcript, *Deemed Product Review: A Conversation with the Office of Science*, at 8, 19 (June 11, 2021), https://www.fda.gov/media/150275/download.

its reviews of Petitioners' applications the concept of a limited review to determine whether their flavored ENDS products provide a greater benefit to adult smokers than a comparator tobacco-flavored ENDS product; if no such evidence existed, FDA's reviewers did not consider or weigh the remaining evidence in Petitioners' applications.

### B.    FDA's August 17, 2021 Memorandum

On August 17, 2021, FDA issued another internal memorandum with a subject of "PMTA Review: Evidence to Demonstrate Benefit of Flavored ENDS to Adult Smokers." A167. Like the July 9, 2021 memorandum before it, the August 17, 2021 memorandum was not published outside the agency.

The August 17, 2021 memorandum describes FDA's "findings with respect to the type of evidence that may support a finding that the marketing of a flavored ENDS is appropriate for the protection of public health." A167. The memorandum details findings from the National Youth Tobacco Survey and other studies suggesting that flavored ENDS products are more popular with youth than tobacco-flavored ENDS products and that, since the 2020 Enforcement Guidance banned flavored cartridge-based ENDS products, a ten-fold increase occurred in high school-aged youth using flavored disposable ENDS products. A170-71.

The memorandum instructs that, based on its "completion of numerous scientific reviews over the last 10 months," product-specific evidence enabling a

comparison between the applicant's new flavored ENDS product and an "appropriate comparator" tobacco-flavored ENDS product in terms of their impact on tobacco use behavior among adult smokers would be required. A175-76. This evidence could be generated using either a randomized controlled trial or a longitudinal cohort study. A176.

FDA later rescinded the August 17, 2021 memorandum without explanation through a three-sentence memorandum issued the day before the agency announced the first denial orders for flavored ENDS products. A182. However, virtually the entire contents of the memorandum were incorporated word-for-word into the Technical Project Lead ("TPL") reviews that supported the denial orders issued to Petitioners and numerous other applicants (discussed below), including the footnotes and the memorandum's 66 references. *Compare* A167-81 *with* A83-106 *and* A135-54.

## VI.   FDA's Review Forms

The FDA reviewers that examined Petitioners' applications completed scientific review forms setting forth their findings. A69, A76, A129, A132.

In these forms, FDA described the scope of its scientific review as follows:

> This review determines whether the subject PMTAs contain evidence from a randomized controlled trial, longitudinal cohort study, and/or other evidence regarding the impact of the new ENDS on switching or cigarette reduction that could potentially demonstrate the benefit of their flavored ENDS over an appropriate comparator tobacco-flavored ENDS.

11

A70, A77, A130, A133.

The scientific review forms consisted of a simple box-checking exercise to determine whether the applications contained a randomized controlled trial or longitudinal cohort study comparing the subject flavored ENDS products against tobacco-flavored ENDS products with respect to switching behavior from smoking, such as by measuring the reduction in cigarettes per day obtained with each product:

**Presence of Evidence for Flavored ENDS Products**

| Criterion A | Present | Absent | |
|---|---|---|---|
| *Randomized Controlled Trial (RCT) on new product use and smoking behavior* | ☐ | ☒ | |

| Instructions: To select "Present", all of the following boxes must be checked "Yes": | Yes | No | N/A[2] |
|---|---|---|---|
| Was the RCT conducted using new products? | ☐ | ☐ | ☒ |
| Does the RCT include a tobacco-flavored arm and a flavored product arm[3]? | ☐ | ☐ | ☒ |
| Do the outcomes include users' ENDS and smoking behavior to assess switching and/or cigarette reduction (e.g., measures of cigarettes per day, smoking cessation, ENDS use)? | ☐ | ☐ | ☒ |
| Comment(s): N/A | | | |

| Criterion B | Present | Absent | |
|---|---|---|---|
| *Longitudinal Cohort Study (LCS) on new product use and smoking behavior* | ☐ | ☒ | |

| Instructions: To select "Present", all of the following boxes must be checked "Yes": | Yes | No | N/A[2] |
|---|---|---|---|
| Was the LCS conducted and does it include users of new products who are followed over time? | ☐ | ☐ | ☒ |
| Was use of tobacco-flavored products and other flavored products assessed[3]? | ☐ | ☐ | ☒ |
| Do outcomes include users' ENDS and smoking behavior to assess switching and/or cigarette reduction (e.g., measures of cigarettes per day, smoking cessation, ENDS use)? | ☐ | ☐ | ☒ |
| Comment(s): N/A | | | |

A70, A77, A130, A133. The review forms also asked whether there was any

"[o]ther evidence in the PMTAs related to potential benefit to adults":

| Criterion C |
|---|
| Other evidence in the PTMA(s) related to potential benefit to adults |
| N/A |

A171, A78, A131, A134. The review forms found no such evidence in the

applications.

