**No. 21-60766 consolidated with No. 21-60800**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

WAGES AND WHITE LION INVESTMENTS, L.L.C.,
doing business as TRITON DISTRIBUTION,

Petitioner,

v.

FOOD & DRUG ADMINISTRATION,

Respondent.

---

On Petition for Review of a Final Marketing Denial Order
by the U.S. Food and Drug Administration

---

## SUPPLEMENTAL BRIEF FOR RESPONDENT

---

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

MICHAEL S. RAAB

JOSHUA M. KOPPEL
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7212*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-4820*

*Of Counsel:*

MICHAEL B. STUART
 *General Counsel*

 *U.S. Department of Health and*
  *Human Services*

SEAN R. KEVENEY
 *Chief Counsel*

WENDY S. VICENTE
 *Deputy Chief Counsel, Litigation*

WILLIAM H. RAWSON
 *Associate Chief Counsel*

 *Food and Drug Administration*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................ii

INTRODUCTION .............................................................................................. 1

STATEMENT OF THE CASE ........................................................................... 2

     A.     Statutory Background.......................................................................2

     B.     Use And Regulation Of E-Cigarettes.............................................4

     C.     FDA's Denial Of Petitioners' Marketing Applications.................8

     D.     Prior Proceedings ..........................................................................10

SUMMARY OF ARGUMENT .......................................................................... 14

ARGUMENT...................................................................................................... 16

The New Arguments Raised On Remand Are Not Properly Before
     The Court And Are Meritless In Any Event........................................... 16

     A.     The Only Arguments Raised On Remand Are Not
               Properly Before The Court ............................................................17

     B.     FDA Was Not Required To Engage In Notice-And-
               Comment Rulemaking Before Adjudicating Petitioners'
               Applications ...................................................................................19

     C.     FDA Did Not Violate Its Good-Guidance-Practices
               Regulation......................................................................................40

     D.     Amicus's Tobacco-Product-Standard Argument Is
               Meritless........................................................................................42

CONCLUSION .................................................................................................. 47

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Air Prods. & Chems., Inc. v. FERC*,
    650 F.2d 687 (5th Cir. 1981) .................................................................38

*American Airlines, Inc. v. Department of Transp.*,
    202 F.3d 788 (5th Cir. 2000) ..............................................24, 25, 29, 32

*Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*,
    810 F.3d 335 (5th Cir. 2016) .................................................................37

*Bidi Vapor LLC v. FDA*,
    134 F.4th 1282 (11th Cir. 2025) ...........................................................45

*Brown-Forman Corp. v. NLRB*,
    169 F.4th 646 (6th Cir. 2026) ................................................................36

*Christopher M. ex rel. Laveta McA v. Corpus Christi Indep. Sch. Dist.*,
    933 F.2d 1285 (5th Cir. 1991) ...............................................................19

*City of Arlington v. FCC*,
    668 F.3d 229 (5th Cir. 2012) .......................................................24, 25, 27

*FDA v. Wages & White Lion Invs., LLC*,
    604 U.S. 542 (2025) .......................................1, 2, 4, 7, 11, 12, 12-13, 13, 15, 21,
                                          23, 28, 30, 32, 35, 38, 39, 43, 45, 46

*Fontem US, LLC v. FDA*,
    82 F.4th 1207 (D.C. Cir. 2023) .........................................................43, 44

*Gripum, LLC v. FDA*,
    47 F.4th 553 (7th Cir. 2022) .................................................................20

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ...................................................................30

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*,
    71 F.4th 1028 (D.C. Cir. 2023) .......................................................... 25-26

*Liquid Labs LLC v. FDA,*
  52 F.4th 533 (3d Cir. 2022) ................................................................39

*Macy's, Inc. v. NLRB,*
  824 F.3d 557 (5th Cir. 2016) ..............................................................24

*Mobil Expl. & Producing N.A., Inc. v. FERC,*
  881 F.2d 193 (5th Cir. 1989) ..............................................................37

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) ..........................................................30, 31

*Nicopure Labs, LLC v. FDA,*
  944 F.3d 267 (D.C. Cir. 2019) ..............................................................4

*NLRB v. Bell Aerospace Co.,*
  416 U.S. 267 (1974) ............................................... 20, 23, 24, 26, 32, 37

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) .......................................................................... 29-30

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.,*
  88 F.3d 739 (9th Cir. 1996) ................................................................39

*Procter & Gamble Co. v. Amway Corp.,*
  376 F.3d 496 (5th Cir. 2004) ..............................................................18

*Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.,*
  980 F.2d 1043 (5th Cir. 1993) ............................................................19

*RJRV v. FDA,*
  65 F.4th 182 (5th Cir. 2023) ..............................................................46

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) ................................................................23, 24, 35

*Shell Offshore Inc. v. Babbitt,*
  238 F.3d 622 (5th Cir. 2001) ..............................................................36

*Tearney v. NTSB,*
  868 F.2d 1451 (5th Cir. 1989) ............................................................38

iii

*United States v. Florida E. Coast Ry. Co.*,
  410 U.S. 224 (1973) ................................................................25

*United States v. Ogle*,
  415 F.3d 382 (5th Cir. 2005) ................................... 17-18, 18

**Statutes:**

The Family Smoking Prevention and Tobacco Control Act of 2009,
  Pub. L. No. 111-31, div. A, § 2(1), 123 Stat. 1776 ..............................2

5 U.S.C. § 551(7) ............................................................25, 29

5 U.S.C. § 553 ...........................................................................18

5 U.S.C. § 553(b)(A) .................................................................29

5 U.S.C. § 706 ...........................................................................31

21 U.S.C. § 387a(b) ....................................................................4

21 U.S.C. § 387e(j)(3) ...............................................................20

21 U.S.C. § 387g .........................................................19, 42, 44

21 U.S.C. § 387g(a)(4) ..............................................................43

21 U.S.C. § 387j .........................................................................44

21 U.S.C. § 387j(a)(1)-(2) ...........................................................3

21 U.S.C. § 387j(b) ...................................................................20

21 U.S.C. § 387j(b)(1)(A) .......................................................3, 21

21 U.S.C. § 387j(c) ...................................................................20

21 U.S.C. § 387j(c)(1)(A) ..........................................................25

21 U.S.C. § 387j(c)(2) ....................................................3, 20, 34

21 U.S.C. § 387j(c)(2)(A) ..........................................................44

iv

21 U.S.C. § 387j(c)(2)(D) ...............................................................................44

21 U.S.C. § 387j(c)(4) ...............................................................................3, 21, 43

21 U.S.C. § 387k(*l*)(1) ...............................................................................20

**Regulations:**

21 C.F.R. § 10.115 ...............................................................................18

21 C.F.R. § 10.115(b)(3) ...............................................................................42

21 C.F.R. § 10.115(e) ...............................................................................40, 41, 42

21 C.F.R. § 10.115(g) ...............................................................................40

**Rule:**

Fed. R. App. P. 28 ...............................................................................17

**Other Authorities:**

FDA, *E-Cigarettes, "Vapes" and Other Electronic Nicotine Delivery Systems (ENDS) Authorized by the FDA* (Mar. 13, 2026), https://www.fda.gov/authorizedecigs ...............................................7

FDA, *FDA Authorizes Marketing of Tobacco- and Menthol- Flavored JUUL E-Cigarette Products* (July 17, 2025), https://perma.cc/7PDN-MYCM ...............................................8

FDA, *Roundtable on PMTA Submissions for ENDS Products* (Feb. 10, 2026), https://www.youtube.com/watch?v=13M1w7WGovk ...............................................40

FDA, *Technical Project Lead (TPL) Review of PMTAs* (May 12, 2022), https://perma.cc/A9BC-H6R3 ...............................................7

79 Fed. Reg. 23,142 (Apr. 25, 2014) ...............................................5

81 Fed. Reg. 28,974 (May 10, 2016) ...............................................4, 5

Press Release, FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://perma.cc/63WX-GFBF ................................8

Press Release, FDA, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://perma.cc/LCZ7-E9FW .............................. 41-42, 42

**INTRODUCTION**

This case returns on remand from the Supreme Court.  At the time of that remand, the only issue remaining was whether the Food and Drug Administration (FDA) committed prejudicial error by not fully reviewing the marketing plans that petitioners included in their applications to market flavored e-cigarette products.  FDA subsequently reviewed those plans, and petitioners do not object to the result of that review.  That should end this case.

