IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 21-60766
consolidated with
No. 21-60800

_____

WAGES AND WHITE LION INVESTMENTS, L.L.C., doing business as
TRITON DISTRIBUTION,

*Petitioner*,

v.

FOOD & DRUG ADMINISTRATION,

*Respondent*.

_____

On Petition for Review of a Final Marketing Denial Order
by the United States Food and Drug Administration

_____

**PETITIONERS' SUPPLEMENTAL REPLY BRIEF**

_____

Eric N. Heyer
Joseph A. Smith
James C. Fraser
Anna M. Stressenger
THOMPSON HINE LLP
1919 M Street, N.W., Suite 700
Washington, D.C.  20036
Phone: 202.331.8800
Fax:  202.331.8330

*Counsel for Petitioners Wages and White
Lion Investments, L.L.C. d/b/a Triton
Distribution and Vapetasia, LLC*

i

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Nos. 21-60766 and 21-60800

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    Petitioners:

> Wages and White Lion Investments, LLC d/b/a Triton Distribution
> Vapetasia LLC

2.    Counsel for Petitioners:

> Anthony J. Hornbach
> Thompson Hine LLP
> 312 Walnut Street, Suite 2000
> Cincinnati, OH 45202
>
> Eric N. Heyer
> Joseph A. Smith
> James C. Fraser
> Anna M. Stressenger
> Thompson Hine LLP
> 1919 M Street NW, Suite 700
> Washington, DC 20036

3.    Respondent:

> United States Food and Drug Administration

4.    Counsel for Respondent:

> Benjamin Lewis
> U.S. Department of Justice
> Civil Division, Appellate Staff

950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Noah T. Katzen
U.S. Department of Justice
Civil Division
450 Fifth Street, NW
Washington, DC 20530

Sean R. Keveney
Wendy S. Vicente
U.S. Food and Drug Administration Food and Drug Division
Office of General Counsel
10903 New Hampshire Ave.
Silver Spring, MD 20993

5.    *Amici Curiae* for Petitioners and Counsel for *Amici Curiae:*

American Vaping Association, Inc.
American Vapor Manufacturers Association, Inc.
Consumer Advocates for Smoke-Free Alternatives Association, Inc
Smoke-Free Alternatives Trade Association, Inc.
United Vapers Alliance, Inc.
38 National and State ENDS Product Advocacy Associations

J. Gregory Troutman
Troutman Law Office, PLLC
4205 Springhurst Blvd., Suite 201
Louisville, KY 40241

Dr. David B. Abrams
Clive D. Bates
David T. Sweanor, J.D.

Mary G. Bielaska
Zanicorn Legal P.L.L.C.
845 Third Ave., 6th Floor
New York, New York 10022

Michael D. Matthews, Jr.

McDowell Hetherington LLP
1001 Fannin St., Suite 2700
Houston, TX 77022

Vapor Technology Association

Anthony L. Abboud, Esq.
950 Hawthorne Lane
Northbrook, IL 60062

R.J. Reynolds Vapor Company

Noel J. Francisco
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

6.    *Amici Curiae* for Respondent and Counsel for *Amici Curiae*:

American Academy of Pediatrics
American Academy of Family Physicians
American Cancer Society Cancer Action Network
American Heart Association
American Lung Association
American Medical Association
Campaign for Tobacco-Free Kids
Louisiana State Medical Society
Parents Against Vaping e-cigarettes
Truth Initiative Foundation d/b/a Truth Initiative

Leane K. Capps
Polsinelli, P.C.
2950 N. Harwood Street
Suite 2100
Dallas, TX 75201

Scott P. Lewis
Austin Paganelli Anderson
Anderson & Kreiger, LLP

iv

50 Milk Street
Boston, MA 02109

/s/ Eric N. Heyer
Eric N. Heyer

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................1

ARGUMENT ...............................................................................................3

    A.    Petitioners Have Adequately Preserved Their Notice-and-Comment Arguments .............................................................................................3

    B.    FDA Was Required to Engage in Notice and Comment ......................5

CONCLUSION ..............................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Anheuser-Busch Beer Labeling Mktg.*,
   664 Fed. Appx. 515 (6th Cir. 2016)....................................................................4