## VII.  The Marketing Denial Orders and TPL Reviews

On August 26, 2021, FDA publicly suggested for the first time via a press

release that marketing of flavored ENDS products would be authorized only if

premarket applications included studies, such as a randomized controlled trial or

longitudinal cohort study, showing that an applicant's flavored ENDS product was

more effective at promoting switching or cessation of combustible cigarette use than

a comparable tobacco-flavored ENDS product over time. FDA, Press Release, *FDA

Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for

Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26,

2021), https://bit.ly/2YsYmzd.

On September 9, 2021, FDA announced that in only a matter of weeks it had issued marketing denial orders for applications covering more than 946,000 flavored ENDS products. FDA, Press Release, *FDA Makes Significant Progress in Science-Based Public Health Application for Review, Taking Action on Over 90% of More than 6.5 Million 'Deemed' New Tobacco Products Submitted* (Sept. 9, 2021), https://bit.ly/33Av9oz.

Less than a week after FDA announced its new requirements through its first press release, on September 1, 2021, through its scientific advisors, Triton submitted a letter to FDA advising that it intended to conduct additional behavioral studies on adult smoking cessation to support and supplement its PMTA and long-term studies of its products. RE at 19. However, on September 14, 2021, FDA issued marketing denial orders to Triton, revealing that the agency had not reviewed the September 1, 2021 letter because it was supposedly "received near the completion of scientific review." A65. FDA issued a marketing denial order to Vapetasia two days later. A124.

Petitioners' denial orders are nearly identical. A57, A66, A124. The denial orders state that the PMTAs "lack sufficient evidence demonstrating that your flavored [ENDS] will provide a benefit to adult users that would be adequate to outweigh the risks to youth." A57, A66, A124. The denial orders demand:

> robust and reliable evidence . . . regarding the magnitude of the
> potential benefit to adult smokers. This evidence could have been

provided using a randomized controlled trial and/or longitudinal cohort study that demonstrated the benefit of your flavored [ENDS] over an appropriate comparator tobacco-flavored ENDS.  Alternatively, FDA would consider other evidence but only if it reliably and robustly evaluated the impact of the new flavored vs. Tobacco-flavored products on adult smokers' switching or cigarette reduction over time.

A57, A66, A124.

The denial orders add that, because "key evidence demonstrating APPH is absent," "scientific review did not proceed to assess other aspects of your application." A58, A67, A125.

FDA produced the TPL reviews supporting Petitioners' denial orders after Triton and Vapetasia filed their petitions for review. A83, A135. As noted above, most of the TPL reviews' content is copied verbatim from FDA's August 17, 2021 memorandum. FDA also published a sample TPL review for flavored ENDS products on September 17, 2021. *See* FDA, Sample Technical Project Lead Review of ENDS-Product PMTA (Sept. 17, 2021), https://bit.ly/304PSyH. FDA's sample TPL is also nearly identical to both Petitioners' TPL reviews and the August 17, 2021 memorandum, suggesting that FDA prepared essentially the same review for every one of the more than 1 million flavored ENDS products for which it issued denial orders.

Petitioners' TPL reviews concluded as follows:

Our review determined that the subject PMTAs do <u>not</u> contain evidence from a randomized controlled trial, longitudinal cohort study, or other evidence regarding the impact of the ENDS on switching or

cigarette reduction that could potentially demonstrate the benefit of their flavored ENDS over tobacco-flavored ENDS. As a result, the applicant has failed to provide evidence to overcome the risk to youth and show a net population health benefit necessary to determine that permitting the marketing of the new tobacco product is APPH.

A85; *see also* A137-38.

Nowhere in either the check-the-box "scientific review" forms or the TPL reviews did FDA suggest or provide any evidence that youth are actually using Triton's or Vapetasia's e-liquid products. *See id.*; A69-82; A129-34. Rather, as in the August 17, 2021 internal memorandum, A171-72, FDA concludes that, "across different device types, the role of flavor is consistent," A89, A141.

## VIII. Procedural History

Triton and Vapetasia timely filed petitions for review. A unanimous motions panel granted Triton an emergency stay of its denial order. 16 F.4th 1130 (5th Cir. 2021). A divided merits panel then denied Petitioners' petitions for review, 41 F.4th 427 (5th Cir. 2022), but the Court subsequently ordered rehearing *en banc* and granted the petitions, 90 F.4th 357 (5th Cir. 2024). Notably, in a footnote near the end of its opinion, the *en banc* Court held as follows:

> FDA's categorical ban has other statutory problems. For example, the TCA states that FDA must follow notice-and-comment procedures before adopting a "tobacco product standard." *See* 21 U.S.C. § 387g(c)-(d). And Congress specifically called a ban on tobacco flavors a "tobacco product standard." *See id.* § 387g(a)(1)(A) (referring to tobacco flavors, "including strawberry, grape, orange, clove, cinnamon, pineapple, vanilla, coconut, licorice, cocoa, chocolate, cherry, or coffee, that is a characterizing flavor of the

16

tobacco product or tobacco smoke"); *see also id.* § 387g(a)(2) (cross-referencing notice-and-comment obligation to revise flavor standards). FDA unquestionably failed to follow § 387g's notice-and-comment obligations before imposing its de facto ban on flavored e-cigarettes.