Petitioners now contend that FDA was required, under the Administrative Procedure Act (APA) and the agency's own regulations, to engage in notice-and-comment rulemaking before it conducted the initial review of petitioners' applications.  Petitioners forfeited that argument, however, by not raising it in their opening brief.  In any event, petitioners' argument is meritless.  As the Supreme Court affirmed, "FDA was not required to issue [predecisional] guidance" outlining the types of evidence it would look for in reviewing applications to market flavored e-cigarettes. *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 582 (2025).  Rather, "FDA had discretion to work out the meaning of the [Tobacco Control Act's] comparative standard when evaluating premarket tobacco product

applications." *Id.* That is precisely what FDA did. In evaluating petitioners' applications, FDA determined that flavored e-cigarette products like petitioners' pose a significant risk to youth, and it looked for evidence of a potential benefit that might outweigh that risk.

The Court should reject petitioners' attempt to inject new issues into the case or, in the alternative, reject petitioners' arguments on the merits and deny the petition for review.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Family Smoking Prevention and Tobacco Control Act (Tobacco Control Act or TCA) established a comprehensive scheme for the regulation of tobacco products predicated on Congress's finding that the "use of tobacco products by the Nation's children is a pediatric disease of considerable proportions." Pub. L. No. 111-31, div. A, § 2(1), 123 Stat. 1776, 1777 (2009). As relevant here, the Act makes it unlawful for a manufacturer to introduce in interstate commerce any "new tobacco product" unless the

manufacturer obtains premarket authorization from FDA.  21 U.S.C. § 387j(a)(1)-(2).[1]

The Act directs a manufacturer applying for such authorization to provide "full reports of all information" that "show[s] the health risks of [its] tobacco product and whether such tobacco product presents less risk than other tobacco products."  21 U.S.C. § 387j(b)(1)(A).  And it provides that FDA "shall deny" an application to market a new tobacco product unless the agency finds, "upon the basis of … the application and any other information before [FDA] with respect to such tobacco product," that the applicant has made "a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health."  *Id.* § 387j(c)(2).  In determining whether an applicant has met the statutory standard, FDA must evaluate "the risks and benefits to the population as a whole," taking into account both the "likelihood that existing users of tobacco products will stop using such products" and the "likelihood that those who do not use tobacco products will start."  *Id.* § 387j(c)(4).

---

[1] The government's principal brief contains a more extended discussion of the relevant background.

### B.     Use And Regulation Of E-Cigarettes

1.  Electronic nicotine delivery systems—commonly known as e-cigarettes or vapes—entered the American market in 2007.  *Wages*, 604 U.S. at 553.  In contrast to a "traditional combustible cigarette," which "contains shredded tobacco wrapped in paper" and produces nicotine-infused smoke when lit, an e-cigarette contains a heating coil that turns a liquid (called e-liquid) into an aerosol that can be inhaled.  *Id.*  The e-liquids and resulting aerosol are laden with nicotine, which is "among the most addictive substances used by humans."  *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 270 (D.C. Cir. 2019).

In 2016, FDA exercised its statutory authority to deem e-cigarettes and other products meeting the statutory definition of "tobacco product" subject to the TCA's requirements.  81 Fed. Reg. 28,974, 28,976 (May 10, 2016); *see* 21 U.S.C. § 387a(b).  The rulemaking was precipitated by "rampant and climbing" e-cigarette use among youth.  *Nicopure*, 944 F.3d at 275.  "By the mid-2010s, approximately 2.4 million high-school students and 620,000 middle-school students reported using an e-cigarette at least once in the last 30 days."  *Wages*, 604 U.S. at 554.

4

FDA recognized that adults "currently using combusted tobacco products" may benefit from "completely switching" to e-cigarettes because the aerosol generated by e-cigarettes generally contains lower levels of toxicants than the smoke from traditional cigarettes. 81 Fed. Reg. at 29,030-29,031. FDA also found, however, that "inhaled nicotine" from e-cigarettes can be "as addictive as inhaled nicotine delivered by combusted tobacco products." *Id.* at 29,047. FDA described the substantial harms posed by nicotine and noted that nicotine's effect on youth is particularly alarming: Research indicates that exposure to nicotine "can disrupt adolescent brain development," "decreas[e] attention performance[,] and increas[e] impulsivity." *Id.*

In light of this evidence, FDA recognized that the overall public-health impact of e-cigarettes depends upon "who uses the products and how." 79 Fed. Reg. 23,142, 23,147 (Apr. 25, 2014). "If such products result in minimal initiation by children and adolescents while significant numbers of smokers quit, then there is a potential" for a net "positive" impact. *Id.* But if "there is significant initiation by young people, minimal quitting, or significant dual use of combustible and non-combustible products, then the public health impact could be negative." *Id.* "FDA has

5

repeatedly emphasized that the availability of non-combustible options should not come at the expense of addicting a generation of children to nicotine through these same delivery vehicles." A221.

2. Despite FDA's increased enforcement efforts over recent years and the adoption of voluntary measures by manufacturers, youth have continued to use e-cigarettes at alarming rates. A189-191. FDA has emphasized the "extraordinary popularity" of flavored e-cigarettes, in particular, noting that 93.2% of e-cigarette users aged 12–17 reported that their first e-cigarette was a flavored product and that 71% of youth users indicated they used e-cigarettes "'because they come in flavors I like.'" A196-197. In 2020, FDA prioritized enforcement against flavored, cartridge-based e-cigarettes that were, at the time, particularly popular among youth. A201-202. Although FDA's enforcement policy led to the removal of many cartridge-based flavored e-cigarettes from the market, use of e-cigarettes by children and adolescents has remained at alarming levels. *See* A87, A139. Many youth migrated from cartridge-based products to other types of flavored e-cigarettes. *See* A90, A142. That shift in the market underscored that flavoring is a principal driver of underage use. *See id.*

3. FDA has received and acted on a large number of applications to market e-cigarettes in various flavors. The agency has authorized the marketing of more than 40 e-cigarette products, most of them tobacco-flavored. *See* FDA, *E-Cigarettes, "Vapes" and Other Electronic Nicotine Delivery Systems (ENDS) Authorized by the FDA* (Mar. 13, 2026), https://www.fda.gov/authorizedecigs. FDA determined that tobacco-flavored products pose a comparatively low risk of enticing new users because "interest in tobacco flavor is low among youth." FDA, *Technical Project Lead (TPL) Review of PMTAs* 27 (May 12, 2022), https://perma.cc/A9BC-H6R3. At the same time, these products can benefit "established cigarette smokers," who have identified tobacco more often than other flavors as their "flavor of interest," and who could switch to e-cigarettes "as a way to reduce or stop smoking." *Id.* at 32.