*Brown Express, Inc. v. United States*,
   607 F.2d 695 (5th Cir. 1979) .............................................................................11

*Brown-Forman Corp. v. NLRB*,
   169 F.4th 646 (6th Cir. 2026) ...........................................................................7, 8

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979).............................................................................................8

*FDA v. Wages & White Lion Invs., LLC*,
   604 U.S. 542 (2025).........................................................................................8, 14

*Hatley v. Lockhart*,
   990 F.2d 1070 (8th Cir. 1993) .............................................................................5

*Merrick v. Paul Revere Life Ins. Co.*,
   500 F.3d 1007 (Fed. Cir. 2007) ...........................................................................4

*Murphy v. IRS*,
   493 F.3d 170 (D.C. Cir. 2007)..............................................................................4

*NLRB v. Bell Aerospace Co.*,
   416 U.S. 267 (1974)............................................................................................17

*Phillips Petroleum Co. v. Johnson*,
   22 F.3d 616 (5th Cir. 1994) .......................................................................2, 12, 13

*R.J. Reynolds Vapor Co. v. FDA*,
   65 F.4th 182 (5th Cir. 2023) ........................................................................2, 6, 14

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947).............................................................................................8

*Shell Offshore Inc. v. Babbitt*,
   238 F.3d 622 (5th Cir. 2001) ......................................................................2, 6, 7, 12

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) ...................................................................8

*Tong v. Lumpkin*,
  90 F.4th 857 (5th Cir. 2024) ...................................................................4

*United States v. Potts*,
  644 F.3d 233 (5th Cir. 2011) ...................................................................4

*United Transp. Union v. Dole*,
  797 F.2d 823 (10th Cir. 1986) .................................................................5

*Wages & White Lion Invs., L.L.C. v. FDA*,
  90 F.4th 357 (5th Cir. 2024) .............................................................2, 4, 6

*W&T Offshore, Inc. v. Bernhardt*,
  946 F.3d 227 (5th Cir. 2019) ...............................................2, 10, 11, 12

**Statutes**

5 U.S.C. § 552 ............................................................................................6

5 U.S.C. § 553 .......................................................................................6, 13

21 U.S.C. § 387g ........................................................................................6

21 U.S.C. § 387j .................................................................................14, 15

28 U.S.C. § 2112 ........................................................................................9

**Regulations**

21 C.F.R. § 10.115 .....................................................................6, 8, 17, 18, 19

FDA, *Flavored Electronic Nicotine Delivery Systems (ENDS)
  Premarket Applications—Considerations Related to Youth Risk;
  Draft Guidance for Industry; Availability*, 91 Fed. Reg. 11980
  (Mar. 11, 2026) .....................................................................................20

**Other Authorities**

Cooper, et al., *E-Cigarette Use Among Middle and High School
  Students—United States, 2022*, 71 MMWR 1283 (Oct. 7, 2022),
  https://tinyurl.com/4vsw87wy ............................................................17

FDA, Press Release, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://bit.ly/2YsYmzd ................................................................18

FDA, Sample Technical Project Lead Review of ENDS-Product PMTA (Sept. 17, 2021), https://bit.ly/304PSyH ...............................................19

FDA, Technical Project Lead (TPL) of Nicotine Pouch PMTAs (Dec. 19, 2025), https://tinyurl.com/rye53bvz ..........................................................15

FDA, Technical Project Lead (TPL) of Nicotine Pouch PMTAs (Jan. 16, 2025), https://tinyurl.com/ypckrm98 .........................................................15

FDA, *Flavored Electronic Nicotine Delivery System (ENDS) Premarket Applications – Considerations Related to Youth Risk, Draft Guidance* (Mar. 11, 2026), https://tinyurl.com/5n7drdmh ......................19

Park-Lee, et al., *E-Cigarette and Nicotine Pouch Use Among Middle and High School Students—United States, 2024*, 73 MMWR 774 (Sept. 5, 2024), https://perma.cc/XFQ8-29HB ...........................................16, 17

## INTRODUCTION

This case presents a straightforward question on remand from the Supreme Court: Did the Food and Drug Administration violate the law when it adopted a sweeping new regulatory standard for flavored electronic nicotine delivery system ("ENDS") products without engaging in notice-and-comment rulemaking? The answer is yes.