90 F.4th at 384 n.5.

The Supreme Court then granted FDA's petition for certiorari and vacated and remanded this Court's *en banc* decision. *FDA v. Wages & White Lion Invs., LLC,* 604 U.S. 542 (2025). However, in its opinion, the Supreme Court declined to address the question of whether FDA had failed to comply with notice-and-comment requirements, finding that it was beyond the scope of the issues on which the Court had granted certiorari:

> The question we agreed to decide is whether the FDA acted arbitrarily and capriciously in denying respondents' applications for premarket approval of their tobacco products. . . . But before tackling that question, we briefly address as a preliminary matter an argument that is touched on in respondents' brief: namely, that either the APA or the TCA required the FDA to use notice-and-comment rulemaking to set out the requirements that must be met in a premarket tobacco product application.

> . . . . Of course, if a statute requires rulemaking, the affected agency must comply. . . . And that is what respondents claim in passing here. Respondents' defense of the decision below is based almost entirely on 5 U. S. C. § 706(2)(A) and related case law. But their brief also suggests that the FDA's decision to issue denials based on standards developed in adjudication violated other provisions of the APA and TCA that, they claim, required notice-and-comment rulemaking. See Brief for Respondents 47-49, and n. 33. This echoes an argument the Court of Appeals made in a short footnote. See 90 F. 4th, at 384, n. 5 (citing 21 U. S. C. §§ 387g(a)(1)(A), (a)(2), (c)-(d)).

17

We did not grant certiorari on that question, and without adequate briefing, it would not be prudent to decide it here. See *Anza v. Ideal Steel Supply Corp.*, 547 U. S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). Accordingly, we do not reach that question and express no view on its merits.

604 U.S. at 565.

It is that unaddressed question—whether FDA violated notice and comment requirements established by either the APA or FDA's own "good guidance practices" regulations when the agency adopted and applied its longitudinal comparative efficacy requirement—that Petitioners now ask this Court to resolve on remand.

## SUMMARY OF ARGUMENT

The Court should set aside the denial orders because they are arbitrary, capricious, and not in accordance with law. FDA violated the Administrative Procedure Act and/or the agency's own regulations when it adopted and applied its longitudinal comparative efficacy requirement without notice or opportunity for public comment.

A "rule" is "the whole or a part of an agency statement of *general or particular applicability* and *future effect* designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (emphases added). If a rule is "substantive," or "legislative" in nature, the APA requires agencies to publish the rule in the Federal Register and give interested persons an opportunity to submit

18

comments. 5 U.S.C. § 553. And if a rule is "interpretive" in nature, FDA's "good guidance practices" regulations require the agency to communicate to the public "expectations that are not readily apparent from the statute" in a guidance subject to notice-and-comment requirements. 21 C.F.R. § 10.115(e); *see also* 21 C.F.R. § 10.115(c)(1), (g); 21 U.S.C. § 371(h)(1)(C)(i).

By contrast, an "adjudication" is the process by which an agency *retroactively* applies the law to reach a final disposition of a *specific case* involving a *specific party*. *Compare* 5 U.S.C. § 551(4)-(5) (rulemaking) *with* 5 U.S.C. § 551(6)-(7) (adjudication).

The longitudinal comparative efficacy requirement that FDA adopted in its August 17, 2021 memorandum and carried over to its TPL reviews was a "rule," not an "adjudication" or a mere "statement of policy." Indeed, the memorandum reflected many of the features of a preamble in a notice of proposed rulemaking. And, in the memorandum, FDA rationalized its adoption of the comparative efficacy requirement for the benefit side of the TCA's risk-benefit equation for marketing tobacco products by making the legislative determination that *all* flavored ENDS products present the same high, uniform, fixed risk to youth, regardless of the product-specific evidence of low risk to youth that Petitioners and others presented in their applications. FDA then applied its new comparative efficacy requirement on

19

a forward-looking basis, using it to review Petitioners' applications and deny them weeks later.

FDA cannot "escape [notice-and comment] requirements . . . by labeling its rule an 'adjudication.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017). Because FDA failed to comply with the notice-and-comment requirements set forth in the APA and the agency's own regulations, the denial orders it issued to Petitioners based on the longitudinal comparative efficacy requirement are arbitrary, capricious, and unlawful. The Court should set them aside.

## ARGUMENT

### A.    FDA's Longitudinal Comparative Efficacy Requirement is a Rule

FDA's adoption of its longitudinal comparative efficacy requirement violated the notice-and-comment requirements found in the APA and FDA's own binding regulations.

The TCA does not say that a flavored ENDS product satisfies the statutory "appropriate for the protection of the public health" or "APPH" standard only if it has an added benefit relative to that of a tobacco-flavored ENDS product in facilitating cigarette smokers switching completely away from or reducing significantly their smoking. Indeed, section 910 of the FDCA, 21 U.S.C. § 387j, does not say anything specific about flavored tobacco products at all. So, as it routinely

does with the statutes it administers, FDA had to interpret section 910. The APA provides FDA with two methods to do so—rulemaking and adjudication.