In contrast, e-cigarettes with flavors other than tobacco present a significant risk to youth. *See supra* pp. 4-6. "The kaleidoscope of flavor options adds to the allure of e-cigarettes and has thus contributed to the booming demand for such products among young Americans." *Wages*, 604 U.S. at 555; *see also id.* at 563. To account for the heightened risk of such products, when an applicant tries to show that a flavored e-cigarette

7

product is appropriate for the protection of the public health because of a benefit to adult smokers, FDA has looked for evidence that the product provides some switching benefit *beyond* that provided by lower-risk tobacco-flavored e-cigarettes.  Applying that analysis case-by-case, FDA has granted marketing authorization for six flavored e-cigarettes—all in menthol flavors—for which the "evidence submitted by the applicant[s] showed" that the flavored product "provided a benefit for adults who smoke cigarettes" beyond the benefit provided by "previously authorized tobacco-flavored products."  Press Release, FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://perma.cc/63WX-GFBF; *see also* FDA, *FDA Authorizes Marketing of Tobacco- and Menthol-Flavored JUUL E-Cigarette Products* (July 17, 2025), https://perma.cc/7PDN-MYCM.

### C.    FDA's Denial Of Petitioners' Marketing Applications

Petitioners applied to FDA for authorization to market e-liquids in fruit and candy flavors such as sour grape, pink lemonade, peachy strawberry, milk and cookies, and pound cake.  A99-101, A119.  In reviewing petitioners' applications, FDA explained that flavored products of this type present a significant and well-documented risk to youth by

making e-cigarettes more palatable, facilitating initiation and continued use, and increasing the risk of addiction. A89, A141. FDA also found that the market for e-cigarettes is fluid, such that when flavored e-cigarettes of a particular type were removed from the market, youth shifted in overwhelming numbers to flavored e-cigarettes of another type. A90, A142. FDA reviewed a summary of petitioners' marketing plans and reiterated its earlier determination that marketing and sales restrictions have not "been successful in sufficiently decreasing the ability of youth to obtain and use" popular e-cigarette products, making it unnecessary for FDA to review the full details of petitioners' plans. A93 n.xix, A145 n.xix.

In light of the significant risk to youth, FDA considered whether petitioners provided evidence that their products provide a sufficient countervailing public-health benefit. A93, A145. Petitioners' applications acknowledged that "[t]he most important consideration in deciding whether e-cigarettes produce a public health benefit is determining if using e-cigarettes is an effective cessation method for combustible cigarette use." A407, A460. But because tobacco-flavored e-cigarettes can provide the same type of benefit claimed by petitioners' products but do not present the same risk to youth, FDA looked for evidence that petitioners' products

9

could provide an added benefit to adult smokers relative to tobacco-flavored products.  A93, A145.  Petitioners' applications conceded that "[r]esearch addressing the specific role of flavors in vaping effectiveness is in its infancy."  A402, A455.  Their own literature review found "not enough evidence from well-designed studies to determine whether e-cigarette flavors aid in smoking cessation."  A472.  That conclusion was consistent with FDA's findings, which showed that "the literature does not establish that flavors differentially promote switching amongst [e-cigarette] users in general."  A93-94, A145-146.  And petitioners' applications did not contain reliable studies of petitioners' own flavored products showing an added benefit compared to tobacco-flavored e-cigarettes.  A96, A148.

FDA thus concluded that petitioners failed to demonstrate a benefit to adult smokers that would outweigh the substantial risk that petitioners' flavored products pose to youth, and it denied petitioners' applications for failure to satisfy the statutory public-health standard.  A96-97, A148-149.

### D.   Prior Proceedings

1.  Petitioners sought judicial review of the marketing denial orders. A motions panel of this Court issued a stay and consolidated these cases, *see* 16 F.4th 1130 (5th Cir. 2021), and a merits panel ultimately denied the

10

petitions for review, 41 F.4th 427 (5th Cir. 2022).  The Court then reheard the cases en banc, granted the petitions for review, and remanded to FDA. 90 F.4th 357 (5th Cir. 2024) (en banc).  The en banc Court reasoned that FDA had changed its position without explanation regarding the types of studies applicants would need to submit to FDA.  *See, e.g., id.* at 376-377, 384.  The Court also found that FDA had erred by not fully reviewing petitioners' marketing plans.  *Id.* at 372, 389-390.

2.  The Supreme Court granted certiorari and unanimously vacated this Court's judgment.  *See Wages*, 604 U.S. at 592.  The Court held that FDA had not "improperly changed its position with respect to scientific evidence, comparative efficacy, or device type."  *Id.* at 567.  The Court explained that FDA had not made "any specific commitments about exactly what sorts of scientific evidence an applicant would have to provide."  *Id.* at 572.  The Court also rejected petitioners' reliance on internal memoranda FDA created in the summer of 2021, which petitioners argued "secretly enforced a new requirement that manufacturers must submit" certain types of evidence.  *Id.* at 576.  The Court explained that FDA had superseded or "rescinded" these memoranda and that the agency "represent[ed] that these internal memoranda played no role in its review

11

of applications," and it declined to "peel back the curtain on that representation." *Id.* at 577-578.

With regard to the so-called "comparative-efficacy requirement," the Court explained that the TCA itself "expressly contemplates comparisons of different tobacco products." *Wages*, 604 U.S. at 578. And the Court found that FDA's approach of specifically looking for a comparison to tobacco-flavored products was "a predictable outgrowth" of both the statutory text and previous guidance that highlighted (1) "the need for robust cross-product comparisons (including on the dimension of flavor)" and (2) FDA's "heightened concern" with flavored products. *Id.* at 580-581. The Court also recognized that "even assuming the predecisional guidance did not perfectly predict the comparative-efficacy standard ultimately applied to applications," "FDA was not required to issue such guidance in the first place." *Id.* at 582. Rather, "FDA had discretion to work out the meaning of the TCA's comparative standard when evaluating premarket tobacco product applications." *Id.*

The Supreme Court further held that FDA had not established a "safe harbor" for any types of e-cigarette products, such as the open-system products that petitioners manufacture. *Wages*, 604 U.S. at 584; *see also id.* at

12

554 (explaining the difference between open- and closed-system e-cigarettes). But even if FDA had changed positions, it offered "good reasons" and "drew a reasonable inference based on the data before it: namely, … youth were most strongly drawn by flavor rather than device type" and were willing to migrate between different types of flavored e-cigarette products. *Id.* at 584-586.

In the Supreme Court, FDA did not contest this Court's finding that FDA erred by not fully reviewing petitioners' marketing plans, but it argued that any error was harmless. *See Wages*, 604 U.S. at 586. The Supreme Court held that this Court applied the wrong harmless-error standard and remanded so this Court could "decide the question afresh." *Id.* at 590-591.