FDA formulated its comparative efficacy standard not through careful consideration of any individual application, but in the abstract in an internal memorandum dated August 17, 2021. While FDA later rescinded the memorandum itself, it copied the memorandum's contents verbatim into every technical project lead review for flavored ENDS products, including those of Petitioners. FDA then uniformly applied the standard to deny marketing authorization for over 1 million flavored ENDS products, including Petitioners' e-liquids, based on the fact that the applications lacked the required comparative efficacy evidence. And not only did FDA develop its standard without reference to any particular application, but the agency ignored evidence in applications—including Petitioners'—that contradicted FDA's assumptions that provided the basis for the standard. FDA's comparative efficacy standard is a rule—and one that FDA was required to subject to notice and comment before it could lawfully take effect.

1

The *en banc* Court's decision in this case agreed. There, this Court concluded that FDA's failure to comply with notice-and-comment requirements required that the denial orders be set aside. 90 F.4th 357, 384 n.5; *see also R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 193 (5th Cir. 2023) ("*RJRV*") ("This is not a close call."). The Supreme Court reversed on other grounds but specifically declined to address the notice-and-comment question. Petitioners have repeatedly raised FDA's failure to engage in notice and comment since first highlighting it in their emergency motion to stay and continue to do so here. And, even if they hadn't done so, FDA would have suffered no unfairness, as it has now filed a 47-page brief exclusively dedicated to the issue.

A long line of Fifth Circuit authority—including this Court's *en banc* decision, 90 F.4th 357, 384 n.5; *RJRV*, 65 F.4th at 193; *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001); and *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994)—confirms that when an agency develops a new policy in the abstract and then applies it uniformly across the regulated industry, the agency has engaged in rulemaking, not adjudication. FDA's actions follow that pattern precisely.

FDA's supplemental brief advances several arguments in defense of its position that the comparative efficacy standard resulted from adjudication rather than rulemaking. But, as explained herein, none withstand scrutiny. The Court

2

should hold that FDA's comparative efficacy standard is a rule that required notice and comment before implementation and that FDA's failure to do so requires that Petitioners' denial orders be set aside.

## ARGUMENT

### A.     Petitioners Have Adequately Preserved Their Notice-and-Comment Arguments

Petitioners preserved their arguments that FDA was required to proceed through notice and comment before implementing its comparative efficacy standard. Arguing to the contrary, FDA mischaracterizes the record; FDA's supplemental brief is the *fourth* opportunity FDA has had to respond to this argument.

Petitioners first made this argument in Triton's emergency motion for stay, ECF 8 at 19-20, and then again in Petitioners' opening merits brief, ECF 85-2 at 45-47. FDA addressed the issue in its merits brief. ECF 114-2 at 56-57. Petitioners' *en banc* reply brief dedicated several pages to the argument, observing that "[s]ince November 2021, Petitioners have consistently argued that FDA's 'across-the-board comparative efficacy standard for flavored ENDS products'" is a rule and that "'FDA . . . unlawfully circumvented the notice-and-comment process' in adopting it." ECF 314 at 10-14. And at the Supreme Court, the argument figured prominently in both parties' briefs. Wages S. Ct. Br. in Opp. to Cert. Pet. 23-24 & n.23; Wages S. Ct. Br. 47-49; FDA S. Ct. Reply Br. 13-14.

3

Given this history, it is no surprise that Petitioners again press their notice-and-comment argument on remand. The purpose of the forfeiture rule is fairness; it exists to prevent courts from considering arguments to which the opposing party has not had an opportunity to respond. *See In re Anheuser-Busch Beer Labeling Mktg.*, 664 Fed. Appx. 515, 529 (6th Cir. 2016); *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (Fed. Cir. 2007). Fairness is not a concern here, as FDA dedicated most of its 47-page supplemental brief to the notice-and-comment issue, and thus has not been unfairly deprived of any ability to respond.

Further, the *en banc* Court did not consider the issue forfeited. Instead, the Court concluded that FDA's failure to comply with notice-and-comment requirements required that the denial orders be set aside. 90 F.4th at 384 n.5. Moreover, this alternative holding remains binding because the Supreme Court specifically declined to address it. *United States v. Potts*, 644 F.3d 233, 237 (5th Cir. 2011); *see also Tong v. Lumpkin*, 90 F.4th 857, 863-64 (5th Cir. 2024).