A "rule" is "the whole or a part of an agency statement of *general or particular applicability* and *future effect* designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (emphasis added). The APA requires agencies to publish proposed rules and the bases for them in the *Federal Register* and give interested persons the opportunity to submit comments in response. 5 U.S.C. § 553.

An "adjudication," in contrast, is the process by which an agency reaches a final disposition of a *specific case* involving a *specific party*. An adjudication is not the means by which an agency adopts a prospective requirement that it will apply only in future cases. *Compare* 5 U.S.C. § 551(4)-(5) (rulemaking) *with* 5 U.S.C. § 551(6)-(7) (adjudication); *see also ITServe All, Inc. v. Dep't of Homeland Security*, 71 F.4th 1028, 1034-35 (D.C. Cir. 2023) (noting that a "rulemaking typically announces generally applicable legal principles" that govern "only the future," whereas an "adjudication involves case-specific determinations" that "immediately bind parties by retroactively applying law to their past actions" (internal citations and quotations omitted)); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 217 (1998) (Scalia, J., concurring) (observing that "there is really no alternative except

the obvious meaning, that a rule is a statement that has legal consequences only for the future").

The longitudinal comparative efficacy requirement that FDA adopted in its August 17, 2021 memorandum and carried over to *all* of its TPL reviews for flavored ENDS products—including the TPL reviews on Petitioners' applications—is a rule. The longitudinal comparative efficacy requirement is a "rule" because, when FDA adopted it in August 2021, it was an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Indeed, the August 17, 2021 memorandum (which was largely cut-and-pasted into each individual TPL review) reflected many of the features of a preamble in a notice of proposed rulemaking. *See* 1 C.F.R. § 18.12 (stating that proposed rules "shall" include "a preamble which will inform the reader . . . of the basis and purpose for the rule.").

The August 17, 2021 memorandum included nearly 11 single-spaced pages of analysis to support the new longitudinal comparative efficacy requirement, including 24 footnotes and a "References" section listing 66 publications, nearly all from medical or scientific journals. A167. And, although FDA purportedly "rescinded" the August 17, 2021 memorandum the day before the agency released its first wave of denial orders for failing to meet the new standard, the TPL reviews for each denial copied virtually the entire contents of the memorandum verbatim.

The memorandum established the longitudinal comparative efficacy requirement without reference to any particular application and in a manner that (1) applied to unnamed and unspecified persons; (2) considered general facts, as opposed to a particular set of disputed facts; and (3) determined a policy issue, rather than resolving a specific dispute. *See Gallo v. U.S. Dist. Ct. for Dist. of Ariz.*, 349 F.3d 1169, 1182 (9th Cir. 2003), *cert. denied*, 541 U.S. 1073 (2004) ("The three primary considerations [in distinguishing between legislation and adjudication] are: (1) whether the government action applies to specific individuals or to unnamed and unspecified persons; (2) whether the promulgating agency considers general facts or adjudicates a particular set of disputed facts; and (3) whether the action determines policy issues or resolves specific disputes between particular parties."); *Xcaliber Int'l Ltd. v. Att'y Gen. of La.*, 612 F.3d 368, 382 (5th Cir. 2010) ("Generally speaking, legislative actions are non-individualized determinations that affect a wide class of individuals, whereas adjudicative actions involve individualized assessments that affect a smaller number of people in a more exceptional manner.").

FDA will claim that it did not violate the APA's or its own regulations' notice-and-comment requirements because it adopted the comparative efficacy requirement through an "adjudication." But "courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Azar v. Allina Health Servs.*, 587

U.S. 566, 575 (2019); *see also Columbia Broad. Sys. v United States*, 316 U.S. 407, 416 (1942) (observing that "it is the substance of what [an agency] has purported to do and has done which is decisive"); *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) ("While mindful but suspicious of the agency's own characterization, we . . . focus[] primarily on whether the rule has a binding effect on agency discretion or severely restricts it."); *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) ("[T]he label that the particular agency puts on its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.") (quoting *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481 (2d Cir. 1972)); *Mauthe v. Millennium Health LLC*, 58 F.4th 93, 102 (3d Cir. 2023) (Phipps, J., concurring) ("An agency's label for an action is not dispositive of the action's essence, and not everything labeled as an 'order' is actually an order."); *Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("It is of course the [agency's] decision whether to proceed by rule or adjudication, but 'rules is rules,' no matter their gloss.") (cleaned up). Thus, FDA "may not escape [notice-and-comment] requirements . . . by labeling its rule an 'adjudication.'" *Safari Club Int'l*, 878 F.3d at 332.