3. Following remand, FDA moved to hold these proceedings in abeyance while it voluntarily considered the specifics of the marketing plans proposed in petitioners' applications. Doc. No. 388. This Court granted that motion. Doc. No. 407. Upon a review of petitioners' marketing plans, FDA determined that petitioners "did not propose any novel or materially different measures from those that FDA has previously considered and found insufficient" to mitigate the substantial risk to youth

13

from flavored e-cigarettes.  SA8-9, SA24-25.  Accordingly, on December 8, 2025, FDA informed petitioners that it had completed its review and that the marketing denial orders would remain in effect.  SA1, SA17.

## SUMMARY OF ARGUMENT

The Supreme Court's decision in this case substantially upheld FDA's determination and mode of analysis, and FDA has resolved the only issue remaining on remand by reviewing petitioners' marketing plans. Petitioners now argue that the APA and FDA's good-guidance-practices regulation required FDA to undertake a notice-and-comment process before reviewing petitioners' applications for evidence comparing the benefits of petitioners' flavored products to those of less-risky tobacco-flavored products.  The Court need not consider those arguments, however, because petitioners forfeited them by not raising them in their opening panel brief or en banc brief.  An amicus, meanwhile, contends that FDA violated the TCA by enacting a tobacco-product standard without notice and comment, but petitioners forfeited this argument by not raising it in their supplemental brief.

In any event, the new arguments lack merit.  The Supreme Court recognized in this case that FDA was not required to issue predecisional

guidance before reviewing petitioners' applications for comparative evidence in part because the TCA itself "expressly contemplates comparisons of different tobacco products" and "calls out for" FDA to engage in "various types of comparisons, including comparisons between new tobacco products and those that are already available." *Wages*, 604 U.S. at 578-579. FDA was permitted to work out precisely how to carry out those kinds of comparisons under the TCA's public-health standard when evaluating those applications.

Petitioners contend that FDA enacted a rule without notice and comment in an August 2021 memorandum. But that memorandum was rescinded days later, FDA has stated that it did not rely on the memorandum in considering petitioners' applications, and the Supreme Court has declared that FDA's representation on this matter must be accepted. In any event, the August 2021 memorandum would not have been subject to notice-and-comment procedures because it was itself crafted as part of an adjudication and it sets forth, at most, an interpretive rule.

FDA also did not violate its good-guidance-practices regulation, which provides that certain guidance documents must go through notice

15

and comment.  Petitioners have not identified any such guidance that FDA
issued.

Finally, amicus's argument lacks merit because FDA did not adopt a
tobacco-product standard and instead denied applications to market
flavored e-cigarettes under the statutory public-health standard based on a
holistic review of those applications.

## ARGUMENT

### THE NEW ARGUMENTS RAISED ON REMAND ARE NOT PROPERLY BEFORE THE COURT AND ARE MERITLESS IN ANY EVENT

The only issue remaining on remand from the Supreme Court was
whether FDA had committed prejudicial error by not reviewing
petitioners' full marketing plans.  FDA has now reviewed those marketing
plans, however, and affirmed its denial of petitioners' applications.
Petitioners do not challenge that new action.  This case has thus reached
the end of the road, and the Court should deny the petitions for review.

Petitioners raise new arguments alleging a violation of the procedural
requirements of the APA or FDA's good-guidance-practices regulation.
Those arguments are not properly before the Court because petitioners did
not raise them in their opening brief.  An amicus raises a separate

16

argument, alleging that FDA violated the procedural requirements of the Tobacco Control Act, but that argument is not properly before the Court because petitioners forfeited it. In any event, petitioners' and amicus's arguments lack merit because FDA did not issue a rule, including a tobacco-product standard, or guidance addressing applicants' obligation to compare their flavored e-cigarette products to tobacco-flavored products. Rather, FDA resolved the applications before it by applying the public-health standard set out in the statute.

### A. The Only Arguments Raised On Remand Are Not Properly Before The Court

1. In their supplemental brief on remand, petitioners argue that FDA was required, under the APA or its own regulations, to engage in notice-and-comment rulemaking before it examined petitioners' applications for evidence that their flavored products provide an added benefit to smokers compared to tobacco-flavored products. *See* Pet'rs' Suppl. Br. 1, 20. Petitioners forfeited those arguments by failing to raise them in their opening brief.

"[A]n argument not raised in [an] appellant's original brief as required by" Federal Rule of Appellate Procedure 28 "is waived." *United*

17

*States v. Ogle*, 415 F.3d 382, 383 & n.1 (5th Cir. 2005) (per curiam); *see also*

*Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004).

The Court has specifically addressed the situation of a remand from the

Supreme Court and held that, absent extraordinary circumstances, the

Court will not review new arguments raised for the first time before the

Supreme Court or in a post-remand supplemental brief. *Ogle*, 415 F.3d at

383. The arguments raised in petitioners' opening brief when the case was

first before the Court continue to limit the issues that can be raised

following remand.

Petitioners' new APA and FDA-regulations arguments are relevant to

FDA's initial review of petitioners' applications and thus could have been

made when the case was first before the Court. Yet petitioners did not

raise those arguments in their opening brief before the panel or the en banc

Court. *See generally* Doc. Nos. 85-2, 252. Indeed, petitioners did not even

cite the section of the APA addressing rulemaking, 5 U.S.C. § 553, or FDA's

good-guidance-practices regulation, 21 C.F.R. § 10.115, in either of those

briefs. Petitioners thus forfeited the arguments and cannot raise them now.

2. Amicus R.J. Reynolds Vapor Co. (RJRV) raises a distinct argument

arising under a different statute, contending (Br. 2-9) that FDA violated the

18

Tobacco Control Act by unlawfully imposing a tobacco-product standard without going through the procedural requirements of 21 U.S.C. § 387g. Petitioners raised a similar argument in their opening brief on appeal, *see* Doc. No. 85-2, at 45, but they subsequently forfeited the argument by failing to press it, or even refer to it, in their opening en banc brief, *see* Doc. No. 252.  And petitioners have further forfeited the issue by not raising it in their supplemental brief on remand from the Supreme Court.

"[A]n issue waived by appellant" generally "cannot be raised by amicus curiae."  *Christopher M. ex rel. Laveta McA v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991); *see also Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1049 (5th Cir. 1993) ("[A]n amicus curiae generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties ….").  Accordingly, this Court need not, and should not, reach the argument raised only by RJRV.

> **B.    FDA Was Not Required To Engage In Notice-And-Comment Rulemaking Before Adjudicating Petitioners' Applications**

Even if petitioners' APA notice-and-comment challenge was preserved, it lacks merit for several reasons.

19

1.  The Tobacco Control Act requires manufacturers to submit applications to market new tobacco products, 21 U.S.C. § 387j(b), and it directs FDA to adjudicate such applications, *id.* § 387j(c).  And although the Act obligates the agency to issue interpretative rules and regulations in some other contexts, *see, e.g., id.* §§ 387e(j)(3), 387k(*l*)(1), in the premarket-adjudication context of § 387j(c), there is no such obligation for FDA to promulgate implementing regulations.  The TCA thus allows FDA "to develop its premarket policy through a flexible, case-by-case adjudicative approach," without requiring "regulations."  *Gripum, LLC v. FDA*, 47 F.4th 553, 559 (7th Cir. 2022).

Of course, FDA "had a statutory duty" to resolve petitioners' applications "in light of the proper standards," and "this duty remained" even if those standards were not previously "'spelled out in a general rule or regulation.'"  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292 (1974).  FDA properly applied the statutory standards here.