Additionally, even if Petitioners had not previously raised their notice-and-comment argument (which they have), circuit courts make exceptions when the issue raised is sufficiently important. *See Murphy v. IRS*, 493 F.3d 170, 173 (D.C. Cir. 2007) (vacating judgment, rehearing case, and, "[i]n view of the importance of the issue . . . belatedly raised," affirming district court's judgment for IRS "based upon

[a] newly argued ground"); *Hatley v. Lockhart*, 990 F.2d 1070, 1073 (8th Cir. 1993); *United Transp. Union v. Dole*, 797 F.2d 823, 827-28 (10th Cir. 1986).

The record of this petition for review illustrates that Petitioners' arguments are not new and, in any event, FDA has had an opportunity to thoroughly address them in its supplemental brief. Further, even if the arguments were new, given that the *en banc* Court's alternative holding was not affected by the Supreme Court's decision, the issue is of sufficient importance that the Court should address it now.

## B.    FDA Was Required to Engage in Notice and Comment

As Petitioners have explained (ECF 449 at 24-29), FDA's comparative efficacy standard is a rule adopted without the requisite notice and comment because FDA developed it outside the context of any specific application and premised the rule on a conclusion that all flavored ENDS products present a uniform, high, and immutable risk to youth without considering evidence found in Petitioners' applications of low youth usage of their bottled e-liquids that contradicted that rationale.

In its supplemental brief, FDA advances several counterarguments. Each of them fails.

**1.**    FDA first contends that Petitioners' notice-and-comment argument fails because the TCA does not require FDA to promulgate implementing regulations. But this Court has already held that the comparative efficacy

5

requirement—which applies *only* to flavored ENDS and requires those products to meet a heightened standard—is a tobacco product standard subject to notice and comment requirements. *See RJRV*, 65 F.4th at 193; *see also Wages*, 90 F.4th at 384 n.5.

But even setting that aside, FDA is wrong because it did not engage in a bona fide adjudication of Petitioners' applications. Rather, FDA created the comparative efficacy requirement in the abstract and without reference to any particular application. And even though FDA was not required to engage in rulemaking to govern PMTAs, once the agency opted to do so, it was required to proceed through notice and comment. *See* 5 U.S.C. §§ 552(a)(1) (providing that "a person may not . . . be adversely affected by, a matter required to be published in the Federal Register and not so published"), 553(b)-(d) (requiring notice and comment for substantive rules); 21 C.F.R. § 10.115(e), (g) (requiring notice and comment for interpretive rules that are "not readily apparent from the statute"); *see also* 21 U.S.C. § 387g(c)(1).

This Court's decision in *Shell Offshore* underscores why FDA's actions are properly characterized as a rule instead of as an adjudication. There, an agency denied the plaintiff's request to deduct costs for transporting oil that were based on a tariff rate that the plaintiff had filed with FERC. 238 F.3d at 625-26. Instead, the agency took the position that the plaintiff needed to file a petition with FERC seeking

6

confirmation that it had jurisdiction over the pipeline before the filed tariff rate could be used to calculate transportation costs. *Id*. This Court rejected the agency's position that its action was merely an adjudication and agreed with the plaintiff's argument that "the decision in the adjudication in this case was wholly predicated upon a new requirement that is, in effect, a new 'substantive' rule." *Id*. at 627-28. This was the case because the "new policy was the basis for the adjudication rather than the facts of the particular adjudication causing Interior to modify or re-interpret its rule. Interior did not apply a general regulation to the specific facts of Shell's case." *Id*. at 628. Instead, the Court emphasized, the agency "established a new policy and then applied that new policy to several OCS producers, including Shell. . . . The adjudication resulted because Interior changed its policy, and the district court did not err in reaching the policy change that controlled the adjudicative process." *Id*. at 628.

Similarly, the Sixth Circuit recently held unlawful the NLRB's attempt to rely on a substantive rule that it claimed to have developed via adjudication. *Brown-Forman Corp. v. NLRB*, 169 F.4th 646 (6th Cir. 2026). There, the NLRB issued a bargaining order under the Board's new *Cemex* standard, which it had announced in an adjudication. *Id*. at 653. The Sixth Circuit held that the *Cemex* standard was "improperly promulgated" "under the guise of an adjudication" because it was a

"general, non-case-specific rule[]" that "was not derived from the case-specific facts of the contemporaneous adjudication." *Id*. at 657, 663, 667.