Examining FDA's stated rationale for adopting the longitudinal comparative efficacy requirement for *all* flavored ENDS products demonstrates why the

24

"essence" of FDA's longitudinal comparative efficacy standard was not applicant- or product-specific, as would be expected in the case of a bona fide adjudication. In its August 17, 2021 memorandum, FDA found that "[t]he appeal of flavors applies across the entire class of ENDS on the market" and that "the removal of one flavored product option prompted youth to migrate to another ENDS type that offered the desired flavor options, underscoring the fundamental role of flavor in driving appeal." A171-72. FDA went on to conclude that the evidence it reviewed "strongly supports the finding that flavored ENDS pose a significant risk to youth. Moreover, because the appeal of flavor is consistent across ENDS device types, and the harms to youth posed by flavored ENDS use, including nicotine dependence, are not moderated by device type, we find that this conclusion applies to all types of flavored ENDS." A174.

FDA then relied on its across-the-board conclusions regarding the purportedly uniformly high risks posed by all flavored ENDS products to justify the need for longitudinal comparative efficacy evidence of such products' benefits with regard to switching or smoking cessation as against a tobacco-flavored ENDS product:

> For flavored ENDS, the known and substantial risk to youth in particular is high. Therefore, to overcome the risk to youth and show a net population health benefit, the applicant must demonstrate potential benefits to smokers from marketing such products using particularly strong evidence—including both robust study design and methods and the strength of the study results. In other words, because the potential benefit to adults is gained through its impact on smoking behavior, such evidence should be provided to demonstrate that a benefit of a new

25

product is significant enough to overcome the risk to youth. In particular, such evidence should permit FDA to assess whether there is any added or incremental benefit to a flavored ENDS product over a tobacco flavored variety in facilitating smokers completely switching or significantly reducing their smoking. If there is no evidence of such an incremental benefit, then there would be no justification to authorize such products, given the significant increase in risk of youth initiation associated with flavored ENDS compared to tobacco-flavored ENDS.

*   *   *   *

In order to adequately assess whether such an added benefit has been demonstrated, FDA has determined that product-specific evidence should be submitted to enable a comparison between the applicant's new flavored products and an appropriate comparator tobacco-flavored product (both ENDS) in terms of their impact on tobacco use behavior among adult smokers. Consistent with section 910(c)(5), this evidence could be generated using either an RCT design or a longitudinal cohort study design.

*   *   *   *

Data from one of these studies could support a benefit to adult users if the findings showed that, compared to the new tobacco-flavored product, use of (each) new flavored product is associated with greater likelihood of either of these behavioral outcomes for adult smokers: (1) complete switching from cigarettes to exclusive new product use or (2) significant reduction in cigarettes per day (CPD).

A175-77.

As Petitioners explained in their applications, however, their bottled e-liquid products do not pose the same risks of youth appeal and uptake as other types of flavored ENDS products:

If teens are attracted to flavors, the abundance of evidence shows that youth are particularly attracted to flavored, *cartridge-based* ENDS products, as FDA itself acknowledges in its recent Enforcement

26

Priorities for Electronic Nicotine Delivery Systems (ENDS) Guidance . . . . This has led FDA to take the position that it will prioritize enforcement against any flavored, cartridge-based ENDS product lacking marketing authorization. . . . In addition, data from the 2019 [National Youth Tobacco Survey] indicate that youth overwhelmingly prefer cartridge-based ENDS products because these products are easy to conceal, can be used discretely, can have high nicotine content, and are manufactured on a large scale.

Open-system e-liquid products, however, are not subject to these same risks, perhaps explaining why FDA chose not to effectively "ban" flavors in these products by eliminating the premarket review compliance period. In short, FDA concludes that flavored pod/cartridge-based systems are the main culprit and source of underage use. Boiler Maker Anvil E-Liquid, because it is an open-system e-liquid, would not be subject to these same risks leading to underage use.

A381. And Petitioners' conclusions were supported by the CDC's most recent National Youth Tobacco Survey results, which found that only 14.8% of current high school-aged users of ENDS used open-system tank devices that could be compatible with Petitioners' bottled e-liquids. A235.

In short, FDA made across-the-board "findings" that all flavored ENDS products pose a high risk of youth initiation regardless of device type and then used those non-applicant-specific risk findings as the basis to conclude that product-specific comparative efficacy benefits are required to offset that risk. In so doing, FDA engaged "in the formulation of a basically legislative-type judgment for prospective application only"—that is, a rule. *United States v. Fl. E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973). FDA did not adopt its comparative efficacy requirement

27

in the course of any particular adjudication, including of Petitioners' applications. Instead, FDA adopted its comparative efficacy requirement via the August 17, 2021 internal agency memorandum and only later applied that requirement in issuing Petitioners their denial orders.