The Tobacco Control Act requires FDA to deny an application to market a new tobacco product if the applicant has failed to demonstrate that permitting the new product to be marketed would be "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2).  Applicants must

20

provide FDA any information concerning "whether [their] tobacco product presents less risk than other tobacco products." *Id.* § 387j(b)(1)(A). And in reviewing an application, FDA must consider the "increased or decreased likelihood that existing users of tobacco products will stop using such products" and the "increased or decreased likelihood that those who do not use tobacco products will start." *Id.* § 387j(c)(4).

The Supreme Court has held that these provisions of "the TCA expressly contemplate[] comparisons of different tobacco products" and require FDA to make "an inherently comparative judgment." *Wages*, 604 U.S. at 578. The statutory balancing test "calls out for various types of comparisons, including comparisons between new tobacco products and those that are already available, as well as between different types of new tobacco products that may attract new smokers." *Id.* at 579.

Faced with those clear statutory directives and the duty to adjudicate petitioners' applications, FDA properly applied the TCA's inherently comparative standard in reviewing petitioners' applications and applications for other flavored e-cigarette products. In particular, FDA concluded that flavored products present a greater risk to youth than tobacco-flavored products because youth are more attracted to flavored

21

products and are more likely to initiate tobacco use and develop an addiction with flavored products—a conclusion with which petitioners cite no disagreement. A87-90, A139-142. FDA recognized that e-cigarettes could provide a potential benefit to existing smokers by offering a less harmful alternative for those who might switch from or substantially reduce their smoking, but it found that this potential benefit can also be provided by tobacco-flavored e-cigarettes. A92-93, A144-145. In light of these relevant comparisons, FDA concluded that petitioners' flavored products would be appropriate for the protection of the public health only if they provide some benefit to existing smokers beyond that provided by less-risky tobacco-flavored e-cigarettes. A93-95, A145-147. Petitioners did not provide any robust and reliable evidence of such an added benefit, however, so FDA determined that petitioners failed to meet the statutory standard of demonstrating that their products are appropriate for the protection of the public health. A96-97, A148-149.

In short, FDA resolved petitioners' applications based on the statutory standards set out in the TCA itself, as the Supreme Court recognized. And FDA was not required to engage in rulemaking in order

22

to read the statute and apply it in the course of individual adjudications. *See Bell Aerospace*, 416 U.S. at 292-294.

2.  To the extent FDA needed to do some additional interpretive work to explain the details of how the TCA's comparative standard applies in the particular context of applications to market flavored e-cigarette products, it was permitted to do so in the course of adjudicating applications instead of through a formal, prospective rulemaking. As the Supreme Court explained, FDA "was not required to issue [predecisional] guidance" setting out "the comparative-efficacy standard ultimately applied to applications." *Wages*, 604 U.S. at 582. Rather, "FDA had discretion to work out the meaning of the TCA's comparative standard when evaluating premarket tobacco product applications." *Id.* "A contrary rule would be in tension with *Chenery*[]'s teaching that, absent a statutory prohibition, agencies may generally develop regulatory standards through either adjudication or rulemaking." *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202-203 (1947)).

In *Chenery*, the Supreme Court held that the Securities and Exchange Commission could apply standards in an adjudication that it had not previously articulated in a rulemaking. 332 U.S. at 201-203. The Court

23

explained that an agency can choose to develop standards either by "general rule" issued under the agency's rulemaking powers or by "individual order" in adjudication.  *Id.* at 202.  "And the choice made between proceeding by general rule or by individual, ad hoc [adjudication] is one that lies primarily in the informed discretion of the administrative agency."  *Id.* at 203.

The Supreme Court reaffirmed and expanded on *Chenery* in *Bell Aerospace*, explaining that agencies are "not precluded from announcing new principles in an adjudicative proceeding" even if those principles "'serve as vehicles for the formulation of agency policies'" and "'provide a guide to action that the agency may be expected to take in future cases.'" 416 U.S. at 294.

This Court, too, has repeatedly recognized that "agencies can choose to announce new rules through adjudication rather than rulemaking."  *City of Arlington v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012); *see also, e.g., Macy's, Inc. v. NLRB*, 824 F.3d 557, 569-570 (5th Cir. 2016); *American Airlines, Inc. v. Department of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000).  In determining whether an agency action constituted adjudication or rulemaking, the Court looks to the product of the agency action and accords "significant

24

deference" to the agency's characterization of its own action. *American Airlines*, 202 F.3d at 797. Importantly, the "notice-and-comment requirements for rulemaking" will "ordinarily not apply" when an agency decides to announce new rules "pursuant to its adjudicative powers." *City of Arlington*, 668 F.3d at 240.

FDA's consideration of an application to market a new tobacco product is clearly an adjudication. The APA defines "adjudication" as the "agency process for the formulation of an order," 5 U.S.C. § 551(7), and the TCA requires that FDA resolve a premarket tobacco-product application by issuing an "order" that either permits or prohibits the marketing of the new product, 21 U.S.C. § 387j(c)(1)(A). Here, FDA considered petitioners' applications and resolved them with the issuance of "marketing denial order[s]." A58, A67, A125.

FDA's review of a premarket tobacco-product application is also plainly an adjudication because it applies the statutory standard and the available evidence to a "particular set of disputed facts," *United States v. Florida E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973), and the resulting order "immediately bind[s]" the particular applicant "by retroactively applying law to [its] past" application, *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*,

25

71 F.4th 1028, 1035 (D.C. Cir. 2023) (quotation marks omitted). The record confirms that FDA made a case-specific determination here to issue the denial orders under review. Its mode of analysis for reviewing petitioners' applications was explained and supported in the Technical Project Lead Reviews that addressed petitioners' specific applications, *see* A85-97, A137-149, and FDA addressed the specific study contained in those applications and explained why it was insufficient to warrant marketing authorization, A148 (addressing the "Vapetasia PMTA Survey and Testimonial"). And the consequence of FDA's decision was not to change the law with regard to all flavored e-cigarettes, but rather to effectuate Congress's default prohibition on the marketing of petitioners' specific new tobacco products.

Thus, to the extent FDA added in any way to the comparative standard set out in the TCA by requiring that an application for a flavored e-cigarette product draw a specific comparison between that product and a tobacco-flavored product, FDA was permitted to develop that standard in the course of adjudicating applications. Under *Bell Aerospace*, FDA was permitted to "'formulat[e] … agency policies'" and "announc[e] new principles" in the course of such an adjudication. 416 U.S. at 293-294. And

26

FDA was permitted to do so without undertaking the notice-and-comment procedures that attend rulemaking. *City of Arlington*, 668 F.3d at 240.

3. Petitioners do not dispute that FDA's consideration and resolution of their applications was an adjudication and that FDA was permitted to formulate standards in the course of that adjudication. Instead, they contend (Suppl. Br. 22-23) that FDA adopted a "comparative efficacy requirement" separately, in an August 17, 2021, memorandum "without reference to any particular application" — that is, outside an adjudication. This new argument contradicts petitioners' previous acknowledgment that FDA "adopt[ed] and implement[ed] its … comparative efficacy standard for flavored [e-cigarette] products through adjudication." Doc. No. 85-2, at 47. In any event, petitioners' new argument fails for several reasons.