So, too, here. The denial orders were similarly predicated on FDA's comparative efficacy standard that the agency first developed before it adjudicated applications and then applied to hundreds of applications.

**2.**    FDA argues that it was permitted to "do some additional interpretive work to explain the details of how the TCA's comparative standard applies" to flavored ENDS through adjudication. But, again, that is not what happened. When the Supreme Court cited *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947), and observed that "absent a statutory prohibition, agencies may generally develop regulatory standards through either adjudication or rulemaking," *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 582 (2025), the Court was not opining on whether FDA actually engaged in case-by-case adjudication when it devised its comparative efficacy standard. Additionally, the Court was not considering the applicability or requirements of 21 C.F.R. § 10.115(e) and (g). FDA's self-imposed restrictions on its ability to communicate new or different regulatory expectations "not readily apparent from the statute" are binding regulations that, like a statute, have the force of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979); *Sierra Club v. Sigler*, 695 F.2d 957, 972 (5th Cir. 1983). FDA limited its own latitude to develop and communicate new regulatory standards "not readily apparent from the

8

statute" through adjudication; it cannot simply disclaim those restrictions because they are now inconvenient.

3.     FDA also contends that any procedural error in issuing the August 17, 2021 memorandum is immaterial because when FDA rescinded the memorandum, it stated that it would not consider or rely on the memorandum when reviewing applications for flavored ENDS. But this hair-splitting argument ignores that while FDA did not cite to the memorandum itself in denying Petitioners' applications, the agency copied verbatim virtually the entire memorandum into the applicant-specific TPL reviews. And FDA did the same for *every other* application for a flavored ENDS product. The fundamental point is not whether FDA relied on the August 17, 2021 *memorandum* in denying Petitioners' applications, but whether FDA developed the comparative efficacy *standard* without reference to—and before adjudicating—any individual application. The contents of the August 17, 2021 memorandum are proof that FDA did so.[1]

Petitioners do not dispute that FDA's TPL reviews ultimately broadened the scope of potentially acceptable evidence beyond just those studies identified in the

---

[1] Further, despite FDA's purported rescission of the August 17, 2021 memorandum, FDA certified that the memorandum was among the "non-privileged materials retained in the FDA's files that were considered, either directly or indirectly, by the relevant officials in reaching the challenged decisions." ECF 71 at 2. It is unclear why FDA would have included the memorandum in the administrative record if it did not form part of the basis for the agency's issuance of the denial orders. *See* 28 U.S.C. § 2112(b) (providing that the record on review consists of "the order to be

August 17, 2021 memorandum—that is, a randomized controlled trial or longitudinal cohort study—to include "other evidence regarding the impact of the ENDS on switching or cigarette reduction that could potentially demonstrate the benefit of the[] flavored ENDS over tobacco-flavored ENDS." A85. But this was a minor, cosmetic modification that did not affect the binding rule—that flavored ENDS must outperform comparator tobacco-flavored ENDS with respect to switching and smoking reduction over time.

4.     FDA claims that it simply engaged in adjudication and argues that the Court owes this characterization "significant deference." Resp. Supp. Br. at 24-25 (citing *American Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000)). But this is not a correct statement of the law. In *W&T Offshore*, this Court observed that "[w]hile the Fifth Circuit may accord 'some deference' to the agency's characterization of its own rule, this deference is minimal—courts 'focus primarily' on the actual characteristics of the agency action.'" 946 F.3d at 237.

In *W&T Offshore*, the agency had developed internally a new royalty valuation methodology to which regulated lessees had to adhere; the agency did not

---

reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency"). FDA's certification that the memorandum is part of the administrative record is an admission that the agency relied on, at minimum, the substance of the memorandum when it denied Petitioners' applications.

apply a pre-existing regulation to the specific facts of the lessee's case. *Id*. at 238. Instead, the agency "followed up the development of a new policy with adjudications in which the new policy 'controlled the adjudicative process' and was applied across the board to a number of industry entities." *Id*. at 238-39. The Court held that the Department "may not cloak its development—and industry-wide application—of a new valuation methodology in the guise of simple adjudicative orders." *Id*. at 239.