FDA simultaneously refused to consider the evidence of low actual risks to youth posed by Petitioners' specific bottled e-liquids as presented in Petitioners' applications and the CDC's own data, and so did not "adjudicate[e] a particular set of disputed facts." *Fl. E. Coast Ry. Co.*, 410 U.S. at 246. The "essence" of FDA's actions was to make a legislative determination that all flavored ENDS products sold by *an entire industry* pose an elevated, uniform, immutable[9] risk to youth. By permanently fixing the "risk" side of the statutory risk-benefit equation at "high," FDA generated the need for a new, countervailing evidentiary requirement on the "benefit" side of the statutory equation that, in turn, resulted in industry-wide marketing denial orders for flavored ENDS. Thus, FDA's own stated rationale for

---

[9] During oral argument before the Supreme Court, FDA contended that, at the time the applications were submitted in 2020, FDA was "concerned most about cartridge devices that were most popular with youth at the time" and that "[a]fter that, by the time of the decision here, youth had migrated to disposable devices. And FDA is legitimately concerned that youth are chasing the flavors that they want. And . . . there's every reason to think that if they needed to use open systems, -- open devices that use liquids like this in order to get the flavors they want, that that number [of youth users of open systems compatible with Petitioners' e-liquids] would go up." S. Ct. Hrg. Tr. at 95-96.

28

adopting and applying the comparative efficacy requirement—stated weeks before the agency applied it to Petitioners' applications—confirms that its actions were a rulemaking, not an adjudication.

This point is underscored by the fact that, from August 17, 2021-forward, FDA has applied the longitudinal comparative efficacy requirement to *all* applications for flavored ENDS, regardless of when those applications were filed and despite the fact that youth usage of ENDS products has declined precipitously since 2020.[10] *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448-49 (9th Cir. 1994) ("Before the decision [by HUD that Washington's state-court eviction procedures met HUD's due process requirements] was made, all public housing tenants in Washington had a statutory right to a pre-eviction grievance

---

[10] The percentage of youth that the National Youth Tobacco Survey (NYTS) identified as "currents users" of e-cigarettes was 19.8% in 2020, A235, but declined to 13.1% in 2021, and then to just 5.9% by 2024. *See* Eunice Park-Lee et al., Notes from the Field: *E-Cigarette Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2021*, 70 Morbidity and Mortality Weekly Report 1387, 1388 (2021), https://bit.ly/2ZSLenl (2021); Ahmed Jamal, et al., *Tobacco Product Use Among Middle and High School Students—National Youth Tobacco Survey, United States, 2024*, 73 Morbidity and Mortality Weekly Report 917, 920 (Oct. 17, 2024). This drop in youth usage has been so precipitous that following release of the 2024 NYTS data, FDA hailed it as the "lowest level in a decade" and "approximately one-third of what it was at its peak in 2019." *See* FDA, Press Release, *Youth E-Cigarette Use Drops to Lowest Level in a Decade*, https://www.fda.gov/news-events/press-announcements/youth-e-cigarette-use-drops-lowest-level-decade (Sept. 5, 2024).

hearing. After that decision, no public housing tenant accused of certain criminal activity had such a right. We conclude that HUD's determination was a rule.").

FDA's limited authorizations to date for flavored ENDS illustrate how the agency continues to apply its longitudinal comparative efficacy requirement to all applications for flavored ENDS and has not moderated its stance on their risks despite substantially reduced rates of youth usage since 2021. In June 2024, FDA authorized the marketing of a menthol-flavored ENDS product manufactured by NJOY LLC.[11] In its TPL review for that application, FDA confirmed that "[f]or flavored ENDS . . . , there is a known and substantial risk of youth initiation and use; accordingly, an applicant has a higher burden to establish that the likely benefits to adults who use [combustible cigarettes] outweigh that risk."[12] Echoing the language of the August 9, 2021 memorandum, FDA stated that, in weighing the application's evidence, "FDA considers whether the applicant has provided robust and reliable evidence of an added benefit from the flavored ENDS relative to that of tobacco-flavored ENDS in facilitating adults . . . in completely switching from or

---

[11] FDA, Press Release, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://tinyurl.com/bddrcmy3.

[12] FDA, *Technical Project Lead (TPL) Review of PMTAs (NJOY Ace Menthol)*, at 5 (June 21, 2024), https://tinyurl.com/4fwkck8u.

significantly reducing their smoking."[13] And, when FDA authorized JUUL menthol-flavored ENDS in July 2025, the agency likewise reiterated that it imposes a "higher burden" on applications for flavored ENDS and requires longitudinal comparative-efficacy evidence.[14] FDA's continued application of the longitudinal comparative efficacy requirement in the face of facts that undermine the rationale for its adoption confirms that FDA adopted a rule and did not merely adjudicate individual applications. [15]

---

[13] *Id.*

[14] FDA, *Technical Project Lead (TPL) Review of PMTAs (JUUL Menthol)*, at 6 (July 17, 2025), https://tinyurl.com/5a2n5htf.