First, the August 17, 2021, memorandum, A167-181, was rescinded approximately a week after it was issued. A182 ("This memorandum rescinds the August 17, 2021, Memorandum re: PMTA Review: Evidence to Demonstrate Benefit of Flavored ENDS to Adult Smokers."). The rescission memorandum states that FDA "has reconsidered the process for" reviewing applications for flavored e-cigarette products "and has determined that it will not consider or rely on the August 17, 2021, memo

27

as a supporting document in that process." A182. The Supreme Court accepted this representation, explaining that "to peel back the curtain" on FDA's representation that this "internal memorand[um] played no role in its review of applications" would have required petitioners "to make a 'strong showing of bad faith or improper behavior.'" *Wages*, 604 U.S. at 577. And the Court determined that petitioners had "not surmounted the high standard that must be met to warrant such a 'substantial intrusion' into the Executive's functioning." *Id.* at 578. Petitioners have made no more showing of bad faith or improper behavior before this Court than they did before the Supreme Court, nor could they raise any new evidence on the issue at this late juncture. Any procedural error in issuing the August 2021 memorandum is therefore immaterial to this case because FDA did not rely on it in issuing the marketing denial orders to petitioners or any other applicants.

Second, the August 2021 memorandum was crafted as part of adjudications, so it did not need to undergo notice-and-comment procedures even if it had not been rescinded. FDA initially developed the memorandum as part of the "agency process for the formulation of … order[s]" disposing of pending applications to market flavored e-cigarettes.

28

5 U.S.C. § 551(7).  By August 2021, FDA had already received thousands of such applications, and it was in the process of reviewing those applications.  *See* A168-169.  The memorandum set out FDA's "approach" to these applications, describing the types of evidence FDA would look for in a "streamlined scientific review" and that would qualify the applications for referral for "further in-depth scientific evaluation."  A168.  And if there were any doubt, this Court must accord "significant deference" to FDA's characterization of its action as adjudicatory.  *American Airlines*, 202 F.3d at 797.[2]

Third, even if the August 2021 memorandum had not been drafted in the process of adjudicating pending applications, it would have been at most an interpretive rule not subject to notice-and-comment procedures, *see* 5 U.S.C. § 553(b)(A).  An interpretive rule is one that is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97

---

[2] Petitioners cite (Suppl. Br. 23-24) several cases that stand for the proposition that an agency's characterization of its rule is not conclusive in determining whether it is an interpretive rule, statement of policy, or legislative rule.  Those cases are inapposite where, as here, an agency has not acted through rulemaking at all, but rather engaged in adjudication.

(2015) (quotation marks omitted).  To the extent the August 2021 memorandum is a rule at all (as opposed to a document prepared during the course of an adjudication), it is an interpretive rule because it does not purport to "'create new law,'" but rather "interpret[s] existing law," *Mock v. Garland*, 75 F.4th 563, 579 (5th Cir. 2023) (alteration omitted)— specifically, the appropriate-for-the-protection-of-the-public-health standard set out in the Tobacco Control Act.  In the memorandum—as in the adjudications that followed the rescission of the memorandum—FDA sought only to "work out the meaning of the TCA's comparative standard," *Wages*, 604 U.S. at 582, not to create a new standard beyond that set out by the statute.  *See* A167 ("The purpose of this memo is to describe our findings with respect to the type of evidence that may support a finding that the marketing of a flavored [e-cigarette] is appropriate for the protection of the public health …."); *see also* Pet'rs' Suppl. Br. 21 (acknowledging that FDA "had to interpret section 910" of the TCA).  It is thus clear that FDA did not purport to "speak with the force of law," *Mock*, 75 F.4th at 580, which is the ultimate issue when distinguishing between legislative and interpretive rules.  *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 17-18 (D.C. Cir. 2019) (per curiam).

30

To the extent this Court may look to additional "factors" to assist with this inquiry, each of those also indicates that the memorandum was interpretive:  FDA did not publish the contents of the memorandum in the Code of Federal Regulations, "invoke[] its general legislative authority," or "claim[] *Chevron* deference."  *Mock*, 75 F.4th at 580 (quotation marks omitted).  And the memorandum did not produce "significant effects on private interests" because ultimately FDA had to apply the preexisting statutory standard to resolve tobacco-product applications.  *Id.* (quotation marks omitted).

Finally, even if the August 2021 memorandum should have gone through notice-and-comment procedures, and even if it had not been rescinded, any error would be immaterial and vacatur of the memorandum would have no effect on the marketing denial orders under review.  *See* 5 U.S.C. § 706 (providing that "due account shall be taken of the rule of prejudicial error").  The denial orders here are fully supported by application- and party-specific reviews that fully explain the basis for the denials.  *See* A69-106, A129-154.  The denial orders do not rely on the August 2021 memorandum that petitioners challenge and are fully supported by the text of the TCA alone, even if FDA ultimately applied

31

reasoning similar to that laid out in the memorandum. Accordingly, any procedural error in issuing the August 2021 memorandum would not affect the adjudication of petitioners' applications.

4. Petitioners contend that FDA must have established a rule because it applied similar reasoning in considering thousands of applications for flavored e-cigarettes. In fact, FDA took the same approach to those applications because the products were similarly situated given FDA's "heightened concern with dessert-, candy-, and fruit-flavored products." *Wages*, 604 U.S. at 581. Furthermore, it is unsurprising that FDA used similar reasoning to resolve similar applications because "adjudicated cases may and do serve as vehicles for the formulation of agency policies" and "such cases generally provide a guide to action that the agency may be expected to take in future cases." *Bell Aerospace*, 416 U.S. at 294 (alterations and quotation marks omitted); *see also American Airlines*, 202 F.3d at 797 (recognizing that agencies may use adjudication "as a means of setting policy"). The fact that FDA applied the same mode of analysis to each of the applications it received for flavored e-cigarette products is a sign of commendable consistency, not a sign of a rulemaking.

32

Furthermore, contrary to petitioners' assertion (Suppl. Br. 29), FDA has not incorporated its same reasoning verbatim across applications. FDA has considered and accounted for updated data and new evidence in more recent adjudications, even where it has ultimately concluded that circumstances call for retaining the same general approach to reviewing applications for flavored e-cigarettes. *See, e.g.*, Addendum to Respondents' Opposition to Motion for a Stay (Redacted) at Add.11-12, Add.21, *Charlie's Chalk Dust LLC v. FDA*, No. 25-60609 (5th Cir. Dec. 19, 2025), Doc. No. 81 (considering updated data from 2024 but still concluding that flavored e-cigarettes present a substantial risk to youth). In any event, petitioners cannot challenge the denial orders at issue here by asserting that FDA failed to consider more recent information in deciding other manufacturers' applications.

Petitioners also argue (Suppl. Br. 2) that FDA must not have been engaged in adjudication because its reasoning accounted for evidence of the products' risk not "presented in any particular application … pending before the agency." When it adjudicates a premarket tobacco-product application, FDA is required to consider both the information submitted by the applicant and "any other information before [FDA] with respect to such

33

tobacco product."  21 U.S.C. § 387j(c)(2).  Thus, the fact that FDA relied upon relevant evidence that may not have been included in a particular application does not mean that FDA was engaged in rulemaking rather than adjudication.