The same conclusion holds for FDA's development and industry-wide application of its new comparative efficacy methodology. *W&T Offshore*'s caution that liberally embracing agencies' questionable claims of adjudication would render notice-and-comment requirements casualties of an "empty formalism" applies equally to the facts here:

> Indeed, [FDA]'s approach would permit an agency to create new policies and uniformly apply them to every industry entity going forward without ever undertaking notice and comment so long as it declined to say that it would necessarily stick to the policy forever. Our approach to the substantive-rule analysis, grounded in *Philllips Petroleum* and *Shell Offshore*, is not just an empty formalism that would permit that result.

946 F.3d at 239.

Contrary to its claims, FDA is not entitled to "significant deference" to its characterization of its actions as adjudicative in nature. Rather, it is "what the agency does in fact" that is decisive. *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979). What FDA did in fact here was impose a new standard (i)

without reference to any particular application and (ii) without considering evidence in Petitioners' applications that undermined FDA's stated rationale. The comparative efficacy standard is thus a rule, not the mere byproduct of an adjudication.

5.      FDA also claims that its August 17, 2021 memorandum was crafted as part of the agency's adjudications. This contention, of course, contradicts FDA's long-stated position that the memorandum played no role in the adjudication of Petitioner's applications. FDA Supp. Br. at 15, 27-28; FDA S. Ct. Reply Br. at 11-12; ECF 114-2 at 41-42. But, more importantly, as Petitioners have explained, FDA *ignored* applicant-specific evidence—i.e., that flavored bottled e-liquids are not used by many youth—in formulating its "findings" that *all* flavored ENDS pose an equally high and immutable risk of youth initiation regardless of device type. *See* Pet. Supp. Br. at 24-29. This critical fact belies FDA's contention that its formulation of the comparative efficacy standard was merely part of the adjudicative process and illustrates the legislative-type judgment FDA exercised.

Further, as *Shell Offshore* and *W&T Offshore* make clear, the mere fact that a standard established in an internal memorandum was later applied to generate final agency orders does not mean that the standard can avoid notice-and-comment requirements. In *Phillips Petroleum*, the Court rejected the agency's contention that an internal agency paper that provided the basis for later agency orders was not a

rule, but rather a mere general statement of policy. The Court first noted that "[t]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." 22 F.3d at 619. After noting that the agency paper did not set a goal for future proceedings to achieve because the change had already been made, was immediately effective, and had a substantial impact on the regulated industry by dramatically affecting the royalty value of all oil and gas leases, the Court concluded that the agency paper was a substantive rule that violated 5 U.S.C. § 553 because it did not go through notice and comment before it adversely affected the plaintiffs. *Id*. at 619-21.

Similarly, here, FDA developed its comparative efficacy standard through an internal, unpublished memorandum, then applied that standard to generate denial orders. Like the valuation methodology in *Phillips Petroleum*, FDA's comparative efficacy standard was immediately effective and had a substantial impact on "an important class of the members [of the regulated industry] or the products of that industry [such that] notice and opportunity for comment should first be provided." 22 F.3d at 620. The mere fact that FDA developed the standard while premarket applications were pending does not insulate the standard from notice and comment requirements.

**6.** FDA also advances a harmless error argument, contending that even if the comparative efficacy standard was a rule, any error would be immaterial because the denial orders are fully supported by the application-specific TPL reviews. But, once again, the TPL reviews do little more than recite word-for-word the same standard and supporting rationale that FDA developed for the first time in its August 17, 2021 memorandum.