[15] Further, even if the Court were to accept FDA's narrative that it developed its comparative efficacy requirement through adjudication, FDA still violated the APA and/or the agency's notice and comment requirements. As this Court has recognized, an agency's discretion to proceed through adjudication "is not unlimited." *City of Arlington v. FCC*, 668 F.3d 229, 241-42 (5th Cir. 2012). Rather, "there may be situations where the [agency's] reliance on adjudication would amount to an abuse of discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974). The Ninth Circuit has found such to be the case "where the new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application." *Pfaff v. U.S. Dep't of Hous. & Urb. Dev.*, 88 F.3d 739, 748 (9th Cir. 1996). FDA's adoption of the comparative efficacy requirement here satisfies each of those elements.

**B.    The Longitudinal Comparative Efficacy Requirement is Not a Mere Statement of Policy**

This Circuit "evaluate[s] two criteria to distinguish policy statements from substantive rules: whether the rule (1) 'impose[s] any rights and obligations' and (2) 'genuinely leaves the agency and its decisionmakers free to exercise discretion.'" *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (quoting *Professionals & Patients*, 56 F.3d at 595). "There is some overlap in the analysis of those prongs 'because [i]f a statement denies the decisionmaker discretion in the area of its coverage . . . then the statement is binding, and creates rights or obligations." *Id.* (quoting *GE v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).

A motions panel of this Court has already found in a parallel case that it is "not a close call" that the "heightened" longitudinal comparative efficacy requirement, or standard, is a rule and not a mere "statement of policy" exempt from notice-and-comment requirements under 5 U.S.C. § 553(b)(4)(A). *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 193-94 (5th Cir. 2023). The standard, as set forth in the August 17, 2021 memorandum and subsequent TPL reviews, "appears on its face to be binding" and was "applied by [FDA] in a way that indicates it is binding." *Id.* at 193 (citing, *inter alia*, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)); *see also Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (same). The new evidentiary standard requires that applications contain "the necessary type of

32

studies," A156, and has served as the basis for denial orders for over one million flavored ENDS products.

The standard also "took away the FDA reviewers' former discretion to consider individual PMTAs solely on their merits and instead requires a cursory, box-checking review." *R.J. Reynolds Vapor Co.*, 65 F.4th at 193-94; *see also Texas*, 933 F.3d at 442 ("[A]ctions that retract an agency's discretion to adopt a different view of the law are binding."); *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) ("[W]here agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action."). Nothing about the Supreme Court's decision in this case, which explicitly declined to address Petitioner's notice-and-comment arguments, undermines the Court's conclusion in *R.J. Reynolds*. Thus, the longitudinal comparative efficacy requirement is not a mere statement of policy that is exempt from notice-and-comment requirements under the APA.

## C.    Regardless of Whether the Longitudinal Comparative Efficacy Requirement is a "Legislative" or "Interpretive" Rule, Notice and Comment was Mandatory

There are two types of rules—"legislative" rules and "interpretative" rules. 5 U.S.C. § 553(b). "Legislative rules are ones with the 'force and effect of law,' while interpretive rules 'advise the public of the agency's construction of the statutes and rules which it administers.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023)

33

(quoting *Perez v. Mortgage Bankers Ass'n*, 575 US. 92, 96, 97 (2015)). "[I]n determining whether a rule is subject to the APA's notice-and-comment provisions, we ordinarily ask whether the rule is a legislative rule (which generally must go through notice-and-comment procedures) or an interpretive rule (which need not)." *City of Billings v. Transp. Sec. Admin.*, 153 F.4th 46, 51 (D.C. Cir. 2025).

While this Circuit has adopted a five-factor test to clear the "considerable smog" that historically "enshrouded" the distinction between legislative and interpretive rules, *Mock*, 75 F.4th at 580, the Court need not engage in that exercise here. This is the case because regardless of whether the comparative efficacy requirement is considered a legislative rule or an interpretive rule, FDA was still required to undertake a notice-and-comment process before enforcing the requirement.

The APA exempts "interpretative rules" from its notice and comment requirements. 5 U.S.C. § 553(b). But even if the longitudinal comparative efficacy requirement were an interpretive rule, the FDA's own "good guidance practices" regulations prohibit the agency from communicating to the public "expectations that are not readily apparent from the statute or regulations" in a manner other than through a guidance document that follows notice-and-comment procedures. *See* 21 C.F.R. § 10.115(e)[16]; *see also* 21 C.F.R. § 10.115(c)(1), (g); 21 U.S.C. §

---

[16] Title 21 C.F.R. § 10.115(e) provides as follows:

34

371(h)(1)(C)(i) ("For guidance documents that set forth initial interpretations of a statute or regulation, changes in interpretation or policy that are of more than a minor nature, complex scientific issues, or highly controversial issues, the Secretary shall ensure public participation prior to implementation of guidance documents.").

Nothing about FDA's longitudinal comparative efficacy requirement for flavored ENDS is "readily apparent" from the language of 21 U.S.C. § 387j. The statute makes no reference to either non-tobacco flavors or ENDS products specifically. And the fact that FDA felt the need to justify its comparative efficacy requirement through a memorandum with nearly 11 single-spaced pages of analysis, including 24 footnotes and 66 references to publications from medical and scientific journals, underscores the lack of obviousness of the longitudinal comparative efficacy requirement from the statutory text.[17]

---

> **(e)** *Can FDA use means other than a guidance document to communicate new agency policy or a new regulatory approach to a broad public audience?* The agency may not use documents or other means of communication that are excluded from the definition of guidance document to informally communicate new or different regulatory expectations to a broad public audience for the first time. These [good guidance practices] must be followed whenever regulatory expectations that are not readily apparent from the statute or regulations are first communicated to a broad public audience.