Petitioners similarly err in asserting (Suppl. Br. 26-28) that FDA did not account for the details of petitioners' applications, including, for example, that petitioners seek to market bottled e-liquids to be used in open-system devices.  FDA accounted for these facts, explaining, based on its enforcement experience and evidence, that "preference for device types and popularity of certain styles is likely fluid and affected by the … options, especially flavors, that are available" to consumers.  A90, A142.  The evidence demonstrated that "the removal of one flavored product option prompted youth to migrate to another [e-cigarette] type that offered the desired flavor options, underscoring the fundamental role of flavor in driving appeal."  A90, A142.  Petitioners may disagree with FDA's conclusion, but their challenge on this score has already been rejected by the Supreme Court, which explained that "[e]ven though the FDA did not cite evidence that was specifically about increasing youth demand for open-system e-cigarette products, the FDA drew a reasonable inference

34

based on the data before it." *Wages*, 604 U.S. at 586.  In any event, petitioners' argument about whether FDA's explanation for its denial reasonably accounted for petitioners' particular products goes to whether the denial orders were arbitrary and capricious (an argument petitioners do not make on remand from the Supreme Court), not whether FDA violated notice-and-comment requirements.[3]

If anything, the differences among e-cigarette products and the evolving e-cigarette market make FDA's decision to proceed by adjudication, rather than rulemaking, reasonable.  If FDA had promulgated a rule concerning all flavored e-cigarettes, it would be bound by that rule unless it amended the rule through notice-and-comment rulemaking.  But by adjudicating each application as it comes in, FDA has retained flexibility to treat different applications differently and to respond to evolving market conditions.  *See Chenery*, 332 U.S. at 202-203 (acknowledging that an agency must "retain power to deal with ... problems on a case-to-case basis"

---

[3] Petitioners identify (Suppl. Br. 27) a study finding that "only" 14.8% of current high-school-aged e-cigarette users used open-system tank devices.  They fail to note, however, that 21.5% of middle-school-aged users used such devices, and together these numbers account for more than half a million youth—a level of use that reasonably concerned FDA.  A235.

where "the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule"). To the extent an applicant thinks that FDA has failed to address the particulars of an application or the current state of the market, the applicant can of course petition for review of FDA's order and challenge FDA's conclusion as arbitrary and capricious.

The cases on which amicus RJRV relies (Br. 12-13) fail to advance petitioners' case. In *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001), the Court reversed an adjudication because it relied on an earlier policy change that was *not* made in the course of adjudication and had not undergone notice and comment. As explained, however, petitioners here cannot identify any policy developed outside the context of adjudication on which FDA relied in adjudicating petitioners' applications. And in *Brown-Forman Corp. v. NLRB*, 169 F.4th 646, 666-668 (6th Cir. 2026), the Sixth Circuit recently held that the NLRB erred by adopting in adjudication a new standard that was not intended "as a case-specific means to provide a remedy to the parties" then before the Board ("which would be a proper exercise of its adjudicatory authority"), but rather to create a "deterrent effect on future, hypothetical … violations" of the statute. Here, however,

36

FDA developed and applied the so-called comparative-efficacy requirement to resolve the applications then before it—not to affect future conduct by other parties. Again, that is precisely the situation in which *Chenery* recognizes that an agency may develop standards in the course of adjudication.

5. In a footnote, petitioners contend (Suppl. Br. 31 n.15) that, even if FDA developed its comparative-efficacy analysis through adjudication, FDA abused its discretion by doing so. "Arguments subordinated in a footnote are 'insufficiently addressed in the body of the brief,' and thus are waived." *Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016).

In any event, petitioners' contention is meritless. The "choice between rulemaking and adjudication lies in the first instance within the [agency]'s discretion." *Bell Aerospace*, 416 U.S. at 294; *see also Mobil Expl. & Producing N.A., Inc. v. FERC*, 881 F.2d 193, 198 (5th Cir. 1989). And, as already explained, FDA acted reasonably by choosing to proceed by adjudication so that it could retain flexibility with regard to different products and changing market conditions.

37

This Court has recognized that "the application of new principles announced in an adjudicative proceeding 'may be so tinged with unfairness as to amount to an abuse of administrative discretion,'" but "in order to constitute such an abuse, an adjudicative rule must be 'such a new departure'" from a prior rule "'that it could not reasonably have been foreseen.'" *Tearney v. NTSB*, 868 F.2d 1451, 1453 (5th Cir. 1989) (alteration omitted); *see also Air Prods. & Chems., Inc. v. FERC*, 650 F.2d 687, 703 (5th Cir. 1981) (considering whether affected parties would "suffer[] sufficiently adverse consequences from reliance on [a] former policy" that had been terminated in an adjudication). The Supreme Court's decision in this case conclusively forecloses any argument that FDA abused its discretion under this standard because the Supreme Court found that the "comparative-efficacy" analysis that FDA ultimately applied was "a predictable outgrowth from previous guidance." *Wages*, 604 U.S. at 580-581. And rather than having relied on a different understanding of how FDA would apply the statutory standard, petitioners "appear to have received the FDA's message," and they in fact "attempt[ed] (albeit unsuccessfully) to draw comparisons between" flavored- and tobacco-flavored products. *Id.* at 578-582. Petitioners' "applications are themselves strong evidence that

38

regulated entities had adequate notice of the sort of comparative analysis the FDA anticipated." *Id.* at 582; *see also Liquid Labs LLC v. FDA*, 52 F.4th 533, 545 (3d Cir. 2022) ("[B]ecause the FDA did not adopt a 'new secret standard' or otherwise change course, it … had no obligation to proceed through notice-and-comment rulemaking.").

Petitioners identify the Ninth Circuit's standard for determining whether an agency abused its discretion by acting through adjudication rather than rulemaking. But that standard, too, requires showing that "the new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law" and that "the public has relied substantially and in good faith on the previous interpretation," *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996). FDA also did not abuse its discretion under the Ninth Circuit's standard because, among other reasons, FDA's marketing denial order does not involve "fines or damages" and because it was applied retroactively to pending applications. *Id.*

Amicus RJRV selectively quotes (Br. 7) extra-record statements from a recent FDA Roundtable Discussion to suggest that FDA has proceeded through adjudication rather than rulemaking to "evade judicial review."

39

But an agency cannot evade judicial review by proceeding through adjudication; an affected party remains free to challenge the agency's decision, including the standards the agency applied.  In any event, the surrounding statements at the Roundtable make clear that FDA has refrained from rulemaking on certain issues because "this is a very rapidly evolving industry," there are "a lot of manufacturers making a lot of different products," and FDA does not want to put "boundary conditions on this industry that [it is] not sure are appropriate yet"—all legitimate considerations.  FDA, *Roundtable on PMTA Submissions for ENDS Products*, at 45:23-45:32, 46:45-46:56 (Feb. 10, 2026), https://www.youtube.com/watch?v=13M1w7WGovk.

### C.  FDA Did Not Violate Its Good-Guidance-Practices Regulation

FDA also did not violate its own good-guidance-practices regulation, which provides that when FDA "communicate[s] new or different regulatory expectations to a broad public audience for the first time," it must do so through guidance documents that undergo notice-and-comment procedures.  21 C.F.R. § 10.115(e), (g).  As an initial matter, the marketing denial orders at issue here were sent only to petitioners and

were not intended to communicate anything to a "broad public audience." *Id.* § 10.115(e). FDA's internal memoranda describing the agency's review of petitioners' applications and the rescinded August 2021 memorandum were all internal documents, and they also were not intended for a public audience. There is thus no dispute that FDA's regulation did not require any of those documents to go through notice and comment.