And it simply is not the case that the denial orders "are fully supported by the text of the TCA alone." If the denial orders had relied solely on the text of 21 U.S.C. § 387j, FDA would not have needed eleven pages, 24 footnotes, and 66 references to justify its conclusions. Further, nothing in the text of section 387j references flavored tobacco products at all, much less any requirement to compare flavored ENDS to tobacco-flavored ENDS with respect to smoking cessation. The Supreme Court's conclusion that FDA's comparative efficacy standard was a "predictable outgrowth from previous guidance" in which "it is hard to find . . . any specific commitments about exactly what sorts of scientific evidence an applicant would have to provide" and which did not "lay down any clear test" forecloses FDA's argument that the text of the TCA alone sufficed to support the denial orders. 604 U.S. at 572, 581. Further, as amicus R.J. Reynolds Vapor Company correctly notes, RJRV, *Amicus* Br. 9 (Mar. 13, 2026), FDA has never applied the comparative efficacy requirement to flavored tobacco products other than ENDS; indeed, the

14

agency's authorization of several flavored nicotine pouch products without evidence that non-tobacco flavors outperform tobacco flavor with regard to switching means the requirement *cannot* stem from the statutory text. *See* FDA, Technical Project Lead (TPL) of Nicotine Pouch PMTAs (Jan. 16, 2025), https://tinyurl.com/ypckrm98; FDA, Technical Project Lead (TPL) of Nicotine Pouch PMTAs (Dec. 19, 2025), https://tinyurl.com/rye53bvz.

7.    FDA points to the fact that the TCA allows FDA to consider "any other information before [the agency] with respect to such tobacco product," 21 U.S.C. § 387j(c)(2), as justification for its failure to account for specific evidence of risk in Petitioners' applications. But it is not the mere fact that FDA relied on evidence that may not have been included in any particular application that renders the comparative efficacy requirement a rule; rather, it is the fact that FDA relied on this extra-application evidence while simultaneously failing to consider countervailing and contradictory evidence actually found in Petitioners' applications (as well, presumably, in those of hundreds of other applicants) that renders FDA's development of the comparative efficacy standard in August 2021 a rulemaking and not an adjudication. As Petitioners have explained, this evidence was that flavored

15

bottled e-liquids do not present the same high risk of youth usage as other flavored ENDS products.

**8.**     FDA argues that its supposed adoption of the comparative efficacy standard in adjudication allows the agency to remain flexible in light of evolving market conditions. But, if anything, FDA's continued application of the standard in the face of facts that undercut FDA's stated rationale only serves as further proof that the standard is a rule.

As FDA has emphasized throughout this case, one of the agency's conclusions underlying its adoption of the comparative efficacy standard was that flavors drive youth usage and that the "appeal of flavor is consistent across ENDS types." A171-72, A174; *see also* A89, A141. FDA emphasized the sharp increase in youth usage of flavored disposable ENDS once most flavored cartridge-based ENDS were removed from the market in 2020 as support for this conclusion. A172; A90, A142. However, since 2019, youth usage of all ENDS products has dropped dramatically—from a high of 27.5% of high schoolers reporting usage in the last 30 days down to only 7.8% in 2024.[2] In recent years, youth usage of disposable ENDS declined as well, from an estimate of 1,390,000 middle and high school students nationwide in

---

[2] *Compare* A235-36 *with* Park-Lee, et al., *E-Cigarette and Nicotine Pouch Use Among Middle and High School Students—United States, 2024*, 73 MMWR 774 (Sept. 5, 2024), https://perma.cc/XFQ8-29HB.

16

2022 to 870,000 middle and high school students in 2024.[3] But, contrary to FDA's underlying assumption, youth usage of flavored bottled e-liquids has not increased as a result. Instead, it has declined by almost a third.[4] Nevertheless, despite this data undermining a major factual predicate for FDA's comparative efficacy standard, FDA did not modify the standard. FDA's unwillingness to revisit or adjust its comparative efficacy standard in light of evidence that contradicts the assumptions that underlie the standard further demonstrates that the standard is a rule, not a mere principle announced through adjudication.

9.    FDA claims that it did not violate the plain terms of its good guidance practices regulation, 21 C.F.R. § 10.115. FDA argues that because it did not publish to the general public either the denial orders at issue here or its internal August 17, 2021 memorandum, 21 C.F.R. § 10.115's notice and comment requirements do not apply. Setting aside the inconsistency between the confidential nature of the denial orders and FDA's position that the orders were adjudications that publicly "announced new principles" under *NLRB v. Bell Aerospace Co.*, 416 U.S. 267

---

[3] *Compare* Cooper, et al., *E-Cigarette Use Among Middle and High School Students—United States, 2022*, 71 MMWR 1283, 1284 (Oct. 7, 2022), https://tinyurl.com/4vsw87wy, *with* Park-Lee, et al., *supra* note 2.