[17] Unsurprisingly, it was not obvious to the regulated industry of small business owners who are neither scientists nor lawyers, as evidenced by the fact that *none* of them included a longitudinal comparative efficacy study in their PMTAs submitted before FDA announced the rule through its August 26, 2021 press release.

FDA first communicated its "new or different regulatory expectations to a broad public audience for the first time" through its August 26, 2021 press release. 21 C.F.R. § 10.115(e). And there can be no reasonable dispute that the longitudinal comparative efficacy requirement was a "new regulatory approach" as described in section 10.115(e). FDA had already finalized a 54-page "Level 1 Guidance" outlining its requirements for PMTAs for ENDS products in 2019 to aid regulated entities in in understanding what type of studies and evidence FDA expected them to include in their PMTAs. A284. And that guidance makes no specific reference to the longitudinal comparative efficacy requirement for flavored ENDS products. As the Supreme Court indicated, "[a]dmittedly, the FDA has not pointed us to any portion of its predecisional guidance that said in so many words that manufacturers must draw that precise comparison." 604 U.S. at 580; *see also id*. at 581 ("[R]espondents are correct that the FDA did not provide this precise instruction in its predecisional guidance.").

Yet, when FDA adopted the new requirement, it neither amended its earlier guidance document, nor issued a new guidance document setting forth its expectations for longitudinal comparative efficacy data. Instead, FDA first announced the requirement through a press release dated August 26, 2021. And FDA's regulations exclude "press materials" from the definition of "guidance documents." 21 C.F.R. § 10.115(b)(3).

36

Indeed, it is only now, four-and-a-half years later, that FDA apparently intends to issue a new draft guidance setting forth its expectations in this respect. *See* Office of Information and Regulatory Affairs, Office of Management and Budget, Notice regarding *Statement of Policy – Considerations for Flavored Electronic Nicotine Delivery Systems (ENDS) Premarket Applications; Draft Guidance for Industry*, https://perma.cc/3APD-F999 (describing draft guidance submitted by FDA to the Office of Management and Budget for Executive Order 12866 regulatory review on February 18, 2026). Thus, even if FDA's longitudinal comparative efficacy requirement were an interpretive rule, FDA still failed to comply with the notice and comment requirements that its own "good guidance practices" regulations mandate.

## D.    FDA's Failure to Engage in Notice and Comment Procedures Renders Petitioners' Denial Orders Arbitrary, Capricious, and Not in Accordance with Law

Regardless of the source of the notice-and comment requirement—the APA or FDA's own "good guidance practices" regulations—the agency's failure to comply requires the Court to set aside any agency action based on the longitudinal comparative efficacy requirement, including Petitioners' denial orders. *See Safari Club Int'l*, 878 F.3d at 332 (setting aside the U.S. Fish and Wildlife Service's generally applicable rule on importation of certain animals because the agency did not conduct notice-and-comment rulemaking when adopting that rule); *Yesler*

37

*Terrace Cmty. Council*, 37 F.3d at 449 (finding notice-and-comment process required by HUD regulation and stating that "[a]n agency cannot avoid the requirement of notice-and-comment rulemaking simply by characterizing its decision as an adjudication" (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality opinion)). The Court should do so here.

## CONCLUSION

For the foregoing reasons, the Court should find FDA's actions arbitrary, capricious, and not in accordance with law, grant Triton and Vapetasia's petitions for review, and set aside their marketing denial orders.

Respectfully submitted,

THOMPSON HINE LLP

By:   /s/ Eric N. Heyer
    Eric N. Heyer
    Joseph A. Smith
    James C. Fraser
    Anna M. Stressenger
    1919 M Street, NW, Suite 700
    Washington, DC 20036
    Phone: 202.331.8800
    Fax: 202.331.8330
    Eric.Heyer@ThompsonHine.com
    Joe.Smith@ThompsonHine.com
    James.Fraser@ThompsonHine.com
    Anna.Stressenger@ThompsonHine.com

    *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I caused the foregoing Corrected Petitioners' Supplemental Brief to be filed with the Clerk's Office for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system and thereby electronically served on all counsel of record.

/s/ Eric N. Heyer<br>Eric N. Heyer

## CERTIFICATE OF COMPLIANCE

I hereby certify that Petitioners' Supplemental Brief complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32. The word count feature found in Microsoft Word reports that the Supplemental Brief contains 8,567 words, excluding the items exempted under Fed. R. App. P. 32(f).

The Petitioners' Supplemental Brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

_____/s/ Eric N. Heyer_____
Eric N. Heyer