Petitioners instead argue that FDA violated its regulations by issuing an August 26, 2021, press release. As already explained, petitioners have not previously raised this argument, and it is therefore forfeited. *See supra* pp. 17-18. Even if the argument was not forfeited, however, any procedural error in issuing the press release would not have affected the marketing denial orders under review because FDA did not rely on the press release in denying petitioners' applications, and petitioners obviously did not rely on the press release when they submitted their applications approximately a year earlier.

Furthermore, the press release did not contain guidance to the public. Rather, it announced the denial of applications to market certain flavored e-cigarettes. *See* Press Release, FDA, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They*

41

*Appropriately Protect Public Health* (Aug. 26, 2021), https://perma.cc/LCZ7-E9FW.  In making that announcement, FDA described the basis for the denial orders "subject to [the] action."  *Id.*  The press release thus was not "use[d] … to informally communicate new or different regulatory expectations to a broad public audience for the first time," 21 C.F.R. § 10.115(e), but rather to communicate FDA's action on particular applications.  As such, it was not subject to the procedural requirements that generally attach to FDA's guidance documents.  *See id.* § 10.115(b)(3) ("press materials" are not "[g]uidance documents").

### D.    Amicus's Tobacco-Product-Standard Argument Is Meritless

Amicus RJRV contends that FDA violated the Tobacco Control Act by relying on a tobacco-product standard without going through the procedural requirements of 21 U.S.C. § 387g, or that FDA was required to issue such a standard.  Even if that argument was not forfeited, it is meritless.

The Tobacco Control Act permits FDA to establish a tobacco-product standard that governs the "construction, components, ingredients, additives, constituents, … and properties" of a tobacco product; provides

42

for the testing of a product; restricts the "sale and distribution" of a product; or requires certain labeling.  21 U.S.C. § 387g(a)(4); *see also Fontem US, LLC v. FDA*, 82 F.4th 1207, 1212 (D.C. Cir. 2023) (describing the role of tobacco-product standards).  FDA's mode of analysis comparing the risks and benefits of a new flavored e-cigarette to those of tobacco-flavored e-cigarettes is not a tobacco-product standard because it does not impose requirements on the content or testing of a product; rather, it is an application of the public-health standard that FDA is required to use in reviewing applications under the TCA, *see* 21 U.S.C. § 387j(c)(4); *Wages*, 604 U.S. at 578-579.  Accordingly, FDA did not need to undertake the procedural requirements that attend the creation of a tobacco-product standard before reviewing petitioners' applications for that type of comparative evidence.

Amicus notes (Br. 4-5) that a ban on certain flavors would be a tobacco-product standard.  But there is no dispute that FDA has not instituted such a ban, and amicus obfuscates the issue by suggesting that FDA must have applied a tobacco-product standard simply because this case involves flavors.  FDA's application of the statute's public-health standard that must be applied in reviewing applications to market new

43

tobacco products under § 387j simply is not a tobacco-product standard under § 387g.

Furthermore, the TCA does not require FDA to impose tobacco-product standards. Where FDA does so, an applicant's "failure to meet those standards would be an independent and sufficient ground for denying the applications, regardless of the overall public health consequences of [the] products." *Fontem*, 82 F.4th at 1217-1218; *see* 21 U.S.C. § 387j(c)(2)(D). But FDA may also choose to "proceed application by application" and "undertake the holistic inquiry required by the statute," *Fontem*, 82 F.4th at 1218—*i.e.*, determine whether the application contains a "showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health," 21 U.S.C. § 387j(c)(2)(A). That is precisely what FDA did here. FDA did not simply state that it had decided that all flavored products were not appropriate for the protection of the public health. And it did not even rely solely on the fact that petitioners had failed to provide evidence comparing their flavored products to tobacco-flavored products and end the analysis there. Instead, FDA provided 13 pages of analysis explaining why petitioners' failure to provide certain comparative evidence meant that they had not

44

made the statutorily required public-health showing. *See* A83-97, A135-149. Specifically, FDA explained that flavored products are more attractive to youth and increase the risk of initiation and addiction, that lower-risk tobacco-flavored products offer the same type of potential health benefit to existing smokers, and that therefore petitioners' more risky flavored products must provide some added benefit compared to tobacco-flavored products in order to be appropriate for the protection of the public health. *See id.* That is exactly the type of public-health analysis that the statute requires FDA to make in the absence of a governing tobacco-product standard. *See Wages*, 604 U.S. at 578-579 (explaining that the TCA "expressly contemplates comparisons of different tobacco products" including "between different types of new tobacco products that may attract new smokers"); *see also Bidi Vapor LLC v. FDA*, 134 F.4th 1282, 1287 (11th Cir. 2025) (rejecting the same tobacco-product-standard argument because FDA is not required to issue such standards and FDA "reasonably explained deficiencies in [the applicant]'s submissions as part of its holistic adjudicatory review of [the product]'s risks and benefits").

Amicus contends (Br. 2) that this Court already credited the tobacco-product-standard argument in a footnote in its en banc decision in this case

45

and in the stay decision in *RJRV v. FDA*, 65 F.4th 182 (5th Cir. 2023). But the issue the Court discussed there was different—whether FDA had improperly imposed what this Court viewed as a "de facto ban" on flavored e-cigarettes. *Wages*, 90 F.4th at 384 n.5; *RJRV*, 65 F.4th at 194 ("RJRV is likely to show that the FDA has instituted a *de facto* ban on non-tobacco-flavored e-cigarettes without going through notice-and-comment."). That is an argument that even amicus disclaims. *See* RJRV Br. 5 ("To be clear, the *de facto* ban (at the time) is not the [tobacco product] standard."). In any event, the relevant footnote in the en banc decision in this case was part of this Court's judgment that was vacated by the Supreme Court. *Wages*, 604 U.S. at 592. And whatever merit that footnote or the discussion in *RJRV* previously held, those decisions certainly do not support a tobacco-product-standard argument now that FDA has in fact authorized several flavored (specifically, menthol) e-cigarettes, which makes clear that there is no "*de facto* ban" on such products. *See supra* p. 8. Moreover, this Court's decisions in *Wages* and *RJRV* did not confront *Chenery* and *Bell Aerospace*'s rule that agencies are permitted to develop regulatory standards through adjudication. Petitioners have not identified any tobacco-product standard that FDA promulgated without required

46

procedures, nor was FDA required to issue such a standard prior to adjudicating petitioners' applications.[4]

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

*Of Counsel:*

MICHAEL B. STUART
  *General Counsel*
  *U.S. Department of Health and*
    *Human Services*

SEAN R. KEVENEY
  *Chief Counsel*

WENDY S. VICENTE
  *Deputy Chief Counsel, Litigation*

WILLIAM H. RAWSON
  *Associate Chief Counsel*

  *Food and Drug Administration*

MICHAEL S. RAAB

 s/ Joshua M. Koppel
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*
  *joshua.m.koppel@usdoj.gov*

April 2026

---

[4] Because this case does not involve menthol-flavored products, the Court need not address FDA's consideration of applications to market such products.  FDA will not respond to RJRV's argument (Br. 19-27) concerning FDA's resolution of applications not at issue here.

47

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Joshua M. Koppel*
Joshua M. Koppel

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit proposed in the parties' January 12, 2026, joint motion because it contains 8,990 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Joshua M. Koppel*
Joshua M. Koppel