[4] *Compare* Cooper, et al., *supra* note 3 (estimating that 160,000 middle and high school students used a tank or mod system compatible with bottled e-liquids at least once in the last 30 days), *with* Park-Lee, et al., *supra* note 2 (estimating only 110,000 students in this category).

17

(1974), FDA splits hairs by focusing on the document through which the new standard was communicated rather than the substance of the new standard itself. The salient point is that none of the documents FDA generated that articulated the comparative efficacy standard went through any notice-and-comment process. And, because the standard was a "new or different regulatory expectation . . . not readily apparent from the statute," 21 C.F.R. § 10.115(e) and (g) required notice and comment before the standard could be implemented.

FDA publicly indicated its adoption of the new standard for the first time through its August 26, 2021 press release. The release explained that "the agency has reviewed the applications subject to this action to determine whether there is sufficient product-specific scientific evidence to demonstrate enough of a benefit to adult smokers that would overcome the risk posed to youth," that "the evidence of benefits . . . would likely be in the form of a randomized controlled trial or longitudinal cohort study," and that "[b]ecause this evidence was absent in these applications, the FDA is issuing MDOs."[5] By explaining that product-specific evidence of benefits "likely in the form of a randomized controlled trial or longitudinal cohort study" was required, the press release "informally

---

[5] FDA, Press Release, *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://bit.ly/2YsYmzd.

18

communicate[d] new or different regulatory expectations to a broad public audience for the first time." 21 C.F.R. § 10.115(e)

Further, if there were any doubt about whether the press release's level of specificity sufficed to "communicate new or different regulatory expectations," no such doubts could exist about FDA's publication of the sample TPL review on September 17, 2021. Like Petitioner's TPL reviews, the sample TPL review was copied almost entirely verbatim from the August 17, 2021 memorandum and explained in detail FDA's new comparative efficacy evidentiary standard and the rationale underlying it.[6]

10.   Finally, FDA's recent publication of a new guidance on PMTAs for flavored ENDS illustrates the contrast between FDA's actions in 2021 and proper compliance with the agency's good guidance regulation. Perhaps cognizant of the shortcomings of its previous approach (and the resulting flood of judicial challenges), FDA published a draft guidance explaining its position on the marginal additional benefit manufacturers of fruit- and sweet-flavored ENDS must show over tobacco-flavored ENDS as compared to menthol, mint, and spice flavors. *See* FDA, Flavored Electronic Nicotine Delivery Systems (ENDS) Premarket Applications – Considerations Related to Youth Risk, Draft Guidance (Mar. 11, 2026),

---

[6] FDA, Sample Technical Project Lead Review of ENDS-Product PMTA (Sept. 17, 2021), https://bit.ly/304PSyH.

https://tinyurl.com/5n7drdmh. FDA simultaneously published a notice of the draft guidance in the *Federal Register* and invited public comments. 91 Fed. Reg. 11980-81 (Mar. 11, 2026). FDA failed to engage in this process when it adopted the comparative efficacy standard and likewise failed to allow applicants any opportunity to satisfy the new requirement.

## CONCLUSION

The Court should grant the petitions for review and set aside the denial orders.

Respectfully submitted,

THOMPSON HINE LLP

By:   /s/ Eric N. Heyer

Eric N. Heyer
Joseph A. Smith
James C. Fraser
Anna M. Stressenger
1919 M Street, NW, Suite 700
Washington, DC 20036
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
Joe.Smith@ThompsonHine.com
James.Fraser@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com

*Counsel for Petitioners*

20

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2026, I caused the foregoing Petitioners'
Supplemental Reply Brief to be filed with the Clerk's Office for the United States
Court of Appeals for the Fifth Circuit using the CM/ECF system and thereby
electronically served on all counsel of record.


        /s/ Eric N. Heyer
        Eric N. Heyer

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Petitioners' Supplemental Reply Brief complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32. The word count feature found in Microsoft Word reports that the Supplemental Brief contains 4,493 words, excluding the items exempted under Fed. R. App. P. 32(f).

The Petitioners' Supplemental Reply Brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

/s/ Eric N. Heyer
Eric N. Heyer
